# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| CARRIER CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>TECHNOLOGY RESEARCH, LLC, F/K/A TECHNOLOGY RESEARCH CORPORATION,<br><br>Defendant.<br>_____/<br><br>TECHNOLOGY RESEARCH, LLC, F/K/A TECHNOLOGY RESEARCH CORPORATION,<br><br>Conditional Counterclaimant,<br><br>v.<br><br>CARRIER CORPORATION,<br><br>Conditional Counterdefendant. | CASE NO.:<br>8:21-cv-00008-VMC-AAS |

### DEFENDANT/COUNTERCLAIMANT'S
### DAUBERT MOTION TO EXCLUDE JEFFERY E. LINDSEY
### AND INCORPORATED MEMORANDUM OF LAW

COMES NOW Defendant/Counterclaimant Technology Research, LLC ("TRC") and respectfully shows as follows:

1

## INTRODUCTION

TRC was an industry leader in incorporating technology that could detect damage to a cord[1], then cut off the power supply before the cord could start a fire. Cord fires generally occur when a cord has been damaged (due to impact from heavy objects, damage from a vacuum cleaner, or damage from being pinched in doors):



[TRC 004711].

---

[1] It is important to know that TRC's Fire Shield technology scans for damage to the **cord**- not every component of the cord set, PTAC unit, or outlet.

As explained above, if cord damage is detected- a pair of contacts within the plug will open and disconnect power.

Mr. Lindsey attempts to criticize the contacts, but fumbles in every attempt. Mr. Lindsey lists three "possible" hypotheses, but then freely admits that he "found **no evidence to suggest which of these three possibilities** listed above is the cause of the failure of the TRC LCDI relay contacts…". [Doc. # 76-1, pg. 18] (Emphasis added).

Despite having access to numerous photos of the subject cord set, Mr. Lindsey **did not formulate an opinion about the thermal damage to very cord set at issue**. [Lindsey Depo.: 156:25-157:13]. Carrier's counsel limited him to investigate **other** cords that are not at issue in this case:

> **Matter Assignment**
>
> SEA, Ltd. was contacted on March 16, 2018, by Ms. Tiffany Winks of Hall Booth Smith, P.C.to conduct a failure investigation into a group of TRC Leakage Current Detection Interrupter (LCDI) protected cord sets utilized on Carrier Corporation Packaged Terminal Air Conditioning (PTAC) equipment. This investigation was assigned to S-E-A Senior Technical Consultant Jeffrey E. Lindsey, as S-E-A Matter No. 01.084913
>
> **Scope**
>
> Specifically, S-E-A was asked to investigate the cause of damage to a group of TRC LCDI cord sets that had been removed from customer-owned Carrier PTAC units.

But Mr. Lindsey did not even bother to inspect all the cords he was provided by Carrier's counsel. [Deposition of Jeffery Lindsey, 41:8-13, attached hereto as Ex. 1].

Perhaps most telling is that Mr. Lindsey, a fire origin and cause expert, was **not even asked to investigate the cause of the subject fire**. [Doc. # 76-1, pg. 17]. Mr. Lindsey's investigation was intentionally misdirected by Carrier's counsel from the outset. Then his investigation was haphazard and flawed in its execution.

Mr. Lindsey should be excluded because he is not qualified to offer design or manufacturing opinions, has not followed a proper methodology, and his opinions would not be helpful to the jury.

## ARGUMENT AND CITATION TO AUTHORITY

To be admitted as an expert and offer opinion testimony to a jury, a proposed expert must first pass "a rigorous thee-part inquiry". See Camacho v. Nationwide Mut. Ins. Co., 13 F. Supp. 3d 1343, 1365 (N.D. Ga. 2014).

> Under Federal Rule of Evidence 702, expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue.

Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1304 (11th Cir. 2014). The proponent of expert testimony has the burden with respect to each of these three

4

requirements. See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence.").

## I. MR. LINDSEY IS NOT QUALIFIED TO OFFER DESIGN OR MANUFACTURE OPINIONS.

Under Federal Rule of Evidence 702, an expert witness must be qualified by "knowledge, skill, experience, training or education." "Expertise in one field does not qualify a witness to testify about others." Lebron v. Sec'y of the Fla. Dep't of Children & Families, 772 F.3d 1352, 1368 (11th Cir. 2014) (collecting cases).

Although a witness may be qualified to provide opinions regarding the reconstruction of an event, to offer design opinions, the witness also must have expertise in the design of the product. See, e.g., Zaremba v. Gen. Motors Corp., 360 F.3d 355, 359 (2d Cir. 2004) (recognizing that an engineer's qualification as an accident reconstructionist did not allow him to opine on automotive design issues). Smith v. Ford Motor Co., 882 F. Supp. 770, 772 (N.D. Ind. 1995) (expertise in fire origin and cause insufficient to opine on design issues).

### 1. Admission of Lack of Design Knowledge

Mr. Lindsey admitted he is not an expert in the area of LCDI design:

Q: Do you consider yourself an expert in the area of LCDI design?

[Carrier Counsel]: Object to the form.

5

> A: **I wouldn't hold myself out to be an expert in – in the design of LCDIs.**

[[Lindsey Depo.:, 147:14-18] (Emphasis added). Mr. Lindsey has never designed any component of a PTAC unit or LCDI cord set. [Lindsey Depo.: 74:1-3]. See <u>U.S. v. Paul</u>, 175 F.3d 906, 912 (11th Cir. 1999) (upholding exclusion of proffered handwriting expert because he had received no formal training in field, had never attended seminars on handwriting analysis, had never worked in the field, and was not member of any relevant professional organizations); <u>Wright v. Case Corp.</u>, No. CIV.A.1:03CV1618-JEC, 2006 WL 278384, at *3 (N.D. Ga. 2006) (finding that proffered expert's engineering degree was not enough to qualify him to provide opinions about machinery with which he had little experience).

2. **Admission of Lack of Manufacturing Knowledge**

Mr. Lindsey is not qualified to offer opinions regarding LCDI manufacturing. Mr. Lindsey admitted he was not an expert in LCDI manufacturing:

> Q: But do you consider yourself an expert in LCDI manufacturing?
>
> A: **No.**

[Lindsey Depo.: 148:2-4]. Mr. Lindsey could not testify as to the manufacturing process for LCDI cord sets in general or the manufacturing process of the cord sets' component parts. [Lindsey Depo.: 169:24-170:170:15].

6

## II. MR. LINDSEY'S METHODOLOGY IS NOT RELIABLE.

"Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) **tested**." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993) (Emphasis added). "Another pertinent consideration is whether the theory or technique has been subjected to **peer review and publication**." Id. (Emphasis added).

### 1. Mr. Lindsey Admits He Cannot Even Identify A Defect.

Mr. Lindsey is unable to identify an alleged defect within the TRC 37190 cord set. Instead, in his report he lists three "possible" hypotheses:

> - The high electrical resistance measured in a sampling of the TRC cord sets was caused by a defect within the TRC's relay contacts that was responsible for the overheating of the TRC LCDI cord sets. S-E-A has identified three possible causes for this defect:
>   - The relay contacts are insufficiently rated for the electrical current which the TRC LCDI is rated. This design defect would cause the contacts to be damaged during normal use of the LCDI.
>   - The relay contacts are defectively manufactured and fail during normal use of the LCDI.
>   - The relay contacts are damaged during assembly into the LCDI at the TRC manufacturing facility.
>
> S-E-A has found no evidence to suggest which of these three possibilities listed above is the cause of the failure of the TRC LCDI relay contacts, however, TRC is responsible regardless: TRC should have a testing and Quality Control program that identifies defective or inadequate components prior to their assembly into the LCDI. In addition, any damage that occurs to the components while being handled or installed at the TRC manufacturing facility would also be the responsibility of TRC.

[Doc. # 76-1, pg. 18; Lindsey Depo.: 153:23-154:1]. However, Mr. Lindsey admits that **none of the foregoing possibilities** are more likely than not the cause of (1) the thermal damage to the TRC 37190 cords he inspected; (2) the thermal damage to any TRC 37190 cords; or (3) the subject fire in Room 203 of the Toccoa Inn:

> Q: You cannot state if any of these three alleged defects more likely than not caused the thermal damage in any of the TRC cords you inspected; is that correct?
>
> [Carrier's Counsel]: Object to form.
>
> A. That's correct.
>
> Q. You cannot state that any of these three alleged defects more likely than not caused thermal damage or a fire in any 37190 cord; is that correct?
>
> A. That's correct.
>
> Q. You cannot state that any of these three alleged defects more likely than not caused the fire in room 203; is that correct?
>
> A. That is correct.

[Lindsey Depo.: 156:25-157:13].

### 2. Mr. Lindsey's Opinions are Not Based Upon a Reliable Methodology.

Plaintiffs must also show under Rule 702 that the witness' opinions are reliable. When evaluating the reliability of an expert opinion, the trial court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." U.S. v. Frazier, 387 F.3d 1244, 1261–1262 (11th Cir.

8

2004). Moreover, the Supreme Court in Daubert noted that "[s]cientific methodology today is based on **generating hypotheses and testing them** to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993) (emphasis added).

The Eleventh Circuit has cautioned that the second Daubert requirement, proof of a reliable methodology, must be strictly enforced. It is "entirely proper - indeed necessary - for the district court to focus on the reliability of [the expert's] sources and methods. To hold otherwise would encourage trial courts to simply rubber stamp the opinions of expert witnesses once they are determined to be an expert." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1336 (11th Cir. 2010). "Under the regime of Daubert a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." Allison, 184 F.3d at 1316–17 (punctuation and citation omitted). "[A]t all times the district court must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it." Kilpatrick, 613 F.3d at 1336.

### A. Mr. Lindsey's Hypothesis Regarding the Rating of TRC's Relay Contacts.

One of Mr. Lindsey's possible hypotheses is that "the relay contacts [within TRC's cord sets] are insufficiently rated for the electrical current which the TRC

9

LCDI is rated." [Doc # 76-1, pg. 18]. The TRC LCDI is rated for 20 amperages of current. [Lindsey Depo.: 158:15-18]. At his deposition, Mr. Lindsey alleged TRC's relay contacts were defective because they were unable to carry 20 amperages of current without degrading. [Lindsey Depo.: 158:13-164:3].

Importantly, Mr. Lindsey was unable to explain **how** the relay contacts were insufficiently rated. [Lindsey Depo.:161:9-165:14]:

> Q: Is that what you're talking about in this first bullet point, that the material used was not properly rated for this amount of electrical current?
>
> [Carrier Counsel]: Object to the form.
>
> A. One of the possibilities I've identified is that something about the electrical contact, its shape, its surface, its size, is insufficient to uniformly and continually carry 20 amps of current.
> …
> These – one of the explanations for this is they are degrading, and one of the possibilities of that is there isn't enough contact surface area or the surface area is not sufficiently smooth or there's some other issue **which I don't know what it is** but what I believe is that over time one of the possibilities is that the contact resistance degrades, and these relays derate themselves.
>
> Q. So what you're describing is in – what you just described is that you think the design of these contacts in terms of the shape, surface, or size can degrade over time and that can cause a problem; is that right?
>
> [Carrier Counsel]: Object to the form.
>
> A. Yes.
>
> Q. What -- have you made any measurements of the shape, surface, or size of these contacts?

> A. Well, I measured the size of the contacts. I measured the diameter of the contacts. They are smaller than the Tower contacts.
>
> Q. All right. What –
>
> A. They're shaped -- they're shaped different -- they have an entirely different shape. One of them is round. On the TRC -- on the Tower contacts they are both round spheroid contacts which is typically what I see, okay? And on the TRC contacts, one is a round smaller diameter spheroid and then the other, the stationary contact, is a rectangular shape. So they're shaped differently.
>
> **It's just an observation. I don't know if it means anything or not**, but it simply tells me that there are differences and possibly those differences have something to do with what's going on with these contacts. **I just don't know. That's why it's a possibility rather than what happened.**

[Lindsey Depo.: 161:9 – 164:23]. Mr. Lindsey failed to perform any testing to prove his hypothesis that the shape, surface, or size of the relay contacts were insufficiently rated. [Lindsey Depo.: 164:24-165:8]. He further failed to test the sufficiency of the relay contact's spring pressure and did not measure the relay's contact point. [Lindsey Depo.: 207:14-21]. Finally, Mr. Lindsey admits the material used within the relay contact – silver cadmium – was sufficient. [Lindsey Depo.: 207:22-208:1].

Mr. Lindsey's defect opinions are based almost, if not entirely, upon the contact resistance measurements and thermal testing of previously **damaged** TRC plugs removed from customer-owned Carrier PTAC units. [Doc. 76-1, pg. 55-56;

Lindsey Depo.: 22:8-23:25, 97:23-98:6, 134:16-135:25].[2] Mr. Lindsey failed to identify how the cord sets were damaged and acknowledges the cord sets could have been damaged from outside factors, including lighting strikes, physical damage, improper or partial plugging, oversized breakers, loose outlet jaws, etc. [Lindsey Depo.: 89:16-96:15]. Moreover, his analysis compares the **damaged** TRC cord sets to the **undamaged** cord sets of a competitor [Doc. # 76-1, pg. 55-56; Lindsey Depo.: 138:8-22].

Mr. Lindsey offers no evidence to support his hypothesis regarding the sufficiency of TRC's relay contacts. His opinions are mere speculation and should be excluded.

### B. Mr. Lindsey Has Not Tested His Manufacturing Hypotheses.

Mr. Lindsey has offered two manufacturing hypotheses: (1) "[t]he relay contacts are defectively manufactured and fail during normal use of the LCDI" and (2) "relay contacts are damaged during assembly into the LCDI at the TRC manufacturing facility." [Doc. 76-1, pg. 18]. Mr. Lindsey's only support for the alleged hypotheses are "gouges" found on the relay contacts of **one** TRC cord set:

> Q. Let's go down to the second which is defective manufacture. What is the manufacturing defect specifically?

---

[2] Of approximately 150 cord sets received, Mr. Lindsey performed testing on only two TRC cord sets exhibiting "no **external** damage" – cord sets 5C and 5E. Cord set 5C was not considered in Mr. Lindsey's report. Mr. Lindsey second guessed his labeling of 5E as having "no external damage" considering the contact resistance measurements. [Lindsey Depo.: 134:16-135:25]. Mr. Lindsey further failed to adequately photograph these cord sets or record the testing performed upon same. [Lindsey Depo.: 51:20-54:10].

> A. Well, in at least one or two of them there's physical damage on the contact surface that's not related to their use and it's not related to electrical activity. There's mechanical gouges. Now, either they came from the supplier that way or they were damaged when they were being assembled at the TRC facility.
>
> …
>
> Q. Other than the scrape marks that we'll look at, did you see any evidence of defective manufacturing?
>
> A. No, I did not. And I didn't look either. That was -- that was -- that's not something I really spent time doing. That's why this is a possibility.

[Lindsey Depo.: 167:23-169:23, 172:13-19]. Mr. Lindsey was unable to describe the source of the "gouges," the manufacturing process for the relay contacts, and was unable to opine whether the "gouges" caused overheating:

> Q: [C]an you tell us what the source of this mechanical damage is?
>
> A. No. I don't know.
>
> Q. And I'm looking at Figure 37. Can you tell us what the source of that mechanical damage is?
>
> A. No.
>
> Q. What is the significance of that to your opinions?
>
> A. It shouldn't be there. I mean, that's -- that's just –
>
> Q. Are you contending that's part of what caused the overheating?
>
> A. I think -- I don't know necessarily that it -- I'm just saying that's indicative that there's some kind of issue during the manufacture of this LCDI that that occurred. **That's all -- it's just an observation.**

13

[Lindsey Depo.: 169:24-170:4; 202:4-21]. Mr. Lindsey offers no evidence to support his manufacturing hypotheses and his hypotheses are unrelated to the ultimate issue in this matter – the cause of the fire in Room 203 of the Toccoa Inn. Accordingly, Mr. Lindsey's expert testimony should be excluded.

### 3. Mr. Lindsey's Three Hypotheses Have Not Been Subjected to Peer Review.

A lack of review and support by the relevant authorities is fatal to any novel theory sought to be imposed in litigation. McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1255 (11th Cir. 2005) (reversing admission of experts where "[t]he medical literature does not support [their] opinions" and the "experts took leaps of faith and substituted their own *ipse dixit* for scientific proof on essential points"); cf. Sexton By & Through Sexton, 926 F.2d at 337 (vacating plaintiff's judgment and holding that proposed testimony should not have been allowed to reach the jury where, among other flaws, "[n]o literature was presented to indicate that anyone—industry, government, or consumers—recognized a need for greater protection . . . than that provided for by these [existing] standards.").

Mr. Lindsey was unable to cite to any peer reviews or publications adopting his design or manufacturing hypotheses. [Lindsey Depo.: 10:22-11:13, 150:17-21]. In contrast, the design of TRC's 37190 and 37190 MMV cord sets were certified by Underwriter Laboratories and their safety approved by the Consumer Product Safety

Commission, an independent agency of the United States government. [Lindsey Depo.: 158:23-25, 214:6-216:20].

Mr. Lindsey's design and manufacturing hypotheses fail as they have not been subjected to peer review or publication. Hence, Mr. Lindsey's expert testimony should be excluded.

### III.   MR. LINDSEY'S HYPOTHESES ARE NOT RELATED TO THE CAUSE OF THE FIRE, THUS SHOULD BE EXCLUDED AS UNHELPFUL TO THE JURY.

Expert testimony also does not help the trier of fact if it fails to "fit" with the facts of the case. McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004). This occurs when "a large analytical leap must be made between the facts and the opinion." Id. The court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1121 (10th Cir. 2004).

Mr. Lindsey's design and manufacturing hypotheses are unhelpful to the trier of fact. First, Mr. Lindsey is unable to identify which of his three possible hypotheses allegedly caused the TRC's cord sets he examined to allegedly overheat. [Doc. # 76-1, pg. 18; Lindsey Depo.: 153:23-156:13]. Although multiple photos of the subject cord set exist, Mr. Lindsay does not opine about the cause of the overheating of the subject cord set.

Second, and more importantly, Mr. Lindsey admits he does **not** opine that any of his hypotheses were the **cause** of the fire in Room 203 of Toccoa Inn – the central issue in this case. [Lindsey Depo.:156:25-157:13]. Mr. Lindsey has no opinions regarding the cause-and-origin of the subject fire. [Lindsey Depo.: 149:1-7]. For these reasons, Mr. Lindsey's hypotheses should be excluded under Rule 702 of the Federal Rules of Evidence.

## CONCLUSION

For the reasons stated herein, TRC respectfully requests that this Court grant its Motion and exclude Mr. Lindsey from testifying at trial.

## RULE. 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g) Local Rules, United States District Court of the Middle District of Florida, the undersigned counsel certifies that he has (1) conferred with opposing counsel by way of email and (2) opposing counsel has not agreed to this Motion.

This 12th day of October, 2021.

WATSON SPENCE, LLP

/s/ Michael R. Boorman
Michael R. Boorman
*Admitted pro hac vice*
mboorman@watsonspence.com
Evan E. Smith, IV
*Admitted pro hac vice*
esmith@watsonspence.com
999 Peachtree Street NE

Suite 1130
Atlanta, Georgia 30309
Telephone: (229) 436-1545
Facsimile: (678) 331-7070

Christopher A. Cazin
Florida Bar No. 43515
ccazin@wickersmith.com
Michael E. Reed
Florida Bar No. 961760
mreed@wickersmith.com
WICKER SMITH O'HARA MCCOY & FORD, P.A.
100 N. Tampa Street
Suite 1800
Tampa, Florida 33602
Telephone: (813) 222-3939
Facsimile: (813) 222-3938

*COUNSEL FOR DEFENDANT TECHNOLOGY RESEARCH, LLC*

17

## **CERTIFICATE OF SERVICE**

I hereby certify I have served a copy of the within and foregoing upon all counsel of record and the Clerk of the Court via electronic filing using the CM/ECF system, to wit:

R. Ryan Rivas
HALL BOOTH SMITH, P.C.
2701 North Rocky Point Drive, Suite 400
Tampa, Florida 33607
rrivas@hallboothsmith.com
*Attorney for Plaintiff*

Kevin T. Kucharz
HALL BOOTH SMITH, P.C.
191 Peachtree Street, N.E., Suite 2900
Atlanta, Georgia 30303
kkucharz@hallboothsmith.com
*Attorney for Plaintiff*

This 12th day of October, 2021.

>/s/ Michael R. Boorman
>Michael R. Boorman
>*Admitted pro hac vice*