# EXHIBIT 1

Jeffrey Lindsey

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

- - -

Carrier Corporation,              :
                                  :
        Plaintiff,                :
                                  :
   vs.                            : Case No.
                                  : 8:21-cv-00008-VMC-AAS
Technology Research, LLC, :
f/k/a Technology Research :
Corporation,                      :
                                  :
        Defendant.                :

- - -

VIDEO DEPOSITION

of Jeffrey E. Lindsey, P.E., IAAI-CFI, taken before

me, Karen Sue Gibson, a Notary Public in and for the

State of Ohio, via Zoom, on Thursday, August 26,

2021, at 10:29 a.m.

- - -

VOLUME I

- - -

ARMSTRONG & OKEY, INC.
222 East Town Street, Second Floor
Columbus, Ohio  43215-5201
(614) 224-9481 - (800) 223-9481

- - -

Jeffrey Lindsey

2

1   APPEARANCES:

2           Hall Booth Smith, P.C.
            By Mr. Kevin Kucharz
3           191 Peachtree Street NE, Suite 2900
            Atlanta, Georgia 30303-1775
4
                On behalf of the Plaintiff.
5
            Watson Spence, LLP
6           By Mr. Michael R. Boorman
            999 Peachtree Street NE, Suite 1130
7           Atlanta, Georgia 30309

8               On behalf of the Defendant.

9    ALSO PRESENT:

10       Mr. Sam Javor, Videographer.
                        - - -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jeffrey Lindsey

3

1                        INDEX

2                       - - -

3      EXHIBIT                              IDENTIFIED

4      1  Notice of Deposition                    5

5      2  Screenshot of Mr. Lindsey's File
          Materials                              12

6

7      3  Thermocouple Apparatus                 78

       4  Screenshot of Figure 6                183
8
       5  Screenshot of Figure 20               193
9
       6  Screenshot of Figure 29               198
10
       7  Screenshot of Figure 30               200
11
                              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           Thursday Morning Session,

2           August 26, 2021.

3                 - - -

4           THE VIDEOGRAPHER:  Okay.  The time is

5    approximately 10:29 a.m.  The camera is roll --

6    rolling, and we are now on the record.  You may now

7    swear in the witness.

8                 - - -

9           JEFFREY E. LINDSEY, P.E., IAAI-CFI

10   being by me first duly sworn, as hereinafter

11   certified, deposes and says as follows:

12                CROSS-EXAMINATION

13   By Mr. Boorman:

14        Q.   All right, Mr. Lindsey.  Can you please

15   state your full name for the record.

16        A.   Yes.  My name is Jeffrey Earl Lindsey.

17        Q.   And I know you've given depositions

18   before, but I'll -- I'll extend you the same

19   courtesies we -- we always do in these depositions.

20   If you need a break at any time for any reason, just

21   let me know and I am happy to take a break, okay?

22        A.   That's fine.

23        Q.   And I'm going to -- if any of my

24   questions become unclear, just let me know and I'm

25   happy to rephrase them, okay?

Jeffrey Lindsey

5

1          A.    That's fine.

2          Q.    And if you do answer my question, I'm

3    going to assume you understood; is that fair?

4          A.    Yes.

5          Q.    All right.  You -- you understand you've

6    been designated as an expert in this case?

7          A.    Yes, I do.

8          Q.    Okay.  And I'm going to start -- starting

9    with Exhibit 1 which is the notice of your

10   deposition, and I'll just share my screen so that --

11   make sure that this works and you don't have to call

12   up the exhibit.  Can you now see Exhibit A on your

13   screen?

14         A.    I can.

15         Q.    Okay.  Great.  I have asked you to

16   produce prior to this deposition your entire file

17   related to this case.  Have you done that?

18         A.    I have.

19         Q.    I want to go over a couple of these

20   categories starting with 7.  Do you have any

21   alternative designs that you believe would be a

22   reasonably safe alternative to the TRC cord involved

23   in this case?

24         A.    As far as alternative designs, I could

25   reference back to the report.  You know, I compared

Jeffrey Lindsey

6

1    the -- my testing results of the TRC units with a --

2    a LCDI manufactured by Tower which I know that

3    Carrier at least had considered and I believe they

4    were actually substituting that for LCDIs that were

5    being returned as being damaged.  So the Tower cords

6    that I looked at, I would -- I would represent that

7    they are a possible alternative design to what the --

8    the TRC unit was.

9         Q.   I did -- I did see that.  I just wanted

10   to make sure that was your opinion.  Specifically

11   what is the model number of that Tower cord that is

12   your alternative design?

13        A.   Well, the cords that I received, I

14   received a number of different models, so I can't --

15   they all appear -- at least as far as the contacts

16   are concerned, they all appear to be similar, the

17   contacts are all similar.  I actually -- I know that

18   when I did some of my testing, I was using one

19   specific cord, but I would have to go back and look

20   at my notes to see what that model number is.

21             But I think, frankly, all the Tower

22   cords, the contacts appeared to be similar or the

23   same on all of the different models of Tower cords

24   that I had received.

25        Q.   Okay.  So the Tower cords that are

Jeffrey Lindsey

7

1    referenced in your report in your materials, you

2    believe them to have reasonably safe contacts,

3    correct?

4              A.    That's what my testing showed, yes.

5              Q.    All right.  Do you believe those cords to

6    be a reasonably safe design in all respects?

7              A.    I'm only really referencing the

8    performance of the electrical contacts.

9              Q.    So you -- you cannot go so far as to say

10   that those Tower cords that are referenced in your

11   report and in your file materials are reasonably safe

12   cords; is that true?

13             MR. KUCHARZ:  Object to the form.

14             A.    I -- I think the way I would answer that

15   question as far as the performance of the contacts,

16   which is basically what I was asked to address, why

17   are these LCDIs overheating, they -- they appear --

18   the Tower cords appear to be a safe design, yes.

19             Q.    So -- so I -- admittedly I'm a little

20   confused.  Initially I thought you said when -- when

21   you -- you'll vouch for the contacts, those

22   components within the Tower cords, but you didn't do

23   an analysis to make sure that the -- the Tower cords

24   themselves were nondefective; is that correct?

25             A.    Yeah.  That's beyond the purview of what

Jeffrey Lindsey

8

1    I was asked to do.

2          Q.   That's what I thought.  So if I -- if I

3    grabbed one of those Tower cords and held it up in

4    front of you and said "Can you tell me, Mr. Lindsey,

5    is this a reasonably safe cord," you would say "I can

6    only tell you that the contacts are reasonably safe";

7    is that fair?

8          A.   Yes, sir.

9          Q.   Okay.  I would like those model numbers,

10   so can you get those for me?  What's the easiest way

11   for us -- for me to get those on the record?

12         A.   Well, I gave you all my notes, and so the

13   model numbers are in the notes.  I mean sometime

14   during the deposition today we can -- I know there's

15   specifically some notes that say Tower.  There's a

16   disassembly of the Tower cords so we can get -- and I

17   know that the model numbers are written on there.

18   So, I mean, we can do it now, or we can do it later.

19         Q.   Would it be easy to do now, or should we

20   wait until we dig into this stuff?

21         A.   I can -- let's see.  Yeah, I guess I can

22   share stuff too, right?

23         Q.   Yes, you can.  You can.

24         A.   And I need to find -- how do I do this?

25   All right.  Give me a second here.

Jeffrey Lindsey

9

1          Q.   If it helps, I found "4-10-20 Inspection

2     of Tower LCDI at SEA."  Is that what you're looking

3     for?

4          A.   Yeah, that's what I'm going to grab.

5          Q.   Okay.

6          A.   Okay.  So it says I can't share screen

7     while you're sharing so does that mean you have to

8     turn yours off?  Okay.

9          Q.   Sorry about that, Mr. Lindsey.

10         A.   That's fine.  This isn't my program so.

11         Q.   And you can just read me the model

12    numbers and show them.  That would be great.

13         A.   Okay.  So on this it looks like they

14    don't necessarily give them model numbers but they

15    have a catalog number of 30389.  30389.  Okay.  So at

16    least those are discussing 30389.  Stop the share.

17    Let me go to another page here.

18         Q.   Okay.

19         A.   Let's see, where's my pictures?  Okay.

20    Apparently 30389 was the model that I disassembled

21    and looked at so let's just stick with that one.

22         Q.   Fair enough.  Getting back to running

23    down the list of documents and I want to make sure

24    we -- in No. 8 we asked for all testing and

25    experiments related to this case.  Obviously I've

Jeffrey Lindsey

10

1    seen in your file materials you brought any

2    document -- electrical resistance measurements,

3    thermal testing, calculation of heat energy,

4    metallurgic testing, and materials analysis.  Is

5    there anything else, any other testing or experiments

6    you've done related to this case?

7            A.   No.  That -- you have the entire file.

8            Q.   Okay.  And then 13 asks for all

9    communications related to this case.  Did you produce

10   that?  I didn't find that.

11           A.   I -- I produced that yesterday.  I

12   gave -- I sent that into the -- the law firm so.

13           Q.   Okay.

14           A.   They are all e-mails basically so.

15           MR. KUCHARZ:  Yeah, Mike -- Michael, that

16   was e-mailed to you and your firm yesterday.  It --

17   for whatever reason we didn't have that when we

18   initially uploaded the files to the -- you know,

19   we'll call it a Dropbox link, but we did supplement

20   that yesterday and sent you an e-mail to that effect.

21           MR. BOORMAN:  Okay.

22           Q.   And then 15 asks for all publications

23   which you consider authoritative related to your

24   opinions in this case.  I didn't see any

25   publications.  Are there any publications that you

Jeffrey Lindsey

11

1    consider authoritative to your opinions in the case?

2         A.   Well, aside from -- I always -- I always

3    consider NFPA 921 authoritative.  I didn't attach it

4    to this case; but, I mean, essentially that's the

5    guide that I use any time I do any kind of failure

6    analysis, especially those that involve fire.  You

7    know, it basically asks, you know, the investigator

8    to have a methodology, and so I always consider, you

9    know, parts of 921 to be authoritative as far as how

10   you do your investigation.

11            I didn't rely upon any publication or

12   book specifically for anything about the way I -- I

13   evaluate the case or did my testing so.

14        Q.   Okay.  18 asks for all advertising for

15   litigation services for you or your company.  Do you

16   or your company do advertising for your litigation

17   services?

18        A.   For me personally, I -- I have no idea.

19   I don't have anything to do with that.  We have a

20   marketing group, and I frankly don't know what they

21   do.

22        Q.   But in terms of did you ask anybody to

23   gather that stuff?

24        A.   No, sir.  I mean, we're on the internet;

25   so, I mean, you can Google SEA, and I'm sure all that

Jeffrey Lindsey

12

1    stuff spews out.

2         Q.   All right.  Exhibit 2 is going to be a

3    screenshot of your file materials, but I want to do a

4    little housekeeping with that, so I'm going to try to

5    share my screen again.  So is -- is this how your --

6    you see the list of documents and folders I have,

7    right?

8         A.   Yes, sir.

9         Q.   Is this how your file is organized?

10        A.   Yes.

11        Q.   Okay.  It looks to me like these first

12   six PDFs are essentially your notes; is that correct?

13        A.   You know, and I had found -- and that's

14   probably included with those e-mails from yesterday.

15   I had also forwarded one more set of notes that had

16   gone astray.  So there should be one more set of

17   notes --

18        Q.   All right.

19        A.   -- I forwarded yesterday.

20        Q.   All right.  Hold on.

21             MR. BOORMAN:  Kevin, who did that come

22   from?

23             MR. KUCHARZ:  That e-mail was sent by

24   Justin Danelski and it was sent at 3:07 p.m. to you

25   and Ms. Miller.  I believe the notes that Mr. Lindsey

Jeffrey Lindsey

13

1    is referring to are entitled "7-2-21 Contact

2    Resistance Measurement."

3           Q.   All right, Mr. Lindsey, I'm doing a

4    little cleaning up.  Before I show you what I have

5    put in that folder, let me ask you this, do you see

6    this PDF "4-10-20 Lab Tower Exemplar Contact Sheet"?

7           A.   Yes.

8           Q.   Is that -- are those photos taken by you?

9           A.   Yes.

10          Q.   Can I put in the Lindsey Photos Folder;

11   is that --

12          A.   Yeah.  That's just -- that's fine, yeah.

13          Q.   Okay.  Then the next document I want to

14   ask you a question about, "Heat Effects from Relay

15   Contacts Found on Assembly."  Do you see this

16   document?

17          A.   Yes.

18          Q.   What is that?

19          A.   I don't know.  We'll have to -- oh, is

20   that this -- that's this document here, right?

21          Q.   Yeah.  I -- I can blow it up obviously.

22          A.   Yeah.

23          Q.   Let me put it up on your screen.  Are

24   these also your notes?  What is this?

25          A.   These aren't notes.  These are basically

Jeffrey Lindsey

14

1    more of -- they're different times during this

2    project, you know, as part of my efforts to bring my

3    client up to -- to what was going on.  These were

4    things that I prepared to basically to have

5    discussions with the client.

6         Q.   All right.

7         A.   So that's all this is.  Basically rather

8    than me waving my hand and them not understanding

9    what I'm talking about, you know, I put some pictures

10   together and marked them up.

11        Q.   Okay.  Would you consider these your

12   notes?

13        A.   I would say it's more of a presentation.

14        Q.   Okay.  And then there's two -- there's

15   Materials Summary in a Word document and then

16   Materials Summary in a PDF.  This also looks to be a

17   presentation, right?

18        A.   That's correct.

19        Q.   And then the Surface to Damage Contact,

20   is that a presentation?  What is this?

21        A.   Yes.

22        Q.   All right.  Then I'm just going to make

23   another folder so that I understand what I'm looking

24   at.  Let's see.  We'll try to march through this

25   stuff in some organized fashion.  Okay.  That's --

Jeffrey Lindsey

15

1    that's very helpful.

2              Let me just start at the top.  There

3    is -- you see this folder -- the first folder now

4    that we've -- I've reorganized your file.  It's

5    entitled "TRC and Tower Testing Data."

6         A.    Yes, sir.

7         Q.    Tell me what that is.

8         A.    I believe that was temperature testing

9    that I had done to both of the TRC examples of the --

10   samples of the TRC and the Tower cord.

11        Q.    Okay.

12        A.    So if you open that up, basically what I

13   did was I put a load current through the cords, and

14   then I measured the temperatures at the contacts.

15        Q.    So just give me a general overview of

16   what these documents are.  So there's -- there's one

17   Excel spreadsheet at the bottom that says "TRC and

18   Tower Testing Workbook" and then there is a total of

19   it looks to be nine other Excel files.  Can -- can

20   you explain what this is?

21        A.    Yeah.  The -- the files that you have

22   highlighted right now, that would be the raw data and

23   then that data then is put in the workbook.  And so

24   then the workbook basically is the illustration of

25   what that data means.

Jeffrey Lindsey

16

1          Q.   That's what I thought but wanted to have

2     the benefit of you help me with that.

3          A.   Right.  So --

4          Q.   So I'm going to open up the workbook.

5          A.   Yeah.

6          Q.   And then please orient me to how somebody

7     reads this.

8          A.   Well, all right.  So basically what you

9     have is you have a time -- the first column would be

10    time.  The second column would be the -- and, you,

11    know with this plug, I think they all had one

12    vertical blade and they all had one horizontal blade.

13    So that was just my uniform designation throughout

14    everything I talk about is, you know, something going

15    on on the vertical or something going on on the

16    horizontal.

17              So then there's three temperatures that

18    are measured.  The measure -- the temperature is

19    measured at the vertical contact, electrical

20    contacts.  The temperature is measured at the

21    horizontal contacts.  And then I measure the air

22    temperature.

23          Q.   Gotcha.

24          A.   So that's ambient.  And then the chart

25    that's generated basically is those three

17

1    temperatures.  You know, if you look down there, it

2    will tell you what the -- you know, what each color

3    is for.

4          Q.   Got it.  And then there is a different

5    page for each sample, right?

6          A.   That's correct.

7          Q.   So this -- just starting on the first

8    page, it's a one-hour test with TRC sample 1, right?

9          A.   Yes.

10         Q.   What -- well, actually I say that.  Is

11    this first page just a general overview page?  It

12    looks different to me than the other pages.  It

13    doesn't have the chart.  Do you see what I'm saying?

14         A.   Yeah.  That should have had a chart too.

15    I'm not sure what happened to that chart.

16         Q.   And the -- this one also says TR1 but

17    this one says TRC1 and that's the same -- that would

18    be the same sample, right?

19         A.   I believe so, yes.

20         Q.   Can you explain that?

21         A.   So --

22         Q.   Make this a little bit bigger.

23         A.   Can you go to the next box?

24         Q.   Sure.

25         A.   The next tab.

Jeffrey Lindsey

18

1          Q.   Do you want me to scroll down on this

2     page or go to the next page?

3          A.   No, no, that tab.  Go to that tab.  I

4     want to see what the start times are, if they are

5     actually different.  Yeah.  Okay.

6               Okay.  Go back to the first then.  I am

7     trying to figure out on temperatures here if this was

8     the same test, it is just a duplicate because I don't

9     have a...  It's quite possible it's the same test,

10     and for some reason I have duplicate sheets on there

11     and stuff because --

12          Q.   Let me ask you a broad overview question.

13     So identified on these tabs is TRC1, TRC1B, Tower 1A,

14     so there's -- there's various, you know -- you

15     identify the manufacturer and then you identify

16     either a number or a number and letter.  Do you

17     have --

18          A.   Yes.

19          Q.   Do you have a master list of all of

20     those?

21          A.   It's -- it's this data right here.  This

22     is the only temperature data I took so.

23          Q.   Well, TRC1, that was a cord that you

24     received from the field, right?

25          A.   That is correct.  And that would be

Jeffrey Lindsey

19

1    marked on the -- physically that would be marked on

2    the bag, whatever that is so.

3        Q.   All right.  So I want to be able to for

4    each one of these tabs understand what the model is,

5    where it was taken from, and look at the photos

6    associated.  How would I do that?

7        A.   All right.

8        Q.   Do you have an inventory list of all the

9    samples you have 1 to 50 -- 150?

10       A.   I'm going to have to go back to the notes

11   on this and figure this out so.

12       Q.   Do you want to do that at break and I can

13   keep asking question or?

14       A.   Yeah.  Why don't you do that.  I'll see

15   if I can -- I should be able to figure that out, but

16   I'm going to have to get into my notes and go back

17   to -- because that should be cross-referenced in the

18   notes.

19       Q.   Right.  And that's something that I was

20   looking for and couldn't find but -- but you would

21   imagine -- I would imagine -- I mean, you seem to be

22   pretty organized.  I would imagine that you would

23   have a numerical listing of all your samples, the

24   model numbers, where they were from, any testing done

25   on those; am I correct or did you not --

Jeffrey Lindsey

20

1         A.    No, you're correct.  I may actually have

2    to go back physically to the bag though.  I may not

3    have written it down but, I mean, it's --

4         Q.    All right.

5         A.     It's pretty obvious which ones I tested,

6    so I can figure it out.  It just may take me a little

7    while to do it, but I can get that information.

8         Q.    All right.  I'll -- I'll table that for

9    now and talk to you after our first break.

10        A.    Okay.

11        Q.    All right.  I think I do understand.

12   Thank you for your overview of this.

13             Okay.  I haven't looked at the

14   correspondence, so I'll look through that at a break

15   and let you know if I have any follow-up questions to

16   that.

17        A.    Okay.

18        Q.    So the next folder we come to is "Easley

19   Photos" and Mr. Easley -- well, you just tell me who

20   he is and what his involvement was.

21        A.     Mr. Easley is one of our materials

22   engineer, and he assisted me during the

23   investigation.  Basically I relied upon him to

24   disassemble, I think, and prepare some of that.  Once

25   we started finding -- figuring out the damage, I

1    relied on him that he -- he operated the SEM.  He

2    took some of the, you know, high magnification

3    photographs.  He prepared some of the samples to, you

4    know, to do the evaluation.

5           Q.   I understand that he helped you take

6    certain photographs and prepped samples.  Do you rely

7    on his opinions for anything in this case?

8           A.   I -- I relied upon information he got me

9    because basically I don't do the SEM, so I relied

10   upon him for his observations on that.  He -- I

11   relied upon him to evaluate the contact material.

12   And some of the high mag damage we found on that I

13   relied upon him for that.

14          Q.   Okay.  So the first sub-folder in Easley

15   is 5A and then there's a 6C and each one of those

16   have, you know, 20 photos or something like that and

17   then there is a "Report Ready Photo" which has 836

18   photographs.

19          A.   Right.

20          Q.   I take it 5A is -- is a cord sample 5A

21   that you have?

22          A.   Yes, sir.

23          Q.   And same for 6C, right?

24          A.   Yes.  And I believe those are referenced

25   in the report --

Jeffrey Lindsey

22

1          Q.   Okay.

2          A.   -- so.

3          Q.   I'm just going to ask, so those -- those

4    are photos that he -- he separated those photos from

5    his 800 plus photos so you could use those in your

6    report, right?

7          A.   That's correct.

8          Q.   So of the -- in these 836 photos, what

9    did Mr. Easley take 836 photos of?  All the TRC

10   samples and Tower samples?  A portion of them?  Just

11   tell me -- tell me what is in these 836 photos.

12         A.   No.  I segregated out a group of cords

13   that I wanted him to look more closely at.

14         Q.   How did you --

15         A.   Those -- those photographs basically are

16   the segregated group that I had him take a closer

17   look at.

18         Q.   What was your methodology for

19   segregating?

20         A.   They were -- well, frankly the

21   methodology was these LCDIs all were damaged.  I

22   tried to -- I tried to pick the vertical blades and

23   horizontal blades.  And, you know, when Tom was

24   involved, this was -- was fairly early in the project

25   and we were just trying to figure out what we had and

23

1    how it made sense.

2              And I will tell you that when -- when Tom

3    started on this project, we hadn't even zeroed down

4    to the contacts as being the issue.  So I was having

5    him take -- basically I pulled out -- you know, and

6    our discussions were "I want you to take a look at

7    how the various components within the plug are

8    assembled together.  There's -- there's some pieces

9    that are riveted together."  I wanted him to look at

10   that.  There was at least one place where a hole was

11   cut out of the material and I wanted him to look at

12   that.

13             Early on I noticed in one of the samples

14   that where the metal was bent there appeared to be

15   stress cracking on the metal.  I wanted him to take a

16   look and see if that's -- something like that was

17   going on.  So, you know, Tom's involvement was early

18   on, and so we just kind of tried to sort through what

19   we were finding and what the common threads were.

20        Q.   I got you.  So essentially what you did

21   was you -- you got a whole bunch of cords.  You

22   separated the ones that you saw some thermal damage,

23   and you said, "Mr. Easley, disassemble and take a

24   closer look at these and get me photos."

25        A.   Yes.

Jeffrey Lindsey

24

1          Q.   All right.  Understood.  All right.

2     Invoices we will go through in a minute.  All right.

3     "LCDI Testing and Inspection," who took these

4     photographs?

5          A.   This is mine.  These are mine.  These are

6     mine.

7          Q.   Should this be in your photos folder or

8     is it --

9          A.   I think those -- well, open that up.  Let

10    me look at that.  Is that?

11         Q.   Sure.

12         A.   Yes, those -- those are photographs.

13    Those all should be in, yes.

14         Q.   All right.  So I'm going to -- we'll get

15    to that.  All right.  And then so we've got your

16    "Lindsey Notes" folder that we're going to spend some

17    time on but these are -- tell me exactly what these

18    are in general and why you put these together.

19         A.   Well, any time I was doing the work, you

20    know, where I was actually making observations, I

21    created notes.  And that's just what those are

22    showing.  I mean, you can kind of go through there

23    and you kind of figure out, you know, what's going on

24    with this.  And it just was -- you know, I basically

25    went through this as I had time because we had a lot

25

1    of cords and, you know, I tried different kinds of

2    tests because you can see there's some thermal

3    imaging notes in there.  You can see the contact

4    resistance measurements.  We acquired early -- early

5    in July this year, we acquired a milliohm meter.  And

6    I thought, well, shoot, I will just try it on this

7    and see what kind of results I get.  There's the one

8    where we did the temperature testing.  Those minutes

9    are in there.  And then just disassembling notes

10   throughout the course of the project.

11           Q.   Okay.  We're -- obviously a lot of these

12   issues are talked about in your report, so we'll talk

13   about those and then return to these, and I'll make

14   sure that I've covered everything in these notes,

15   okay?

16           A.   Right.

17           Q.   All right.  So we're now down to "Lindsey

18   Photos."  Let me make sure these are -- so the date

19   convention that is used is different.  You know, a

20   good portion of these start with the four numeric

21   code year and then some of these don't.  Do you know

22   why?

23           A.    It -- I would just say I don't really

24   have a convention and that's just the way I put them

25   down I think would be the -- I don't have a good

Jeffrey Lindsey

26

1    explanation for that.  It's just how I typed them in

2    at the time.

3            Q.   I gotcha.  Okay.  All right.  Then I'll

4    just -- I'll just start at the top.  And can you

5    just -- so I'm starting with the file "4-10-20 Lab

6    Tower Exemplar Contact Sheet."  That's basically your

7    photos of the exemplar Tower cord, right?

8            A.   That's correct.

9            Q.   All right.  Next folder is "8-12-21 Lab

10   at SEA."  What is this?

11           A.   I have to look at the pictures, but I'm

12   thinking probably that's just disassembling and

13   inspection of the different cords.

14           Q.   So --

15           A.   So if you go up to the top, go to the

16   first picture.

17           Q.   Sure.

18           A.   Look at this picture.  Okay.  So I

19   always -- any time I'm examining so I keep track of

20   it, so this is item 6H, okay?  And then basically

21   this is -- this is this particular piece of evidence.

22   And so 6H, it's coming from Oklahoma City, the

23   Tuscany Village Apartment -- or room 411B and so this

24   is just -- you know, then I will know that the

25   following pictures are all associated with item 6H

Jeffrey Lindsey

27

1    until I see another evidence sticker.  And so that's

2    how I can kind of keep track.

3              So as you go through this list of

4    pictures, the first picture is always the evidence

5    sticker, and then -- you know, then you see pictures

6    basically that as I disassembled that unit.

7         Q.   What is 52M on this first picture?

8         A.   I have no idea.  I don't know.  Right

9    now, I don't recall what that was.

10        Q.   All right.  So that I'm getting a sense

11   of how your file is organized, it -- it you got -- I

12   know from your report that you received approximately

13   150 TRC cords, right?

14        A.   Yes.

15        Q.   At different points in these different

16   dated folders, are those -- you just kind of did a

17   batch, inspected those, came back a little bit later,

18   did another batch, inspected those; is that what's

19   going on here?

20        A.   Yes.

21        Q.   Okay.  So then this -- this next contact

22   sheet, that's just the same photos that are in the

23   folder, right?

24        A.   Yes.

25        Q.   All right.  Then "10-8-20 Tower Exemplar

Jeffrey Lindsey

28

1   Lab," can you -- can you tell me what's in this

2   folder?

3           A.   They're just documenting Tower cords.

4           Q.   It says "Lab."  Did you do -- are these

5   showing -- is there testing in here?

6           A.   It looks -- I -- well, as we go through,

7   let me see, I have to look at each one.

8           Q.   It doesn't look like testing to me.  It

9   looks like you just disassembled, right?

10          A.   I think disassembled -- disassembling,

11  looking at different parts and pieces of the --

12          Q.   Right.  Understood.  Then "2018-12-06,"

13  I'm looking at the first photo.  It's a whole bunch

14  of boxes.

15          A.   Yep.

16          Q.   What is this?

17          A.   This is probably the -- this is how --

18  what I received.  At some point I -- I received a

19  large group of cords from Carrier and this is

20  probably when they were all brought to the -- so the

21  first thing I had to do basically was just, you know,

22  create some kind of evidence system for this.

23          Q.   Okay.  All of these cords were received

24  directly from Carrier?

25          A.   Yes.

Jeffrey Lindsey

29

1          Q.    Do you know how Carrier got these cords?

2          A.    Well, my understanding are that these

3    cords came either from customer returns.  Some of

4    these cords were cords that their engineering lab had

5    had that they done testing or evaluations.  And, you

6    know, it's my understanding was I -- I acquired all

7    the LCDI cords that Carrier had.

8          Q.    Got it.

9          A.    They just showed up in these boxes.

10         Q.    All right.  "2018-12-10 Lab."  I am

11   looking at the first picture.  Is this another batch

12   of the returned cords that you're going through?

13         A.    Well, this is -- this was basically what

14   these cords are.  You know, I got them, I believe, on

15   the 6th of December, 2018, and then I started going

16   through the cords.

17         Q.    Right.

18         A.    So basically I had to, you know, break

19   them out into individual samples and identify them,

20   and I had to create -- create basically a listing of

21   the cords that I was looking at so that's what we're

22   seeing here is just my intake of those cords.

23         Q.    Right.  And then "2018-12-11," that's

24   just you continuing to go through and inspect the

25   cords you received, right?

Jeffrey Lindsey

30

1          A.   Yes.

2          Q.   "2018-12-12," again you continuing to go

3     through the cords you received?

4          A.   Yes.

5          Q.   "2019-5-12," what is this?

6          A.   Well, now we're zeroing in on some -- oh,

7     I believe -- I believe this was actually an LCDI that

8     was supposedly unused.  This was a TRC LCDI that had

9     never been used, never been in service.

10         Q.   All right.  How do you know that?  That's

11    just something Carrier told you?

12         A.   I -- yeah.  That's what I asked for.  I

13    said, you know, "All the ones I'm looking at appear

14    to have been in service.  You know, do you have -- do

15    you have any that had never been plugged in, never

16    been used?"

17         Q.   Gotcha.  What -- what model number cord

18    is this?

19         A.   You would have to go back to the -- is

20    that the first picture?

21         Q.   That's the first picture.

22         A.   I believe they are all the model number

23    of interest.  They -- all the TRC cords I had all

24    were the same model.

25         Q.   And what model is that?

31

1          A.    I don't know off the top of my head.

2          Q.    That's important so I need you to figure

3     that out.

4          A.    Okay.  Well, we'll probably have to go

5     back to the -- all right.  I will just figure that

6     out at the break.

7          Q.    All right.  "2019-25-11," what is this?

8          A.    Again, these are returned cords.

9          Q.    So every other time that you were going

10    through cords, the very first photo was the product

11    identification, basically the evidence sticker.

12         A.    That's correct.

13         Q.    In this file it's not.

14         A.    No, it isn't.

15         Q.    Can you tell me why not?

16         A.    No.  Well, obviously I forgot to do it.

17         Q.    All right.  "2020-17-04."  This appears

18    to be a Tower LCDI?

19         A.    Yes.

20         Q.    And what are you doing here?

21         A.    I'm just trying to get some dimensions on

22    the actual physical contact.

23         Q.    All right.  All right.  Then we get down

24    to the next sub-folder, the final sub-folder "LCDI

25    Testing and Inspection 7-2-21."  And tell me what

Jeffrey Lindsey

32

1    this is.

2           A.    This is just me going back through

3    evidence and taking photographs.

4           Q.    Well, it says "Testing and Inspection."

5           A.    That's correct.

6           Q.    So what testing are you doing?

7           A.    This would have been when I started doing

8    the milliohm measurements of the various plugs.  So

9    if you look, I have notes from that period of time.

10   If you look, you will see me having like some

11   electrical measurements for each one of these items.

12          Q.    This -- this corresponds to your -- part

13   of the report that is elect -- electrical resistance

14   measurements; is that right?

15          A.    That would have been where I got the

16   data, yes.

17          Q.    All right.  Okay.  All right.  Then we're

18   now into presentations.  And are all of these

19   presentations -- there's -- there's really only three

20   of these, right?

21          A.    Yeah.  One's -- one's a PDF and one's a

22   Word, but it's the same thing so that's correct.

23          Q.    Let me just -- let me go through this now

24   then.  All right.  The first one is "Heat Effects

25   from Relay Contacts Found on Assembly."  Explain to

33

1    me who you are giving this presentation to and -- and

2    what your conclusions are.

3            A.   Well, I'm not sure how -- that

4    conclusions is the right word.  These are just

5    observations.  I was presenting this to -- I don't

6    really recall.  It was the client.  I don't recall

7    who all was on the phone call.  But this was

8    basically observations that I was making and I just

9    wanted everyone to have the same nomenclature, so

10   when I am talking about the relay contact, they

11   actually have a visual image of what part of the LCDI

12   I'm talking about.

13           Or if I'm talking about the, you know,

14   vertical or horizontal blade I want them to have an

15   image of, you know, the fact and the circuit board

16   and I'm showing how this tab unsolders itself.  You

17   know, I just -- and the damage to the contacts.  I'm

18   just kind of trying to give them the visual image of

19   what that is.

20           Q.   And --

21           A.   Go ahead.

22           Q.   I'm sorry, Mr. Lindsey.  I cut you off.

23   I apologize.

24           A.   No.  It's just -- or this picture you're

25   showing right now the heat effect, you know, what

Jeffrey Lindsey

34

1    exactly does that mean.

2        Q.   And I recognize many of these photos and

3    illustrations from your report, right?

4        A.   That's correct.

5        Q.   All right.  Then the next thing -- I'm

6    just going to -- there's two documents as we've

7    discussed called "Materials Summary."  One is --

8    one's a PDF.  One's a Word.  So tell me -- tell me

9    what this is, please.

10       A.   Well, this is a PowerPoint presentation

11   that Mr. Easley and myself had put together where we

12   were basically again going over our findings to date

13   on this -- this project.

14       Q.   It's -- the year is 2019 but there's no

15   day or month.  Do you know exactly when this was

16   done?

17       A.   I don't -- unless you can figure out from

18   the date on the PDF.

19       Q.   Okay.  And who is this presentation given

20   to?

21       A.   Again, it was -- it was a conference call

22   for -- for the client.

23       Q.   Do you recall who was on the phone?

24       A.   I do not, no.

25       Q.   Again, many of these images are in your

Jeffrey Lindsey

35

1    report, correct?

2         A.   Yes.

3         Q.   Okay.  Then the final presentation is

4    titled "Surface Damaged Contact."  Please explain

5    what this is.

6         A.   Well, this was a -- just -- just my

7    findings basically.  This was -- you know, this was

8    how I was finding the contacts and that's really all

9    it is.  I mean, if you scroll down through there and

10   stuff, all these contacts are -- are pretty beat up

11   and which in my mind is kind of surprising.  I mean,

12   there are -- clearly there is some mechanical damage

13   on that contact that didn't happen because we were

14   using the contact.  It clearly happened at some point

15   during the assembly of the -- of the unit.

16        Q.   Is -- are these photo -- selected

17   photographs from the TRC cord that was allegedly

18   never in service?

19        A.   I want to say yes but go down to the last

20   picture.  That's -- on page 3.  I'm not sure about

21   that.  I -- I don't really recall now when -- where

22   these pictures came from.

23        Q.   Okay.  All right.  I guess if you're not

24   sure where it they came from, it's kind of hard to

25   draw any conclusions.

Jeffrey Lindsey

36

1          A.   Right.  I wouldn't rely on these.  I
2     don't know that -- frankly I don't even remember why
3     I did that page so.
4          Q.   Okay.  Then the next folder is your
5     report submittal, and I've seen all this stuff.  This
6     is your report and your fees and CV and all that,
7     right?
8          A.   Yes, sir.
9          Q.   Okay.  All right.  So this is going -- a
10    screenshot of this is going to be marked as
11    Exhibit 2.  Is Exhibit 2 your entire file related to
12    this case?
13         A.   Yes; yes, sir.
14         Q.   Other than Exhibit 2 is there anything
15    that you are relying upon for your opinions in this
16    case?
17         A.   No.
18         Q.   Please describe your fee arrangement for
19    this case.
20         A.   I -- SEA charges a set fee for all my
21    work and that's -- that's essentially it.  You know,
22    I put down my time, the time I spend on -- on each
23    part of the job; and, you know, SEA sends out an
24    invoice.
25         Q.   The retention agreement, which I'll open

Jeffrey Lindsey

37

1    up, is -- it shows you were assigned on March 16 of

2    2018; is that right?

3            A.   Yes.

4            Q.   And you were retained by Hall Booth?

5            A.   Yes, sir.

6            Q.   Is that the first time that you started

7    working on this case?

8            A.   Well, that's when it was set up.

9    Honestly the first time I had anything to do was in

10   December when the cords were brought over for me to

11   look at.

12           Q.   December of 2018?

13           A.   Yes.

14           Q.   When did you first start investigating

15   Carrier PTACs?

16               MR. KUCHARZ:  Objection.

17           A.   Oh, shoot.  I -- you know, I've been

18   doing this for 36 years.  I can recall in late --

19   late '80s, I can recall doing Carrier PTAC fires.  I

20   can -- I can specifically recall there was -- there

21   actually was a recall -- at that time the PTACs

22   were -- they had those mechanical push button

23   switches, and Carrier had a group of those that they

24   recalled.  And so we had a large group of PTACs that

25   we had to go out and look at, and actually we had a

Jeffrey Lindsey

38

1   couple investigations that turned out to be arsons

2   that the hotel owners had discovered that these were

3   under recall and took that as a way to rebuild some

4   of their units.

5              But I've been doing PTACs -- PTAC fires

6   my whole career, not only for Carrier but I've been

7   doing it for Trane.  I've been doing it basically for

8   all the manufacturers.  That's -- that's a pretty

9   hefty part of my, I guess, experience.

10     Q.   The TRC 37190 was the cord that was

11  connected to what model Carrier PTACs?

12     A.   That's a good question.  I'm not sure I

13  can answer that.  Offhand I don't know.

14     Q.   When was the first time that you became

15  involved in investigating any Carrier PTAC that was

16  connected to a TRC LCDI cord?

17     A.   The first time I recall an LCDI cord was

18  in 2014.

19     Q.   Okay.

20     A.   And it was -- it was a -- there was a

21  number of them at a Ramada Inn up on the Ohio

22  Turnpike outside Elyria, Ohio.  And that's the first

23  recollection that I had of -- of the LCDI cords.

24     Q.   What was your involvement -- it's Elyria,

25  Ohio?

39

1        A.    That's correct, yeah.

2        Q.    What was your involvement?

3        A.    I was hired by Carrier.  There was --

4   there was a Carrier PTAC unit was alleged to have

5   been involved in the fire and went up and did the

6   fire scene.  And it also involved -- so I did a fire

7   scene inspection on one date and then there was an

8   evidence exam at the Travelers' lab over in

9   Connecticut on a second for the same project.

10       Q.    What was your conclusion of the origin

11  and cause of that fire?

12       A.    There was a problem in the LCDI.

13       Q.    Was that a TRC LCDI?

14       A.    It was.  Well -- well, every other one

15  that -- it was totally destroyed.  That LCDI was

16  gone.  It wasn't recovered but every other unit in

17  there -- and I am kind of relying upon the claimant

18  basically.  They said they were all the same cords.

19  And but every other one was a TRC unit.

20       Q.    How do you conclude that an LCDI is the

21  cause of the fire if it was completely destroyed?

22       A.    Because that's where the fire started.  I

23  mean, it was pretty obvious in our inspection.  And

24  what was even more disturbing was we pulled -- well,

25  I didn't but the plaintiff's expert pulled several

Jeffrey Lindsey

40

1   other damaged LCDI plugs from the -- from the fire

2   scene.  And when we got over to the Travelers' lab

3   and started disassembling them, it became pretty

4   obvious there was a problem in the LCDI.  That was my

5   first experience -- because the whole point of the

6   LCDI was to prevent fires.  And so it was kind of

7   disturbing that the device that you actually put on

8   the unit was -- appeared to be where the fire

9   started.

10          You know, it wasn't really my job to

11  assign the cause and origin of this fire.  You know,

12  I was there to assist Carrier in understanding that

13  they had a problem.  So I reported back to Carrier

14  that it appeared that there may have been a problem

15  inside the plug.  And that was kind of the extent.

16  That was the end of it for me.

17          Q.   Let me make sure that I understand,

18  whether you formed any opinions or whether you

19  didn't, did you form an opinion about the origin of

20  the fire in Elyria?

21          A.   Yes.

22          Q.   What was the origin?

23          A.   At the plug.

24          Q.   Did you form an opinion as to the

25  manufacturer of the plug?

41

1        A.    I did not know the manufacturer of that

2   plug because it was destroyed.

3        Q.    Did you form an opinion about the cause

4   of that fire?

5        A.    I -- officially I had no cause for the

6   fire, and I reported a concern based on the exemplar

7   cords that were collected at the same site visit.

8        Q.    Okay.  So I'm going to move on to that

9   next, but in terms of the fire, you've given me what

10  you concluded and what you haven't concluded.  Now, I

11  understand that you did as part of that investigation

12  inspect certain TRC exemplar cords, right?

13       A.    That is correct.

14       Q.    How many?

15       A.    It's been a long time.  I -- it was more

16  than one.  I -- I can remember -- oh, my goodness.

17  There was several rooms that had basically -- I would

18  say several.  There was several.  I don't recall the

19  specific number.

20       Q.    So you may have gotten to the point where

21  you told Carrier that you had a concern that there

22  was a -- a problem with the TRC cords and you may

23  have left it at that, or you may have done a root

24  cause analysis and you may have gotten to the point

25  where you said "I know the problem, it's a design or

Jeffrey Lindsey

42

1    manufacturing defect problem, and it's this specific

2    problem."  Tell me how far your investigation went

3    with respect to those TRC exemplar cords.

4                  MR. KUCHARZ:  Object to the form.

5           A.    Actually -- actually I did not -- the

6    only -- I only got as far as I said it looks like

7    there were several TRC LCDI plugs that had evidence

8    of overheating inside the plug.  That was as far as I

9    got.

10          Q.    Okay.  So -- so what you were -- what you

11   told Carrier is that you observed several TRC cords

12   that were thermally damaged, correct?

13          A.    Not thermally damaged.  I would say they

14   had evidence of heating inside the plug.

15          Q.    But you did not develop an opinion as to

16   what was causing that heating inside the plug; is

17   that correct?

18          A.    Not at that time, no.  Nope.

19          Q.    Have you gone back since that time and

20   done further analysis on those TRC exemplar cords in

21   Elyria, Ohio, from 2014?

22          A.    They were never my evidence.  I never had

23   them.  I only saw them at the lab.  I saw them twice.

24   I saw them when they were collected, you know, at

25   that time the -- the Travelers' investigator wanted

43

1    to collect these cords, and he did.  And then we

2    disassembled them at the Travelers' lab also in 2014.

3    You know, Travelers' retained those cords.  I have no

4    idea what happened with that case.

5              And I'm not sure that they made a

6    connection -- I'm not sure that they made the same

7    connection that I made.  I didn't really have a

8    discussion with them.  It's not my -- it's not my

9    place to help them figure out what happened so.  But

10   I did observe problems in those plugs, and I did

11   report that back to the Carrier people.

12        Q.   Okay.  But you never came up with a

13   causation opinion, correct?

14        A.   Not at that time, no.

15        Q.   Well, you are saying not at that time,

16   Mr. Lindsey.

17        A.   I'm sorry, no, not to that case.  That's

18   a better answer.

19        Q.   All right.  Any other conclusions or

20   opinions that you drew with respect to your

21   investigation of this 2014 fire in Elyria?

22        A.   No.

23        Q.   All right.  Up until 2018 where you were

24   retained by Hall Booth, did you -- did you have any

25   other investigation involving TRC LCDI cords?

Jeffrey Lindsey

44

1          A.    I -- I know that I looked at PTAC units

2    between 2014 and 2018.  I don't have a specific --

3    specific recollection on anything to do with LCDIs in

4    that period of time so.

5          Q.    Okay.  That's fair.  I'm trying to -- I'm

6    trying to figure out how much I need to cover with

7    you today.  Obviously I'm going to cover your

8    involvement from the time that you were retained for

9    this particular case in 2018.

10          What I need to know is from the end of

11    the investigation in Elyria, Ohio, in 2014 -- well,

12    let me put it this way, prior to 2018 when you were

13    retained by Hall Booth, other than the Elyria

14    investigation that you did in 2014, did you draw any

15    opinions or conclusions with respect to any TRC LCDI

16    cords?

17          MR. KUCHARZ:  Object to form.

18          A.    No.

19          Q.    Do you know when SEA, your company, ever

20    started investigating TRC LCDI cords?

21          A.    I -- I only know my involvement.  I

22    can't -- I mean, we have offices in other parts of

23    the country.  It's quite possible that there were

24    other engineers that were involved, but I haven't

25    spoken to anyone.  I only know when I became involved

Jeffrey Lindsey

45

1    specifically on investigating the TRC LCDI and

2    that's -- that's shown on this retention agreement.

3         Q.   You haven't talked to anybody else who

4    may have been involved in the investigation of other

5    TRC LCDI cords at your company?

6         A.   No.

7         Q.   Why not?

8         A.   I -- I routinely don't do that.  That's

9    just not -- you know, I'm busy enough as I -- with

10   the work that I have.  I really -- you know, we all

11   kind of do our own thing and this wasn't something

12   frankly that -- you know, we don't discuss our cases

13   among ourselves.

14        Q.   Have -- with respect to this case, have

15   we -- have we already discussed Mr. Easley's role in

16   this case?

17        A.   Yes.

18        Q.   What was the role of Randall Bills?  He

19   signed your report, I believe.

20        A.   Well, every report that is written is --

21   is reviewed by another engineer and that was his role

22   was to review the report that was prepared and he

23   just basically -- you know, we have people that do

24   proofing for grammatical and spelling errors, and

25   Randy just -- his job in this case was to review the

Jeffrey Lindsey

46

1  report and make sure that it was put together under

2  our guidelines of how a report is supposed to be put

3  together.  So it's a technical review.

4       Q.   Understood.  So I want to talk to you

5  about a few of your invoices.  The -- in this invoice

6  that is dated June 28, 2018, do you see that there is

7  a Derek Starr who billed about 17 hours?

8       A.   Yes.

9       Q.   Who is -- who is Mr. Starr?

10      A.   Well, Derek is one of our electrical

11  engineers out of the Chicago office.

12      Q.   Did he meet with you about this case?

13      A.   He was -- he was -- Derek was part of the

14  meeting that we had originally with the client, Hall

15  Booth.

16      Q.   Okay.  And tell me what was discussed at

17  that meeting and why he was there.

18      A.    I can't tell you why he was there.  I

19  didn't invite him.  But that was the initial meeting

20  where we -- we broadly talked about, you know, the

21  PTAC cord issue.  So we talked about it.  This was

22  the original group that was assembled by SEA.  I

23  didn't assemble it.  This was other people,

24  management in the company assembled this group.  They

25  had Derek come out to the -- to the meeting and it's

Jeffrey Lindsey

47

1    quite possible that Derek himself had some PTAC cord

2    issues.  I don't really remember.

3              Q.   Who was at that meeting?

4              A.   Well, clearly Lindsey, Easley, and Starr

5    were at the meeting.  I believe Adam Bainbridge which

6    is -- he's -- he's like our engineering manager was

7    at the meeting, and I recall Tiffany Winks was at the

8    meeting.  And I want to say there may have been a

9    couple other attorneys.  I just don't recall their

10   names.

11             Q.   Was anybody from Carrier at that meeting?

12             A.   Yes, there was.  Thank you.  That was

13   Howard Jamieson was there.

14             Q.   What -- what is Howard Jamieson's role?

15             A.   Well, I think Howard kind of inherited

16   the -- the PTAC power cord issue.  And if I recall,

17   Howard actually has -- had retired from Carrier by

18   that time.  And but he was the -- still the point

19   person for Carrier on -- he had some recollections on

20   I guess the history of the LCDI being put on the

21   Carrier PTAC units and the problems that they had

22   with it.

23             Q.   Okay.  And what did he tell you, if

24   anything, about his conclusions?

25             A.   I don't recall Howard having any

Jeffrey Lindsey

48

1    conclusions.  I think he was there more for anything

2    just to answer questions.

3            Q.   Okay.

4            A.   And actually it was from Howard that I

5    received all these cords in December of 2018.  Howard

6    brought them over from Indianapolis to our offices.

7            Q.   Okay.  Do you know whether Mr. Starr was

8    ever involved in the investigation of TRC LCDI cords?

9            A.   He wasn't involved in my investigation,

10   so I can't answer that.  I don't know what Derek's

11   role was with Carrier.  I know that Derek does

12   Carrier cases.  Frankly, I just don't know what he

13   did for the LCDI.

14           Q.   Okay.  And do you have any idea why

15   Mr. Starr -- Mr. Starr did not work on this case?

16           A.   That wasn't my decision so I can't answer

17   that.

18           Q.   All right.  I want to show you an invoice

19   dated January 31, 2019.  And then it looks like

20   starting on December 6, 2018, through January 4,

21   2019, this lab examinations -- those lab examinations

22   are what we talked about, you going through the TRC

23   cords that you got from Mr. Jamieson, right?

24           A.   Yes.

25           Q.   And then February 28, 2019, invoice,

Jeffrey Lindsey

49

1    there's a 1-23-19 and 1-30-19 lab examinations.

2    Again, you going through these cords, right?

3         A.   Yes.

4         Q.   Should there be dates -- photo dates that

5    match up with all these lab examination entries?

6         A.   There -- you know, I only take pictures

7    when I see something of interest.  I didn't

8    necessarily document everything I looked at.  So I

9    guess the easy answer is there may not be photographs

10   taken on each day that I did a lab examination.

11        Q.   Do you take photographs every time you

12   disassemble something?

13        A.   If it's -- if it's physical evidence,

14   yes, I do.  I didn't really treat -- I didn't really

15   treat starting on -- I was trying to figure out a

16   starting point.  I mean, I had so many cords, and to

17   be perfectly honest, I didn't necessarily document

18   the disassembly, or I may have gone back and looked

19   at the same one I had already looked at.  So I just

20   think that any time I saw anything noteworthy, I

21   would document it.  I would start the documentation,

22   but if I was going back over and looking at stuff I

23   had already looked at, I wouldn't necessarily take

24   any pictures.

25        Q.   Okay.  All right.  Then I'm going to jump

50

1    down to an invoice August 29, 2019.  There -- for

2    Mr. Easley there are "Evidence Exam-Materials

3    Analysis Entries" on August 7, 2019.  Do you know

4    what he was doing there?

5         A.   He was doing his own thing.  You know, I

6    had -- I had turned evidence over to him for him to

7    examine.  And, you know, if this is his earliest

8    entries, that would have been what he was doing was

9    just starting his process of disassembling and taking

10   a closer look at the materials and the things that we

11   had discussed.

12        Q.   An invoice on November 21, 2019.

13   August 30, 2019, there's a testing that is done.  Do

14   you know what testing that was?

15        A.   Offhand I don't recall now what it was.

16   This would have been the period of time where I was

17   trying to -- this may have been when I was doing my

18   thermal testing where I was using the FLIR to try to

19   run some current through these devices.  And I had

20   several issues, I guess, with the way I was doing the

21   testing, so I had to do a lot of work to -- the FLIR

22   didn't really want to get down to that macro view, I

23   guess, of the contact.  I was getting extraneous

24   information from the whole device, so I spent a lot

25   of time trying to get that improved.

Jeffrey Lindsey

51

1          Q.   And what did you ultimately end up doing

2     to improve that?

3          A.   Well, ultimately I decided the FLIR

4     wasn't the right tool, and so then the next thing I

5     had to do was I had to measure the temperatures on

6     the contacts.  There's a little bit of a problem with

7     that.  You can't -- our equipment, it's only designed

8     to work at very low voltages; and, of course, I was

9     running 120 volts or 240 volts through this device to

10    load it down.  And that would have damaged our

11    temperature measuring equipment, so I had -- I had to

12    build a circuit to interface so that to keep the

13    voltage levels safe so I wouldn't damage the computer

14    that was recording the temperature data.

15         Q.   All right.  I -- we went through your

16    photos, and I saw photos in where you documented your

17    what I am going to call ERM.  Where are your photos

18    documenting your heat measurement testing?

19         A.   Well, there's those FLIR measurements.

20         Q.   What -- did -- we went through all your

21    photos, and I don't recall seeing -- did you

22    photograph or video when you did your thermal or heat

23    testing measurements?

24         A.   I don't believe I did, no.  I certainly

25    didn't do any videos.

Jeffrey Lindsey

52

1       Q.   Did you take any photos of your heat
2   testing measurement?
3       A.   I think the only photos I would have had
4   would be in the notes themselves.  If there's any
5   photographs, I would just -- shot it from the iPad.
6   So if you go down to thermal imaging, that one right
7   there --
8       Q.   So we're in your "Lindsey Notes" folders,
9   and the only measurements that -- or only photographs
10  you have of this are found on these two pages?
11      A.   That's correct.  Yeah.  I mean, it's --
12  it's just basically I was trying to, you know -- I
13  took a lot of FLIR images, but to be honest with you,
14  after a while I just was not -- I was disenchanted
15  with the -- I couldn't really zero in on the actual
16  temperature of the contact, and it just -- it wasn't
17  working.
18      Q.   Where are all those FLIR images?
19      A.   Well, I didn't save them because they
20  aren't -- I mean, these are just representative of
21  all basically the testing I did.
22      Q.   You said you had to build some apparatus
23  in order to take these FLIR measurements?
24      A.   No, not the FLIR.  Actual thermocouple
25  measurements.

Jeffrey Lindsey

53

1          Q.   All right.  Where are the photos of those

2     and what you -- and the device you had to use?

3          A.   I didn't take any pictures of it.

4          MR. KUCHARZ:  Object to form.

5          Q.   How did you record those values -- how

6     did you document those values if you didn't take any

7     photographs?

8          A.   Well, that -- you asked me questions

9     about the spreadsheet.  That's where that data came

10    from is from those measurements.

11         Q.   Don't you usually document the testing

12    you do either by video or -- or a photograph so that

13    other people can see exactly how you set up your

14    testing?

15         MR. KUCHARZ:  Object to the form.

16         A.   No.  No.  No.  I mean, the documentation

17    was the actual recording of data.  That's the only

18    thing that's important.

19         Q.   Well, isn't it important for another

20    expert who is evaluating your work to see exactly how

21    you did it and where you -- where you set up and

22    where you pointed the measuring device?

23         MR. KUCHARZ:  Object to the form.

24         A.   Well, the measuring device, I said I was

25    measuring the temperature of the contact.  The -- the

Jeffrey Lindsey

54

1    thermocouple is actually affixed to the contact.

2         Q.   And isn't it -- isn't it important for us

3    to understand how you did that and what that looked

4    like?

5              MR. KUCHARZ:  Object to the form.

6         A.   It's -- it's a temperature measurement.

7    I'm physically touching the contact with the

8    measuring device.  I don't need to take a picture.

9    That's -- I'm just -- I'm stating this is where the

10   temperature came from.

11        Q.   What measuring device did you use?

12        A.   Thermocouple, a type K thermocouple.

13        Q.   Is the -- so this -- I'm going back to

14   the invoice, the November 21, 2019 invoice.  Do you

15   know specifically what testing was done on 8-30-2019?

16        A.   Not from looking at that, no.

17        Q.   How would I -- how would I find out?

18        A.   Right offhand I'm not exactly certain how

19   you would find out.  We would have to go back through

20   the notes I've taken, the photographs I've taken, and

21   I would have to try to reconstruct what I did and

22   when I did it.

23        Q.   Every time you did testing, you didn't,

24   you know, write down today's date, this is the

25   testing that I'm doing, and here are the testing

55

1     results?

2               MR. KUCHARZ:  Object to the form.

3          A.   Well, I -- I spent a lot -- as I

4     indicated to you, I spent a lot of time trying to

5     measure temperatures of the contacts with the FLIR

6     and so that probably is in that period of time.  Also

7     in -- after I gave up with the FLIR and then I went

8     to developing a method to test directly the surface

9     temperatures using the thermocouple.

10              And my recollection is all this time I'm

11    charging right there is basically that's what I'm

12    doing.  That is what I was doing during that period

13    of time.  So while Tom was doing his examination of

14    the -- of the contacts and the whole conductive path,

15    if you will, I was trying to come up with a better

16    way of measuring the temperatures at the contact.

17         Q.   When you ultimately -- the numbers that

18    are reflected in your report, when you ultimately

19    connected the thermocouple, were you connecting it to

20    the stationary contact or the moveable contact?

21         A.   It depended.  It depended where the

22    easiest surface was.  And but since they are

23    physically touching each other -- if you're measuring

24    a temperature and they are touching each other, you

25    are basically measuring the temperature at the

Jeffrey Lindsey

56

1    contact.

2          Q.   That was my next question.  All of your

3    measurements were with the contacts touching each

4    other?

5          A.   Yeah, because -- well, if the -- if the

6    contacts aren't closed, you can't pull current

7    through there and you're not going -- I mean, the

8    temperature won't rise.  So it depended whether I was

9    testing the TRC or the Tower because I did

10   temperature testing on both of them.  It was easier

11   on the TRC to measure the moveable contact because

12   that's the one on top.  And on the Tower, at least in

13   one specific part, I would have had to measure it off

14   the stationary contact because I couldn't really get

15   the thermocouple in on the moveable one.  So it just

16   kind of depended how the device was constructed on

17   where I physically put the thermocouple.  But because

18   the contacts were closed, I'm essentially measuring

19   the temperature of both.

20         Q.   Was the -- when you were measuring the

21   thermo -- the contacts on the Tower and the TRC, had

22   you removed the plastic housing?

23         A.   Yes.

24         Q.   It was completely removed?

25         A.   Yes.

Jeffrey Lindsey

57

1        Q.    Was there anything else surrounding

2   either one of those, or was it just basically the

3   internal components were kind of out in the open, and

4   you were touching them with thermocouple?

5              MR. KUCHARZ:   Object to the form.

6        A.    Basically I had removed -- I believe the

7   circuit board was still plugged -- the blades were

8   still going through the plastic housing and on the

9   bottom, but the top housing was removed.  So the top

10  would have been exposed.

11       Q.    What -- how were you running power

12  through?  Was it plugged into an outlet?

13       A.    No.  No.  I had a -- I had an electrical

14  current, I call it a load box, so essentially what I

15  am doing is I'm pumping -- I pump 20 amps through --

16  I shorted -- I basically put a jumper across, and so

17  I just ran from the cord in, I connected the cord

18  directly to the load box, and then I pumped 20 amps

19  through the circuit.  So it goes down one side, I

20  have the horizontal and the vertical blade, there's a

21  short, there's a jumper across the two, then the

22  current flows back through the other way back out.

23       Q.    But the electrical current is coming in

24  through the blades and then going out?

25       A.    No.  It would actually be coming in the

Jeffrey Lindsey

58

1    opposite direction.  It would be coming from the cord

2    in.  I cut the connector off at the end and put that

3    directly on the load box.

4          Q.    When --

5          A.    When the two -- the horizontal and

6    vertical blade, I would have a jumper bolted across

7    it so it -- so it's jumpered.

8          Q.    When the -- this LCDI cord is in use, the

9    electricity is coming through the blades, right?

10         A.    Yep.  Yes.

11         Q.    Do you have any concern that by running

12   the electricity the op -- from the cord as opposed to

13   the blade, that that would change your results?

14         A.    No.  Current -- flow current isn't going

15   to change.  That ain't going to matter so.

16         Q.    Okay.  There is an entry on this invoice

17   of Mr. Chojecki.  What is -- what is his role?

18         A.    He was assisting Tom.  He is another

19   materials engineer, so he was assisting Tom somehow.

20   I don't know.  I don't -- I don't know if he was

21   helping him use the SEM or what so.

22         Q.    In February 18 -- this is invoice

23   March 27, 2020.  February 18 of 2020, you're doing a

24   report preparation.  What report is that?

25         A.    It's probably one of those presentations.

Jeffrey Lindsey

59

1    I just charged my time that way.

2        Q.   Then we're on an invoice May 26, 2020.

3    A -- on May 7, 2020, "Design and construct test

4    apparatus."  What is that?

5        A.   That was probably when I finally

6    finalized my design for testing the temperatures.

7        Q.   Do you still have that test apparatus?

8        A.   Yep.  Sure do.

9        Q.   Have you taken any photos of it?

10       A.   Nope.

11       Q.   Is it -- is it in proximity to where you

12   are today?

13       A.   Yeah.  I can actually -- I believe I can

14   go wrap them and probably show them to you, or I can

15   take a picture of them.

16       Q.   Okay.  If you could take a picture at a

17   break, it's -- you know, I'm a layperson.  It's hard

18   for me to understand some of this stuff so.  If you

19   wouldn't mind do that at a break, I would appreciate

20   it.

21       A.   All right.

22       Q.   All right.  Then there is an invoice

23   December 31 of 2020.  "Attorney contact Brooke

24   Loucks, attorney for Carrier."  Do you know who that

25   is?

Jeffrey Lindsey

60

1          A.   I -- I really have no idea what that is.
2     I don't recall that at all.
3          Q.   All right.  Then we've got an invoice
4     July 19 of 2021.  And then on June 24 of 2021,
5     there's a lab examination.  That was obviously
6     recently.  Do you know what that -- you were doing
7     there?
8          A.   Yeah.  I had -- I had gone -- I had gone
9     back in, and this was before the report was prepared.
10    And I had gone back in, and I just was basically
11    going over some of the evidence, you know, checking
12    photographs, checking notes.  You know, I was just
13    basically -- at that time I was gathering -- I'm
14    starting to, I guess, mentally prepare how I was
15    going to write the report.
16         Q.   And that's what you're doing at these
17    other lab examinations in July?
18         A.   That's -- that and I was measuring the
19    electrical resistance of the contacts.  Like I said,
20    we had just gotten the milliohm meter and it was kind
21    of an expensive purchase and so I was -- bought it
22    for another project, but I was using it on this one.
23         Q.   Okay.  Have you done any work related to
24    your investigation in this case that is not on these
25    bills?

Jeffrey Lindsey

61

1          A.    Just, you know, getting ready for this

2     deposition.

3          Q.    Okay.  And what did you do to get ready

4     for this deposition?

5          A.    Well, again, I have gone back in and, you

6     know, there is -- I believe there is some photographs

7     that should be in there from earlier this month or

8     last month, I guess, that I have gone back in and

9     taken some more pictures of -- of the evidence.

10         Q.    Okay.  You understand there was a fire

11    that occurred in room 203 of the Toccoa Inn?

12         A.    I -- I do know that, yes.

13         Q.    Obviously you've never seen that -- that

14    room 203 PTAC or the cord attached to that PTAC,

15    right?

16         A.    No.  I just saw some photographs but

17    that's it.

18         Q.    Have you ever visited the scene at the

19    Toccoa Inn?

20         A.    I have not.

21         Q.    Have you ever communicated with any of

22    the fact witnesses related to that fire or anybody

23    who investigated that fire within two months of the

24    fire occurring?

25         A.    No.

62

1        Q.   Have you spoken with any current or

2   former employees of TRC about your investigation or

3   the issues in this case?

4        A.   I have not.

5        Q.   Did -- did you receive production

6   documents in this case that had Bates labels on them

7   like a TRC Bates label and a Carrier Bates label?

8        A.   No, I have not.

9        Q.   You haven't received -- received any

10   Bates labeled documents in this case.

11       A.   No.  If I had, they would be in the file

12   so.

13       Q.   Okay.  Then I know the answer to this

14   question, but I'm going to ask it anyway, there has

15   been significant E-discovery that's been done this

16   year.  Have you reviewed any of the E-discovery

17   that's been done this year in this case?

18       A.   I have not.

19       Q.   Were you aware that as -- as part of the

20   documents produced in this case, there are -- there

21   is -- there are documents and presentations from your

22   company SEA prior to your involvement?

23       A.   No.

24       Q.   None of the lawyers for this -- for

25   Carrier or anybody at Carrier told you that?

Jeffrey Lindsey

63

1          A.    That's correct.

2          Q.    Did you ask anybody at Carrier or the

3    lawyers whether -- what other investigation was done

4    by your company or anybody else?

5          A.    No.  I've been focused on my

6    investigation.

7          Q.    Okay.  Mr. Lindsey, we've been going for

8    a little while.  I'm happy to keep going, but I want

9    to offer you a break if you need one.

10         A.    I'm fine.

11         Q.    All right.  Let's -- let's keep rolling

12    then.  All right.  So I looked at your -- you know,

13    you joined SEA in 1985 and prior to that what -- what

14    type of work were you doing?

15         A.    Prior to SEA?

16         Q.    Yep.

17         A.    Okay.  I basically had a power company

18    background prior to SEA.

19         Q.    And just in laymen's terms, I'm sorry, in

20    laymen's terms, what were you doing at the power

21    companies that you were working with?

22         A.    Well, I started out at Appalachian, and

23    it was kind of a combination field/lab type of job.

24    I was out in the field a lot.  I was in the metering

25    section, and so basically I was involved in, you

Jeffrey Lindsey

64

1    know, where the -- the electrical supply basically is

2    connected to the customer.  That would be a big

3    involvement.  So I was involved in testing of

4    equipment.  That's the other thing that they did

5    there was they tested a lot of equipment.

6              I did do some failure analysis, damaged

7    electrical equipment would come in.  I went out to a

8    couple different -- I remember I went out to a couple

9    electrical accidents.  Company involved, the company

10   employee accidents.  I was out, and I participated in

11   the investigation of that.

12             I was transferred up to the American

13   Electric Power Service Corporation and that was

14   primarily an office job.  Instead of one operating

15   company, which was Appalachian, I basically had seven

16   or eight to deal with.  I had some specialties, and I

17   did transform -- metering transformer specifications

18   and testing.  I was in charge of the meter security

19   documents, so basically how we keep people from

20   stealing electricity.

21             While at AEP I -- I was loaned out to the

22   USAID and I went over to Pakistan and I was part of

23   their rural electrification program and involved

24   primarily with metering and training their people to

25   test and install and operate meters.  Then I went to

Jeffrey Lindsey

65

1    SEA.

2        Q.   Okay.  Have you authored or coauthored

3    any peer-reviewed publications related to the -- your

4    opinions in this case or the issues that we're

5    talking about?

6        A.   No, other than the report that you have.

7    That's the only thing I've written.

8        Q.   I want to talk about your expert

9    consulting career.  Is -- was 1985 the first year

10   that you were hired by a lawyer to help consult on a

11   lawsuit?

12       A.   That's correct.

13       Q.   Okay.  And since 1985 until today, would

14   you say 100 percent of your labor income is working

15   on lawsuits assisting lawyers?

16       A.   I wouldn't say it's 100 percent.  You

17   know, it's probably the majority of my work is --

18   is -- has the potential, I guess, of going to

19   litigation.  I do a fair amount of product evaluation

20   towards -- I have several cases right now where

21   basically I am helping to defend a manufacturer.

22   They have to go up in front of the CPSC for possible

23   recalls, and so I do a fair amount of that.  But I

24   think the majority of my work probably could end up

25   in litigation, yes.

Jeffrey Lindsey

66

1    Q.   Okay.  So between, you know, matters for
2  litigation or helping manufacturers with CPSC
3  investigations, is that 100 percent of your labor
4  income, or do you do anything else?
5    A.   That's it.
6    Q.   Okay.  What percentage of your -- do
7  you -- do you ever take any cases for individuals, or
8  is essentially all of your work for companies or
9  manufacturers?
10    A.   Oh, well, no.  There have been times
11  where, you know, I've been involved in cases, I
12  guess, say a person has passed away, died in an
13  accident; and, you know, I have worked for their
14  estate as far as the investigation is concerned.  So,
15  you know, I would say there have been times when I
16  have worked for individuals or entities that
17  represent individuals, I guess.
18    Q.   Within the past five years, what
19  percentage of your matters are for individuals versus
20  companies?
21    A.   The vast majority would be for either
22  insurance companies or manufacturers.  Very -- I have
23  very few cases -- I may only have one or two cases a
24  year that -- you know, where it's an individual.
25    Q.   What -- currently what is your caseload?

Jeffrey Lindsey

67

1          A.   Oh, gosh --

2               MR. KUCHARZ:  And if I could jump in,

3     Dr. Lindsey, I would advise you not to reveal any

4     information about cases in which you've been retained

5     as an expert but yet -- have not yet been disclosed

6     as an expert witness.  I believe that's subject to

7     work product protection.

8               MR. BOORMAN:  I'm asking for the number.

9               MR. KUCHARZ:  Oh, okay.  I thought you

10    were asking him to get into specifics.  That's fine.

11         A.   Right -- right now.  I -- I don't know

12    what my caseload is to be honest.  I -- right -- you

13    know, during -- toward the end of the pandemic there

14    haven't been a lot of new cases but there's certainly

15    been a lot of old cases that, you know, all of a

16    sudden become -- like this one become very active.

17    So I think right now I'm looking at -- you know, I

18    have about 20 or 30 open files.

19         Q.   Okay.

20         A.   You know, and -- you know, I may be

21    picking up four or five new jobs a month, but I

22    have -- I have a bunch of old stuff that's keeping me

23    really busy.

24         Q.   How many cases have you had or have with

25    Hall Booth?

Jeffrey Lindsey

68

1      A.   As far as I know, this is my first one.

2      Q.   Okay.  And how many cases have you been

3  retained by a lawyer representing Carrier?

4      A.   By a lawyer representing Carrier --

5      Q.   Well, let me just make it easier, how

6  many cases do you have in -- where you're testifying

7  on behalf of Carrier?

8      A.   I -- I do a number of investigations

9  where Carrier products are related that I've been

10  contacted directly by Carrier.  As far as litigation,

11  very few.

12      Q.   How many matters have you had for Carrier

13  over the years?  Is it -- is it 10?  Is it a

14  thousand?  Can you give me an estimate?

15      A.   No, I don't keep those kind of numbers.

16  You know, it varies from year to year, but I

17  certainly worked for Carrier a fair number of times.

18  I just don't have a number for you.

19      Q.   When -- when is the first year that you

20  worked for -- you started working for Carrier?

21      A.   Probably about the second or third year

22  that -- after I was hired so in the late '80s.  I

23  definitely remember going out to the upper New York

24  State for the -- those PTAC recalls.  That was in the

25  late '80s.  But I work for a number of HVAC

Jeffrey Lindsey

69

1    companies.  That's -- that's one of my areas that I

2    do work a lot so.  Not only is it for Carrier but

3    it's for Trane.  It's for other HVAC companies.

4         Q.   You're obviously giving opinions critical

5    of TRC today.  What other manufacturers or component

6    part manufacturers have you testified against?

7         A.   Oh, goodness.  I -- I -- well, right at

8    the moment, my mind is blank.  I know I have, but I

9    can't really give you any other names right at the

10   moment.

11        Q.   What -- what other types of products have

12   you given an opinion were defective?

13        A.   Well, you know, I'm an electrical

14   engineer, and I do fires.  And so pretty much any

15   product that you plug in, you know, has a failure

16   mode that could cause a fire.  So I have pointed the

17   finger at a lot of different products that have

18   failed.  I've also pointed a finger an awful lot at

19   the users, you know, there was no fault of the

20   products.  So it's just, you know, I don't know how

21   to answer other than that.

22        Q.   Well, what -- I'm saying what types of

23   products have you -- have you ever found a PTAC to be

24   defective?

25        A.   Yeah.  No, there was -- there were PTACs

Jeffrey Lindsey

70

1    that were defective because I've been involved in

2    recall campaigns where I have worked for

3    manufacturers where they were recalling the units.

4    Before they could get the unit out, it had caught on

5    fire, and then our investigation basically verified

6    that it failed because of the issue that the recall

7    was addressing.

8         Q.   Okay.

9         A.   So --

10        Q.   So you've -- you've found certain Carrier

11   PTACs to be defective in the past as -- as you told

12   us you were involved with the recall, right?

13             MR. KUCHARZ:   Object.   Misstates the

14   testimony.   And also, Dr. Lindsey, again, I would

15   advise you not to provide any information on matters

16   in which you were retained as an expert but were not

17   disclosed as a testifying witness.

18        Q.   Have -- have you ever testified or been

19   disclosed that and given the opinion that a Carrier

20   PTAC was defective?

21        A.   I have never testified to that or been

22   disclosed, that's -- that is -- that is true.

23        Q.   Have you ever given -- been -- testified

24   or been disclosed that any PTAC was defective?

25        A.   I believe I offered testimony in a case

Jeffrey Lindsey

71

1    involving a General Electric PTAC unit many years

2    ago.  That's the only one that I recall actually it

3    going that far and it probably was a deposition.

4         Q.   And what -- what was wrong with that

5    PTAC?

6         A.   Well, it overheated.  There was

7    maintenance issues with it.  They hadn't cleaned the

8    filters, but it did go ahead and overheat and ignited

9    the plastic housing of the -- of the unit.

10        Q.   What was the defect is my question?

11        A.   Obviously it didn't sense the fact that

12   it was overheating.  The controls failed to stop --

13   it had an electric heat element in it and the unit

14   failed to sense that it was overheating and, you

15   know, the overheating condition got to the point

16   where the unit caught on fire.

17        Q.   Have you ever given the opinion in

18   testimony or in a disclosure that a cord set was

19   defective other than this one?

20        A.   Can you repeat that again?

21        Q.   Sure.  Have you ever given the opinion

22   whether in testimony or in disclosure that a cord set

23   was defective other than the one we're talking about

24   today?

25        A.   I don't recall any -- any of my PTAC

72

1    cases involving cord issues going as far as that I

2    wrote a report or I testified either in deposition or

3    trial.

4         Q.   And have you ever been disclosed or given

5    an opinion in testimony that a cord set was not

6    defective?

7         A.   No.

8         Q.   How many times have you given opinions

9    about the origin and cause of a fire?

10        A.   Oh, many times.  I don't have a number

11   for you.

12        Q.   Would it be over 100?

13        A.   Yes.

14        Q.   Would it be over 500?

15        A.   Well, I've certainly authored more than

16   500 reports where I've given opinions about the

17   origin and cause of a fire.

18        Q.   Okay.  I mean, would you have authored

19   more than a thousand reports about the origin and

20   cause of a fire?

21        A.   I'm sure, yes.

22        Q.    Is that the best estimate you can give,

23   or would you say it was 2,000 or 3,000 or?

24        A.    You know what?  Whatever I give you is

25   going to be a guess because I don't keep track of it

Jeffrey Lindsey

73

1    but I've been doing this for 36 years and, you know,

2    this is what I do.  A lot of what do I is fire cause

3    and origin, so I've certainly had several thousands

4    of jobs involving fires where you wrote reports so,

5    you know, I just -- I can't really give you a number.

6         Q.   Have you ever been excluded or limited in

7    your testimony?

8         A.   No.

9         Q.   Have you ever been qualified as an expert

10   in Florida?

11        A.   In Florida?  I know I've given

12   depositions in Florida.  I don't -- I've never

13   testified in a trial in Florida.

14        Q.   Okay.  Have you ever been convicted of a

15   crime or pled guilty to a crime?

16        A.   No.

17        Q.   And have you ever been suspended or

18   disciplined by any organization?

19        A.   No.

20        Q.   Have you ever worked for a manufacturer

21   as an employee of a PTAC?

22        A.   I have not.

23        Q.   Have you ever worked as a manufacturer as

24   an employee for cord sets?

25        A.   I have not.

Jeffrey Lindsey

74

1    Q.   Have you ever designed any component of a
2    PTAC or a cord set?

3    A.   I have not.

4    Q.   And do you -- do you own any LCDI cords?
5    Like do you have them at your office or at your work?

6    A.   Not -- not at this office, no.  There was
7    an LCDI on a PTAC we had at our old office back in
8    the lab but not -- not presently where we are at now.

9    Q.   When -- when was that?  Was that a year
10   ago or 20 years ago?

11   A.   No, no.  The lab was -- I would say we've
12   been out of the old building now for I think three
13   years.  And the lab we -- we built that lab probably
14   about 12 years prior to that so that would have been
15   15 years ago, I guess.

16   Q.   Do you remember what type of PTAC and
17   what type of cord set it was?

18   A.   No.  I was trying to think about that
19   actually this morning.  And it was a -- it was a
20   Korean model.  I'm not quite sure.  I don't -- I
21   don't know if it was LG.  I'm not quite sure whose it
22   was, but it wasn't -- it wasn't one I was really
23   familiar with.  It was just the contractor we had
24   build the lab, that's what they stuck in there.

25   Q.   Okay.  And you don't know if it was a TRC

Jeffrey Lindsey

75

1    or Tower cord, do you?

2         A.   No.  I do not recall that.  I just know

3    there was one on it.

4         Q.   Okay.  So to -- well, I tell you what,

5    I'm about to launch into some questions related to

6    the specific makes and models of the PTAC in room 203

7    and the cord set because I want to make sure we're

8    specific about those -- those model numbers so just

9    make sure we're talking about the same thing.  So why

10   don't -- let's take a 10-minute break.  Would that

11   give you enough time to -- to make sure you

12   understand the model number of the cord set?

13        A.   Yeah.  That's -- that's fine.

14        Q.   Great.  All right.  We'll take 10 minutes

15   now.  And if you do have time and you can take a

16   picture of that apparatus, great.  If not, we'll

17   catch it another break, okay?

18        A.   Okay.  In fact, I'll go grab it right now

19   so.

20             MR. KUCHARZ:  Mr. Lindsey, I -- you know,

21   I think Michael and I are used to working through

22   lunch.  I don't know what your preference is on that

23   so if -- if you are in need of or would like to take

24   a little more than 10 minutes, you can get something

25   to eat, now would be the time to do it.  If not, just

Jeffrey Lindsey

76

1    let us know and we can stick with the 10-minute

2    break.

3            Q.   And, Mr. Lindsey, I echo that.  If you

4    want to take lunch now, if you want to take lunch

5    later, it's your schedule that I'm working on so let

6    us know.

7            A.   Why don't you give me 30 minutes because

8    I brought a lunch.  Let me just eat that and I will

9    gather all the other stuff we talked about and so.

10               MR. BOORMAN:  All right.  Thank you.

11   I'll see -- see you in 30 minutes.

12               THE WITNESS:  Good enough.

13               (Thereupon, at 12:22 p.m., a lunch recess

14   was taken.)

15                           - - -

16

17

18

19

20

21

22

23

24

25

77

1          Thursday Afternoon Session,

2          August 26, 2021.

3              - - -

4          THE VIDEOGRAPHER:  Okay.  The time is

5    approximately 12:57 p.m.  The camera is rolling, and

6    we are back on the record.

7              - - -

8          JEFFREY E. LINDSEY, P.E., IAAI-CFI

9    being previously first duly sworn, as hereinafter

10   certified, deposes and says further as follows:

11         CROSS-EXAMINATION (Continued)

12   By Mr. Boorman:

13         Q.   Okay.  Mr. Lindsey, it looks like you're

14   screen sharing, and can you tell me what I'm looking

15   at?

16         A.   Well, you had asked for a picture of the

17   test setup I created for measuring the temperatures

18   and essentially these are the important items, I

19   guess.  The plexiglass blocks up there, each one has

20   a temperature transmitter on it.  And the purpose of

21   that is normally you could just connect the

22   thermocouple directly to the -- to the recording

23   device which is the blue box down below.  But because

24   the voltages were at 120 or 240 volts, depending on

25   how high it's set up, that would put too much voltage

78

1    into the device and burn it up.  So the plexiglass

2    blocks, basically they have a device on them that

3    takes the temperature, creates an analogue signal

4    that I then reduce to a -- to a voltage, a scaled

5    voltage, and then that's just -- so that gets me the

6    electrical isolation to -- to measure the contacts'

7    temperatures as electrical current was flowing

8    through the contacts.

9         Q.    All right.

10        A.    And it just took a while to get it set

11   up, get the right devices, get it scaled properly so

12   that it was measuring the proper temperature and so

13   this is the end result.  I have -- these two here are

14   for 0 to I believe 800 degrees Fahrenheit, and I also

15   had two blocks that 0 to 300 degrees Fahrenheit.  So

16   the 0 to 300 I would use -- typically use them first,

17   and then for some of the contacts it actually got hot

18   enough that I had to go to the 0 to 800.

19        Q.    Okay.  I'm going to mark this photo as

20   Exhibit 3.  I guess it's a photo of the thermocouple

21   apparatus.  Is that an okay way to describe it?

22        A.    That's fine.

23        Q.    Okay.  Great.

24        A.    And you had also asked about the model

25   number for the TR -- TRC LCDIs.

Jeffrey Lindsey

79

1        Q.    Yes.

2        A.    And I did some digging on that and --

3    hold on.  That should be -- this is the common unit

4    for all of the ones I looked at.  So it's model

5    No. 37190.

6        Q.    Okay.  Did you document the model number

7    for all 150 or so of the TRC cord sets that you

8    inspected?

9        A.    I would have taken a picture of the

10   nameplate of every one that I disassembled.

11       Q.    Okay.  Is that -- is this what you call

12   the nameplate?

13       A.    Yes.

14       Q.    Okay.

15       A.    It is what I'm calling the nameplate, so

16   right.  So anything that I took apart I would have

17   taken a picture of the nameplate.

18       Q.    Okay.  Thank you.  Are you aware that

19   there is a 37190MMV?

20       A.    I think I did see that on some of them,

21   yes.

22       Q.    All right.  And you -- basically the

23   nameplate might say MMV after the number; is that

24   what you're telling me?

25       A.    That is correct, yes.

Jeffrey Lindsey

80

1        Q.    Thank you.  Okay.  Anything else?

2        A.    I think that was it, wasn't it, so?

3        Q.    Yes.  And then I'm going to -- I'm going

4    to share my screen because there was a couple pieces

5    of correspondence I want to ask you about.

6        A.    Sure.

7        Q.    But I think you might have to stop --

8    have you stopped sharing your screen yet?

9        A.    I thought I had but.

10       Q.    Okay.  Let me -- let me try to do this.

11   Are you seeing an e-mail?

12       A.    I am.

13       Q.    All right.  So this is the PDF "Carrier

14   versus TRC Correspondence TW" and it's page 88.  You

15   sent an e-mail on May 31, 2019, and at this point in

16   time it looks like you were thinking that there was

17   overheating occurred between dissimilar metals

18   connected together within the plug.  Can you tell me

19   what you mean by that?

20       A.    I am trying to zoom in a little bit so I

21   can read it.

22       Q.    Yeah.  I can --

23       A.    I think maybe you have to do it --

24       Q.    Yeah.

25       A.    -- so.  All right.  What was this -- when

81

1    was this dated?

2            Q.   Hold on one second.  Let me get --

3            A.   That's good.  Yeah, so this was -- this

4    was really why I got Tom involved, Tom Easley

5    involved was this was early on when I was, you know,

6    kind of brainstorming, different ways that the plug

7    could fail.  And one thing you notice if you look at

8    how this thing is constructed, actually there's a

9    picture of the construction inside the report, it

10   shows that you have one material which is the male

11   blade and then it is riveted with two rivets to

12   another piece.

13            And so early on one of the things that I

14   identified as something I wanted to take a closer

15   look at was the interaction between those two metals

16   and the rivets.  And so I had spoken -- that's really

17   why I got Tom involved early on was I -- I knew I was

18   going to need his help with a materials analysis.

19            And so that's when this e-mail was

20   generated so I had talked to the client and I told

21   them that this was one of the -- the areas of pursuit

22   I wanted to take and I was going to bring a materials

23   engineer onboard to help me do that.

24            Q.   Okay.  I understand this is early on in

25   your investigation.  You ultimately did not conclude

Jeffrey Lindsey

82

1    that dissimilar metals that you just described

2    were -- was a defect; isn't that true?

3         A.    Yes, sir, that's correct.

4         Q.    All right.  So I'm going to show you

5    another -- all right.  So the next e-mail I'm going

6    to show you is in the PDF "Carrier V TRC

7    Correspondence JL," and it is page 45.  And here you

8    are e-mailing Ms. Winks that you have narrowed it

9    down to the relay's stationary contact arm.  Again, I

10   know this is -- you haven't concluded your

11   investigation.  Did you ultimately conclude that the

12   relay's stationary contact arm was not a defect?

13        A.    Yeah.  I think this is -- this is another

14   thing so.  You know, and this kind -- honestly

15   this -- this kind of shows, you know, how things are

16   supposed to work, I guess, where the methodology is

17   you identify potential hypothesis for explaining

18   what's taking place.

19             We know that there's some kind of

20   overheating taking place so one thing that was

21   identified was dissimilar metals.  This is another

22   one where we are talking about there is actually a

23   large piece of the material is removed.  And so, you

24   know, in brainstorming with Tom, you know, I said,

25   "Well, what could we do to either prove or disprove

83

1    this?"

2              And again, this is -- I'm explaining to

3    the client why we need to go this way.  And so again,

4    it didn't pan out.  You know, our testing after we

5    got done, after Tom completed his analysis, you know,

6    this didn't pan out.  So this was another, I guess,

7    avenue that we approached, we took a look at that --

8    that, you know, we applied the scientific method to

9    it and, you know, once we disproved it, we moved on.

10         Q.   Okay.  And so this is -- I know you

11   looked into it.  You -- as you sit here today, you're

12   not contending there's a defect with the relay's

13   stationary contact arm; is that true?

14         A.   That is correct.

15         Q.   All right.  Then another e-mail you sent

16   on September 30, 2019, and this is page 43 of that

17   same PDF.  Now you're talking about "relay contacts

18   both exhibit damage that is more in line with

19   contacts of a relay with significant wear from

20   constant opening and closing."  Can you tell me what

21   you mean by this?

22         A.   Right.  All right.  So the point of an

23   LCDI is it's one of these devices that's really

24   designed to never be used.  And so the relays that

25   are in it, the relay that is in it, is only to open

Jeffrey Lindsey

84

1    in the -- in the event that the cord is damaged and

2    fails.  So it's quite possible that an LCDI would go

3    its entire life and never be used.  In fact, that's

4    the hope.

5              And it's really only to be used in the

6    event that the cord is damaged.  So the contacts

7    really shouldn't have any wear on them.  I mean, if

8    they have any wear at all, it would be whatever

9    happens in the factory.  They have some kind of test

10   cycle in the factory goes through.  That should be

11   the only wear that you see on the surfaces of the

12   relay contact.

13             And what we were seeing -- and this is

14   basically, you know, when we start disassembling the

15   relays and started looking at, you know, the things

16   that we were looking at in the lab, you know, each

17   one of these contact surfaces was really pitted and

18   there was a lot of melting and there was a lot of

19   damage to it and there was more than I expected to

20   see on a relay that just wasn't designed to be used.

21        Q.   Okay.  And this ultimately is where

22   you've ended up with respect to your investigation,

23   right?

24        A.   This is what pointed us towards taking a

25   closer look at the relay contacts so.  You know, we

Jeffrey Lindsey

85

1   did the SEM work.  We identified the material that

2   the contacts were made out of.  We -- you know, I did

3   my temperature testing.  I did my contact resistance

4   measurements.  This was all -- this was the first, I

5   guess, hint that we needed to take a closer look at

6   this.

7            Q.   Okay.  I'm going to switchgears on you,

8   and I neglected to ask you about your testimony list.

9   This first one, the Stur -- Sturbois case, what does

10  this case involve?

11           A.   I don't recall.  I do not remember what

12  that one's about.

13           Q.   Okay.  What about this medical marijuana

14  case?

15           A.   That was a controller.  That was a motor

16  controller that had failed and caused basically

17  the -- the fans to quit running and the marijuana

18  plants died.

19           Q.   Okay.  I got you.  And then the Ryco

20  Electric case, what was that about?

21           A.   I don't recall that one either.

22           Q.   Okay.  Then let me -- let me ask you -- I

23  want to return for a moment to the fire that occurred

24  in room 203 of the Toccoa Inn on February 2, 2014, in

25  which Courtney Patton was injured.  The -- do you

Jeffrey Lindsey

86

1   know the make and model of the PTAC that was in room

2   203 when it caught fire?

3         A.   I do not.

4         Q.   Do you know the cord that -- that was

5   in -- that was in room 203 when it -- when the fire

6   occurred?

7         A.   No, I don't.

8         Q.   Okay.  Fair to say that the PTAC -- if

9   you don't know the model number of the PTAC, can you

10  tell us whether that PTAC was subject to any Carrier

11  recalls?  Is there any way for you to answer that

12  question?

13        A.   No.

14        Q.   Okay.  And you certainly wouldn't know

15  the service, repair history, or modification -- any

16  modifications that would have been done to that PTAC

17  in room 203; is that fair?

18        A.   Yes.

19        Q.   You don't know when that PTAC in room 203

20  was installed, how long it was in service, or whether

21  it had prior problems; isn't that true?

22        A.   You've been breaking up.

23        Q.   Sorry about that.

24        A.   You may want to ask that question again.

25        Q.   Yes, I'm sorry, Mr. Lindsey.  There

Jeffrey Lindsey

87

1    appears to be an internet issue.  So I'm trying to

2    ask these questions in summary form so that I move

3    through this.  You would agree that with respect to

4    the PTAC that was in room 203, you don't know when it

5    was installed or how long it was in service or

6    whether there were any prior problems; isn't at that

7    true?

8              A.    Yes, sir, that's correct.

9              Q.    Okay.  And with respect to the cord that

10   was in room -- the PTAC cord that was in room 203 at

11   the time of the fire, you don't know if that was

12   plugged in properly or had prior damage or anything

13   like that; isn't that true?

14             A.    That is correct.

15             Q.    All right.  Okay.  Switching topics on

16   you, an LCDI cord, do you agree with me that the

17   purpose of an LCDI cord is to -- to detect and cut

18   off power when physical damage is detected to a cord?

19             A.    Yes.

20             Q.    Okay.  You would agree that LCDI cords

21   are a good technology; isn't that fair?

22             MR. KUCHARZ:  Object to form.

23             A.    I -- well, I would agree that that was an

24   answer to a problem that frankly I had seen and a lot

25   of people had seen with the power cords and HVAC

Jeffrey Lindsey

88

1    equipment, whether it be a window air conditioner or

2    a PTAC unit, I mean, yes.

3         Q.    LCDI cords improve safety for certain

4    types of incidents, specifically damage to the cords

5    themselves, right?

6              MR. KUCHARZ:  Object to the form.

7         A.    That's my understanding.

8         Q.    Okay.  Would you agree that TRC was one

9    of the leaders in LCDI technology in the 2000s?

10              MR. KUCHARZ:  Object to the form.

11        A.    I don't know.  I can't answer that.  I

12   don't know the history of who manufactured what when,

13   so I can't speak to that.

14        Q.    LCDI cords do not sense any electrical

15   failures to the plug body; isn't that true?

16        A.    That is -- that is correct, yes.

17        Q.    Okay.  What is an MOV?

18        A.    Metal oxide varistor.

19        Q.    And what does it protect against?

20        A.    Typically Metal Oxide Varistors are put

21   in place to clamp the voltages at a certain --

22   they're not for steady state high voltage.  They

23   would just be for transient voltage that come into

24   the system.

25        Q.    Do you believe that every time an MOV is

89

1    used there should be a thermal fuse attached to it?

2              MR. KUCHARZ:  Object to the form.

3         A.   I think it depends on the application.

4    If the MOV is -- if the MOV is located across where

5    you could have a continuous voltage, then, yes, it

6    should have a thermal fuse located with it.  For

7    instance, if it can go to a steady state, say that

8    you lose the neutral or something, and the voltage

9    climbs above the trip point of the MOV, then you need

10   to have some way to shut it down before it becomes a

11   heating element.

12              And so if you had -- it depends how they

13   are using the MOV in the circuit so there are some

14   instances, yes, the thermal cutoff should always be

15   with it.

16        Q.   Okay.  A fire can occur involving an LCDI

17   cord and it not be a product defect, right?

18        A.   Yes.

19        Q.   What are the other causes of a fire that

20   an LCDI cord can be involved in?

21              MR. KUCHARZ:  Object to the form.

22        A.   Well, if the cord is -- is physically

23   damaged and fails, I mean, the LCDI won't detect

24   that.  For instance, if there is a lightning strike

25   and it damages the -- either the cord or the plug

Jeffrey Lindsey

90

1    body, then, you know, that's not the responsibility

2    of the LCDI.  If the LCDI is physically damaged

3    somehow, you know, that clearly wouldn't be a product

4    defect.  That would just be abuse of the appliance.

5           Q.   If an LCDI was not fully plugged in so

6    that the blades were not securely connected with the

7    jaws, can that cause resistance heating in a fire?

8                MR. KUCHARZ:  Object to the form.

9           A.   I -- that hasn't been my experience that

10   that's a good cause of a fire.  And the reason I say

11   that if it's not plugged in to the point where you

12   get that kind of damage, then the appliance isn't

13   going to be -- running dependably.  It will be

14   shutting itself on and off.  And there's a lot of

15   overbuild in the way plugs and outlets are built.

16   And so they are very tolerant, I guess, the way

17   things are plugged in.

18                And it's been my experience, based on

19   what I've seen, that if a plug is only partially

20   plugged in, you know, that is known.  That is

21   something that's troubleshootable before a fire would

22   start.

23          Q.   Well, I appreciate -- I understand what

24   you're saying.  Well, let me ask a specific question,

25   is it possible that a -- any plug, not an LCDI plug

Jeffrey Lindsey

91

1    but any kind of plug, that you can plug it in

2    partially at an angle and that can cause resistance

3    heating and a fire?

4         A.   No.  It's either plugged in, or it's not.

5         Q.   You're saying it's impossible that if I

6    take a plug and plug it in just enough but not all

7    the way, that that will never cause resistance

8    heating or a fire?

9         MR. KUCHARZ:  Object to the form.

10         A.   Well, it -- it is should -- I guess is

11    the word you're using with you say plug it in.  In my

12    mind it's only plugged in is when it's -- the two

13    surfaces are latched together, all right?  If you --

14    if you're saying is it possible to partially insert

15    it and cause a fire, yes.

16              But the thing is you're going to know

17    that because the appliance you're plugging in is

18    partially inserting, I guess, at that time it's going

19    to be cutting in and out.  It's not going to be

20    operating properly.  And that's going to happen -- I

21    mean, there's going to be evidence of that happening

22    very quickly because you're basically putting the

23    plug and the outlet in that condition, you're going

24    to be creating a lot of heat very quickly.  You're

25    going to be creating a lot of smoke very quickly.

Jeffrey Lindsey

92

1    There is going to be flashes of lights and the person

2    that's inserting that is going to recognize that they

3    have a problem.  It's not something that's going to

4    sit for days or weeks.  That's going to be an

5    immediate problem.

6         Q.   Well, let me use your terminology.  It

7    is -- if you partially insert a plug, it can cause

8    resistance heating and a fire; is that true?

9              MR. KUCHARZ:  Object to the form.

10        A.   No.  I think actually if you partially

11   insert it, what you're doing is you're actually

12   creating an arcing event on the part that's -- that's

13   not inserted correctly.  And that's going to quickly

14   damage the two pieces, the jaws, the female jaws and

15   the male blade.

16             And the other thing that's going to

17   happen is you're going to notice -- you know, like,

18   for instance, if I only -- if I have my hair dryer on

19   and I just start sticking the plug in there, I don't

20   plug it in kind of stuff, the hair dryer is going to

21   cut off and on, off and on, off and on.  And

22   accompanying that off and on is going to be flashes

23   of light and smoke coming out of the outlet.  That's

24   what a partial insertion does.  But the outlets and

25   the plugs are designed to -- to make a good

Jeffrey Lindsey

93

1    connection.  That's part of the design of it.  And so

2    this partial insertion thing is that -- that's an

3    operator error type of thing that's -- that's

4    recognizable as you're doing it.

5           Q.   You -- you -- you answered no to that

6    question and then provided a -- an explanation, so

7    I'm going to ask the opposite of that question.  If

8    you partially insert a plug, it is -- it will not

9    cause a fire; is that your testimony?

10          MR. KUCHARZ:  Object to the form.

11          A.   No.  I think partially inserting a plug

12   and attempting to operate the appliance partially

13   inserted can cause damage.  Whether it causes a fire

14   or not, I don't know, but it certainly will damage

15   the receptacle and the plug.

16          Q.   And can that lead to a fire?

17          MR. KUCHARZ:  Object to the form.

18          A.   If the -- well, it's only going to happen

19   when you're there physically trying to create that

20   condition.  And if the user allows a fire to develop,

21   then, yes, it can.  But the typical response is when

22   you get that kind of action, they're going to unplug

23   it and they're going to -- you know, they're going to

24   stop before a fire occurs.

25          Q.   Have you ever investigated a fire that

Jeffrey Lindsey

94

1    you believe that was caused by a partial insertion of

2    a plug?

3         A.   No.  I've investigated fires -- I'll

4    answer it this way, the answer is no.  I've

5    investigated fires that have started because of bad

6    connections on the receptacle.  I've also

7    investigated fires that were the result of damaged

8    plugs, damaged connections in the plug, but I've

9    never investigated a fire where the result was

10   because of a partial insertion.

11        Q.   A fire -- if the jaws of an outlet are

12   loose, that can cause resistance heating and a fire,

13   correct?

14             MR. KUCHARZ:  Object to the form.

15        A.   Well, if the jaws are loose, you're going

16   to have intermittent operation of the appliance you

17   have plugged in.  You don't just get the resistance

18   heating.  You basically -- if they are that loose,

19   the device is going to go on and off, on and off.

20   There is going to be some kind of cycling.  You know,

21   it's like flipping a switch.  Sometimes it's

22   connected; sometime it's not.

23        Q.   Mr. Lindsey, didn't you just testify that

24   you can have a problem within the outlet and that can

25   cause a fire?

95

1          MR. KUCHARZ:  Object to the form.

2          A.   I said you can have a bad connection

3     between the wire -- the wiring terminal and a wire.

4     That will cause fires.  That has caused fires.  I've

5     also had fires caused by a damaged wire connection to

6     the plug.

7          Q.   So wiring within the outlet, you have

8     seen that -- you've seen problems with that that have

9     caused fires; is that correct?

10         A.   Yes.

11         Q.   Have you ever seen an outlet that its

12    jaws had loosened somewhat and that caused a fire?

13         A.   No.

14         Q.   Have you ever investigated a fire in

15    which the breaker that was connected to an outlet was

16    too large than what was called for by the appliance

17    plugged into it cause a fire?

18         MR. KUCHARZ:  Object to the form.

19         A.   Well, if -- if the circuit breaker is

20    not -- the circuit breaker has to be sized to the

21    size of the wire.  That's -- that's the requirement.

22    That's -- that's the reason the circuit breaker is

23    there.  The circuit breaker is there to keep the wire

24    from becoming overloaded, the wire from the panel to

25    the load, wherever the load is.  That's -- so the

Jeffrey Lindsey

96

1    circuit breaker -- so if it's oversized, then that --

2    what that means is you can have too much electrical

3    current flowing on your wire, the wire in the wall

4    can become a heater, and that can cause a fire.

5         Q.   All right.  So have you ever seen an

6    oversized breaker cause a fire?

7         A.   I've seen an oversized breaker cause

8    insulation damage.  I don't necessarily believe I've

9    ever saw one that actually led to a fire.  It --

10   usually there was an alert to a problem.  But that's

11   possible.

12        Q.   Have you ever --

13        A.   No, I take that back.  I take that back.

14   Actually I have seen that on older wire, the knob and

15   tube wiring.  I have seen that problem so, yes.

16        Q.   Have you ever seen contaminants such as

17   cleaning supplies or paints get into an outlet and

18   that cause a fire?

19        A.   No.  Again, what that would do if you --

20   if you painted over the outlet, that would -- that

21   would probably cause bad operation of your appliance.

22        Q.   My question is have you ever seen

23   contaminants -- have you, Mr. Lindsey, ever seen

24   contaminants get into an outlet and cause a fire?

25        A.   No.

97

1          Q.   Do you agree that if contaminants get

2     into an outlet such as cleaning supplies, that can

3     cause a fire?

4               MR. KUCHARZ:  Object to form.

5          A.   No.  No.  No, I don't.

6          Q.   What -- what is your basis for saying

7     that can't cause a fire?

8          A.   Well, the metals in an outlet in a plug

9     are designed to be nonreactive metals.  Okay?  They

10    plate -- they plate the metals in there.  They are

11    usually a brass or a nickel which don't really react

12    quickly with chemicals.  And to have high resistance,

13    you basically would have to have reactive metals in

14    place and you don't find that with outlets and I

15    don't find that with the blades.

16               So I think that's -- no.  Anything that

17    you are using for cleaning, you know, they are going

18    to be soaps or things like that.  Over time, you

19    know, they may call -- they may cause tarnishing, but

20    they're not going to react with the metal and create

21    the oxides that you would need to cause the

22    insulation to cause a bad connection.

23         Q.   All right.  Let me talk to you about the

24    scope of your investigation in this case was to

25    investigate the cause of damage of a group of TRC

Jeffrey Lindsey

98

1    LCDI cord sets that had been removed from

2    customer-owned Carrier PTAC units; is that correct?

3         A.    Yes, sir.

4         Q.    That -- that is the full scope of your

5    work in this case.

6         A.    Yes.

7         Q.    Then I want to talk to you about your

8    procedures.  So you received approximately 150 TRC

9    LCDI cord sets; is that correct?

10        A.    Yes.

11        Q.    What is the exact number of TRC LCDI cord

12   sets you received?

13        A.    I don't know.  I don't have -- I've never

14   taken them all and counted.  There are several boxes

15   of cord sets that frankly I -- they don't appear to

16   have any physical damage to them.  I really haven't

17   done anything with them.  It's my understanding that

18   these were actually cord sets that through the years

19   the engineering group at Carrier had done -- used for

20   testing.  And so I just have them, but I don't

21   necessarily know how many of those I have.  That's

22   why I gave you an estimate about 150.  That's my

23   guess.

24        Q.    When you get evidence, isn't it important

25   to document and know what evidence you have?

Jeffrey Lindsey

99

1          MR. KUCHARZ:  Object to the form.

2          A.   Well, if -- if, in fact, it's evidence,

3     yes.  But sometimes I get stuff that I never use, and

4     if I'm not relying upon it, then it's -- it really

5     isn't evidence to me.

6          Q.   So the fact that you consider some of the

7     cords that you got from Carrier to be evidence but

8     some of the cords from Carrier to be not evidence; is

9     that what I'm hearing you say?

10          MR. KUCHARZ:  Object to the form.

11          A.   Any -- anything that I have used to

12     formulate my opinions I have marked it as evidence,

13     I've got it stored as evidence, and it's been

14     documented as evidence.  But the problem I had was I

15     received everything.  I received everything, and if

16     it didn't have physical damage to it that was evident

17     that there had been some kind of overheating, I

18     didn't really -- I didn't really go any deeper into

19     why I had it or if it had any use to me.

20          Q.   So you just ignored it.

21          A.   Well, I didn't ignore it because I told

22     you that I had observed that it physically did not

23     have evidence of overheating.  So it wasn't ignored;

24     it just wasn't used.

25          Q.   All right.  So as you sit here today, you

Jeffrey Lindsey

100

1    can't tell me how many cords you received, TRC LCDI

2    cords you have in your possession; is that true?

3         A.    That's correct.

4         Q.    Of the TRC LCDI cords that you've

5    received, have you documented how many you observed

6    thermal damage to?

7         A.    Those -- those are all covered in the

8    various groups of lab notes that you have and

9    photographs.  So between photographs and the notes,

10   everything that I've looked at that had physical

11   damage to it are -- that's my documentation for that.

12        Q.    That -- that -- I think I hear you say go

13   fish and that's not what I'm going to do.  Do --

14             MR. KUCHARZ:  Object -- object to the

15   colloquy.  Mr. Boorman, please just ask questions and

16   be respectful.

17        Q.    Please just answer the questions.  Do you

18   have a list of how many cords, TRC LCDI cords, that

19   you believe have been thermally damaged?

20        A.    And my answer was any list I would have

21   would be in the notes.  The notes are my list of the

22   actual cords that are in -- each cord that has been

23   physically damaged, that I saw physical damage that I

24   inspected, has a specific evidence item number.  And

25   those all -- if I looked at it, it's either in my

Jeffrey Lindsey

101

1    photographs or my notes.  But, no, I don't have a

2    written list that -- that I itemize all those things.

3          Q.   How many --

4          A.   That's not --

5          Q.   How many evidence items numbers do you

6    have for these TRC LCDI cords?

7          A.   If I recall, there were 16 groups of

8    evidence.  Now, of the 16, several of those are just

9    boxes of loose cords that weren't identified as

10   coming either from a customer location or -- or

11   having thermal damage to them.

12              So a number of those cords are in those

13   boxes.  They are just all in there together.  A

14   smaller group then is -- of the 16 are like they had

15   several different programs where they went out like

16   to that Tuscany Village, and they removed a number of

17   outlets and plugs.  And I received all those and so

18   that may be like item No. 11 and then it may be A, B,

19   C, D, E, F, and G.  So that's basically how I

20   organized the evidence.

21         Q.   You have 16 groups of -- of cords; is

22   that right?

23         A.   Well, there's 16 blocks of evidence.

24   That's my recollection.  There's 16 -- I have 16

25   evidence items.

Jeffrey Lindsey

102

1      Q.   Is that 16 cords or 16 boxes?

2      A.   No.

3      Q.   Explain to me what a block is.

4      A.   Well, yeah.  It started out as a box so

5   there was -- I believe there was 16 boxes.  And

6   within several of those boxes was just a large pile

7   of loose cords that did not -- when I went through

8   them did not appear -- and several of them had been

9   disassembled, so they're just parts and pieces.  None

10  of them appeared to have been overheated.

11           And then there's a smaller number of

12  boxes which Carrier had received them from customers,

13  either a Carrier technician had gone out and removed

14  them or -- anyway they're -- they're from a specific

15  location or locations.  And they all have -- at least

16  most of them have some evidence of thermal damage to

17  them.

18     Q.   So I am in your folder "2018-12-6."  And

19  it looks to me like in the photos here we have 1

20  through 15 boxes, right?

21     A.   Yes.

22     Q.   Is there a 16th box?

23     A.   I believe there is.  I think I got

24  another box at a later date.  Well, I know I did.

25  Actually that was that -- that was the cord that was

103

1     believed to be brand new that I disassembled.

2          Q.   Where -- where is the photo of the 16th

3     box?

4          A.   Well, it wouldn't be in there because I

5     didn't have it at that time.

6          Q.   Did the --

7          A.   Go to "Unused" -- go to "Unused TRC

8     Cord," that file.

9          Q.   Did the 16th box only have one cord in

10    it?

11         A.   Yes.

12         Q.   There are close-up photos in this folder

13    of "2019-5-12."  Are there any photos of the evidence

14    as you received it and then overall photos of the

15    product?

16         A.   No.

17         Q.   So it looks like in 2018, you did get 15

18    boxes, and then when you look at the first box, it

19    doesn't tell you where those cords are from, right?

20         A.   That's correct.

21         Q.   But when you open the box, what

22    information do you have about where the cord was --

23    what unit it was attached to, the location, and where

24    that unit was and how long it was in service?

25              MR. KUCHARZ:  Object to the form.

Jeffrey Lindsey

104

1          A.    I think that was -- this is -- these are
2     cords that Carrier had.  I don't think these came
3     from any location.  If it says on the -- see there,
4     that's right there.  So that's box 2.  Those are
5     Tower replacement kits.
6          Q.    All right.  Let me -- let me start with,
7     Mr. Lindsey, I need to get an understanding of the
8     evidence that you received and what you did with it.
9     So if there is a good way to do this, if there is an
10    efficient way to do this, I'm all for it.
11             Otherwise, the only way I know how to do
12    it is go box by box and you tell me how many and what
13    was in there.  Hopefully you documented everything in
14    either, you know, within certain photos or you
15    generated a list or something like that, you've
16    already done that.  Can you tell me the most
17    efficient way for me to understand how many cords you
18    received and the information related to those cords?
19         A.    Well, you didn't like my suggestion.  If
20    we go back to the notes and the photographs, those
21    are physically the cords that I have looked at.  I
22    mean, we can look at these pictures, but honestly a
23    number of these cords I didn't do anything with.
24         Q.    Okay.  That -- that's what I need to
25    understand.  So I think we can -- it sounds like we

105

1    can make a list of the cords that you looked at.  And

2    then at some point I'm going to need to understand

3    the rest of it.  Even if you didn't look at it, I

4    need to know what you received.  Do you understand

5    what I'm telling you?

6         A.   Well, probably the best thing is if you

7    send someone here to look at it.  I mean, I think

8    that -- that would be the easiest way to understand

9    what we have.

10         Q.   All right.  So let me -- let me get an

11   understanding of the cords that you did look at.  Is

12   the best way to do that going -- going through the

13   documents called "Lindsey's Notes"?

14         A.   Yes.  I think so.

15         Q.   All right.  So we're going to start with

16   "4-10-20 Inspection of Tower LCDI Cord."  So this

17   first one says it is No. 16A.  It is a Tower cord,

18   right?

19         A.   Yes.  So just so you understand, item 16A

20   means that there is a cord set with a 16A or an A on

21   it, okay?  And so then if there is a B, then there is

22   going to be a B.  So basically this is out of box 16

23   and it's A, B, however many there are.

24         Q.   I got it.  Okay.  So this is -- it says

25   has -- was this cord ever in service?

Jeffrey Lindsey

106

1          A.   I don't believe so, no.

2          Q.   Okay.  And in terms of the model number

3     for this, it's catalog 30389, right?

4          A.   Yep.

5          Q.   Any other information you can tell me

6     about this cord or -- or other than it came from

7     Carrier?

8          A.   I mean, what this shows is that this is a

9     cord that I disassembled and I inspected, you know,

10    and I made some notes about my inspection on this

11    piece of paper.

12         Q.   And the purpose of what you did with this

13    cord was basically to disassemble it, right?

14         A.   And to understand what was inside, yes.

15         Q.   Is that -- is that all that's in these

16    notes, Mr. Lindsey?  Hold on.  I apologize.  I'm

17    flipping down to page 3, and I see that there's a

18    16B, right?

19         A.   Yes.

20         Q.   All right.  So 16B, also a Tower, also

21    30389; is that correct?

22         A.   Yes.

23         Q.   Was this one ever in service?

24         A.   I don't believe any -- I don't recall any

25    indication that any of these were ever in service.

107

1          Q.   Okay.  This 16B, there is a note
2    "Different setup than 16A."  What do you mean by
3    that?
4          A.   My guess is it's -- somehow it's
5    physically different than 16A.  It's a different
6    style.
7          Q.   What was the purpose of 16A?  Was that
8    just to disassemble and understand?
9          A.   Well, this 16B, look at -- I mean, it's
10   obvious to me 16A, the relay contacts are oriented 90
11   degrees different than 16B.
12         Q.   Okay.
13         A.   So clearly there's a -- you know, it's
14   the way they're placed in the module.
15         Q.   Okay.  And was there any damage to
16   these -- I mean, this one was never in service
17   either, right?  16B?
18         A.   Right.
19         Q.   All right.  And we're moving down, 20A,
20   are you telling me that that came from box 20?
21         A.   Apparently, yes.  It just -- that's why I
22   said, I know that on that day in December we got 15
23   boxes.  But through the course of SEA's
24   investigation, we ended up -- I thought it was 16 but
25   apparently there were 20, so at some point I got

Jeffrey Lindsey

108

1    additional boxes.

2         Q.   Okay.  What -- is this a Tower cord?

3         A.   It is, yes.

4         Q.   What model number -- or catalog number?

5    I'm sorry.

6         A.   I don't know if we can zoom in on that

7    one photograph of the face.  You may have to zoom in

8    on the whole -- yeah, it's going to go out of focus.

9    They are really hard to read.  There's so much glare

10   on those.  They were always hard to read the numbers.

11   They're just stamped in the plastic.  I'm not sure I

12   know.

13        Q.   Are there going to be other photos

14   associated with -- with this invest -- with your

15   looking at these or are these the only photos?

16        A.   Well, we would have to go over to the

17   photo catalog and see if there is some additional

18   images with that date, April 10, 2020.

19        Q.   Okay.  All right.  So that -- any

20   other -- was 20A ever put in service?

21        A.   No.

22        Q.   And what was your purpose of 20A?  Was it

23   also disassembly to understand the components?

24        A.   Yes.

25        Q.   What are you looking at here?

Jeffrey Lindsey

109

1          A.    Well, it's a -- I'm comparing the

2     construction and the design and the orientation of

3     the contacts of the Tower cord.  Those are the top

4     two and the TRC cords which are the bottom two.

5          Q.    This says "TRC 8190."  Is that the model

6     number of the TRC cord that you're looking at?

7          A.    Must be, yes.

8          Q.    The next file is "4-17-20" and this is

9     item 2A so that's from box 2, right?

10         A.    Yes.

11         Q.    Tower cord; is that correct?

12         A.    Yes.

13         Q.    What catalog number?

14         A.    I don't know that either.

15         Q.    Was this cord ever in service?

16         A.    No.

17         Q.    All right.  This is the second page of

18    that document.  Now, this is a TRW.

19         A.    That should be TRC, I'm sorry.

20         Q.    All right.

21         A.    That's a TRC contact.

22         Q.    Okay.  This is 9A.  This is TRC.  Do you

23    know the model number for this?  Is it documented?

24         A.    Could be.

25         Q.    Okay.  Where is it?

Jeffrey Lindsey

110

1          A.   I believe it's the same model they all

2     are.  It's that 3790 whatever the number is.

3          Q.   You think it's a 37190?

4          A.   Yes.

5          Q.   Okay.  All right.  Any more -- was this

6     9A in service?

7          A.   Yes.  This was a returned unit.

8          Q.   Where was it in service?

9          A.   If we go back to the original

10    December 6 -- let's look at box 9, so this first

11    group of pictures.

12         Q.   What do you want me to go to?

13         A.   Okay.  The December 6, 2018, where were

14    those photographs at?

15         Q.   December 6.

16         A.   Yeah, that one there.

17         Q.   You want me to go to box 9?

18         A.   Yeah.  And let's see what it says on the

19    label.  10, almost.  There we go.  That's from

20    Miller's Manor.  So those were apparently a recall.

21    So I don't know if Carrier went out and got those, or

22    they had a local electrician that -- but anyway they

23    ended up at Carrier.

24         Q.   All right.  Do you know how long it was

25    in service?

Jeffrey Lindsey

111

1      A.   No.

2      Q.   Do you have the associated receptacle or

3  outlet?  Let me just call it an outlet.

4      A.   That's possible that we do.  So then we

5  would have to go to the next group of pictures.

6  Let's see if I did that on that lab of December 10,

7  11, or 12.  You'll have to go and see if we can get

8  to item 9.

9      Q.   So basically I need to -- I need to go

10  through the folders, get to 9A, and see what else is

11  included with the photos of 9A?

12      A.   Yes.  Or go to the notes that would be

13  associated with that lab exam.  That might be faster.

14      Q.   I thought we were on those notes.

15      A.   Yeah.  Well, we were measuring stuff so I

16  think -- no.  That's -- I'm physically measuring the

17  contacts in that.  That's really -- I've already

18  looked at the item 9.  So this is later -- this is

19  much later.

20      Q.   Okay.  All right.  I am opening the notes

21  for 11-25-19.

22      A.   Are those the earliest notes?  There

23  should have been notes before that.

24      Q.   Well, I don't want to miss any of these,

25  so we've got -- we'll go --

Jeffrey Lindsey

112

1        A.   Okay.  Well, that's fine.  I mean,
2   whatever -- I don't want to mess up your -- just I'll
3   answer whatever you ask me.  So we'll figure it out.
4        Q.   So on -- on these notes, 11-25-19, we're
5   looking at item 6G so that's from box 6, right?
6        A.   Yes.
7        Q.   What -- is this -- who's the
8   manufacturer?
9        A.   Well, this would be a TRC.
10        Q.   And what's the model number?
11        A.   As far as I know, these were all the same
12   model numbers.  I don't really -- they all -- when I
13   take them apart, they all appeared to be the same
14   inside, and they all had the same shape on the
15   outside, so they should all be the same model number.
16   I'm not sure that I documented each one what it's
17   model.  But we still have it all.  I mean, I could go
18   back, I guess, and pull all the model numbers off.
19        Q.   This was installed -- this one was in
20   service at Tuscany Village in Oklahoma City, right?
21        A.   Yes.  And then it shows what room number
22   it was in, yes.
23        Q.   You don't know how long it was in -- it
24   was in service, do you?
25        A.   I do not.

Jeffrey Lindsey

113

1        Q.   But we do see that you have the
2    associated receptacle?
3        A.   In this case, yes.
4        Q.   All right.
5        A.   Yes.
6        Q.   All right.  Then there's -- the next page
7    in your notes is 6F.  Again, it's TRC, and you
8    believe it to be a 37190?
9        A.   Yes.
10       Q.   Same location?
11       A.   Yes.
12       Q.   All right.  The next page is 6E, also
13   TRC, also 37109?
14       A.   Yes.
15       Q.   Same location?
16       A.   Yes.
17       Q.   All right.  These are just blank pages,
18   right?
19       A.   Yes.
20       Q.   Then your next notes are -- it is
21   "12-5-19 Disassembly Exam of Unused LCDI Cord."  I
22   don't see an item number.  Do you?
23       A.   No.
24       Q.   Why not?
25       A.   I didn't put it down apparently.

Jeffrey Lindsey

114

1           Q.    Who is the manufacturer?

2           A.    This is a TRC.

3           Q.    And do you know the model number?

4           A.    This is that 37190.

5           Q.    You believe that to be the case, right?

6     We don't see it on here?

7           A.    That is correct but it was -- it's my

8     recollection they were all the same model.

9           Q.    And you don't believe that it was ever in

10    use; is that what you --

11          A.    That was what I was told.

12          Q.    But you do see some heating on the

13    contact, right?

14          A.    Yes.

15          Q.    Meaning that it had to have been in use

16    at some point, right?

17          A.    Well, that's -- I guess the question of

18    the day is, you know, is that done -- did they do a

19    test at the factory?  Is that created then?  Or, you

20    know, I don't know.  I mean, that's -- and also in

21    addition to that heating effect, if you look at the

22    rectangular contact, there's some pretty significant

23    gouges in the contact material so, and it's not a

24    smooth surface.

25          Q.    This second page of this PDF, is this the

Jeffrey Lindsey

115

1    same cord?

2           A.   Yeah, same cord, second contact.

3           Q.   All right.  All right.  That's all the

4    information on that one, right?

5           A.   Yes.

6           Q.   So the next file is "August 2019 Carrier

7    PTAC LCDI Inspection," right?

8           A.   Yes.

9           Q.   We are looking at model -- or item

10   No. 14A?

11          A.   Yes.

12          Q.   Who's the manufacturer of 14A?

13          A.   This is a TRC.

14          Q.   Model number?

15          A.   Be the 37190.

16          Q.   Was this ever in use?

17          A.   Yes.  This one -- actually this one was

18   at the Carrier factory I think in their maintenance

19   shop.  They had -- if I recall, they had one that had

20   been plugged in for quite some time.  So this had

21   been in use.

22          Q.   So was this actually being used as a

23   PTAC, or was this being studied by Carrier?

24          A.   No.  It was being -- it was being used as

25   a PTAC to cool or heat that office, wherever it was

Jeffrey Lindsey

116

1    at.

2            Q.   All right.  Then the next --

3            A.   There were two of them.

4            Q.   All right.

5            A.   14A and 14B.

6            Q.   All right.  This is TRC and you believe

7    it is a 37190?

8            A.   Yes.

9            Q.   And same location?

10           A.   Same building.  I think it was in a

11   different location.

12           Q.   Same building though, right?

13           A.   Right.

14           Q.   Then item 15.

15           A.   Yes.

16           Q.   Is this a TRC 37190?

17           A.   Yes.

18           Q.   And was this one in use at Bohan in

19   Auburn, Georgia?

20           A.   Yes.

21           Q.   And then we've got item 9A but that was

22   also -- we already looked at 9A, didn't we?

23           A.   That's correct.

24           Q.   All right.

25           A.   This probably would have been the first

Jeffrey Lindsey

117

1    time I looked at it so.

2         Q.   And then we've got 9B.  And you believe

3    this is a TRC 37190, right?

4         A.   Yes.

5         Q.   And you believe this was in use at

6    Miller's Manor?

7         A.   Yes.

8         Q.   And then 9C, you believe this is a TRC

9    37190 also at Miller's Manor, right?

10        A.   Yes.

11        Q.   9D you believe is a TRC 37190 at Miller's

12   Manor, right?

13        A.   Yes.

14        Q.   And then the next is 6D and you believe

15   this is a TRC 37190, right?

16        A.   Yes.

17        Q.   But you believe this is Tuscany Village

18   room 427?

19        A.   Yes.

20        Q.   Then we's got 6C, 37190, TRC cord, and

21   you believe it's in Tuscany Village, right?

22        A.   Yes.

23        Q.   But you think this is room 317?

24        A.   Yes.

25        Q.   And then we have item 5A which you

Jeffrey Lindsey

118

1    believe is a TRC 37190, also from Tuscany Village,

2    right?

3           A.    Yes.

4           Q.    This is room 619B?

5           A.    Yes.

6           Q.    So the next notes are September of 2019.

7    And what item is this?

8           A.    I don't have it marked which -- which one

9    this was.

10          Q.    Do you believe this is a TRC 37190,

11   right?

12          A.    It's a TRC unit, yes, and it did -- I

13   chose it because it had evidence of external damage

14   on it.  So that's why I -- I powered it up to see

15   what kind of temperature I was getting.  And you can

16   see on here that -- I mean, the area where the red

17   is, that is the area on both sides where the contacts

18   are, I mean, the contact arms are.  It's just you

19   can't -- with any definition you really can't -- so

20   this is more of a trial thing just to see if -- you

21   know, how good the technology was, if the FLIR would

22   help me in doing this, and it really didn't.

23          Q.    So this was a -- this one was in use and

24   had experienced thermal damage before you made these

25   measurements, right?

Jeffrey Lindsey

119

1           A.   That's correct, yeah.  It was one of the

2    ones that clearly there had been some kind of

3    overheating taking place.

4           Q.   Do you know where it was in use?

5           A.   No.

6           Q.   Do you rely on -- do you rely on any of

7    these numbers?

8                MR. KUCHARZ:  Object to form.

9           A.   No.

10          Q.   And --

11          A.   This was -- this was just preliminary

12   testing that I was doing to see if the FLIR was going

13   to help me.

14          Q.   Okay.  Page 2, is this the same unit?

15          A.   Probably, yes.

16          Q.   All right.

17          A.   I only -- I -- my recollection was I

18   basically only had one set up and then I spent

19   several days trying to -- several different

20   techniques trying to get better measurements and it

21   really wasn't that successful, but I don't recall

22   using more than one unit.

23          Q.   And you ultimately concluded that you

24   couldn't use the FLIR for this thermal testing,

25   right?

Jeffrey Lindsey

120

1          A.   Yes, correct.

2          Q.   And so for this particular document, the

3     17 -- September 2019 thermal imaging, you're not

4     relying on this, are you?

5          A.   Sir, you were breaking up a little bit.

6          Q.   Sure.  This --

7          A.   I really didn't understand the question.

8          Q.   Sure.  This September 2019 document that

9     documents certain numbers as captured by the FLIR,

10    are you relying on this?

11         A.   No.

12         Q.   Then these last notes, what are these

13    notes?  Contact resistant -- these are just

14    calculations done for -- from other -- well, tell me

15    what this is.

16         A.   I went through -- this was in preparation

17    of the report basically.  I went just back through

18    the evidence and I started grabbing random, I guess,

19    receptacles and I started doing these measurements so

20    that's -- that's what these pages reflect.  And I'd

21    gotten the milliohm meter tester, and so I just spent

22    a day basically measuring -- measuring the resistence

23    on these -- on these recep -- not receptacles, these

24    LCDI plugs.

25         Q.   Okay.

121

1          A.   So those are resistance measurements.

2          Q.   Are these -- are any of these plugs'

3     model numbers in addition to the ones that we've

4     already discussed?

5          A.   No.  All the TRC units would be the same

6     model we've already talked about.

7          Q.   No.  I'm sorry.  Are these any additional

8     item numbers?  Are you looking at any other samples?

9          A.   These, no.  These should be the samples

10    that we probably already talked about.

11         Q.   Okay.  So from -- from what I've

12    documented so far, 16A, 16B, 20A, and 2A are the

13    Tower samples that you looked at; does that sound

14    correct?

15         A.   Yeah.  Actually if you go through here, I

16    believe there's some more Tower samples in there.  I

17    may have actually measured and photographed more on

18    this page here.

19         Q.   Well, I don't --

20         A.   You have to go through -- well, we will

21    have to go through those sheets.

22         Q.   All right.  You want us to go through

23    these?  I just need to know all the ones you've

24    analyzed, and I want to make sure I have a full list.

25    So do we just need to go look at all the items and

Jeffrey Lindsey

122

1    see if we've already checked them off?

2            A.    Yeah.  You're going to have to cause.

3            Q.    All right.  9C we've already talked

4    about.  14B we've already talked about.  5A we've

5    already talked about.

6            A.    6D.

7            Q.    Where do you see 6D?

8            A.    It's above 5A.  Actually there's several

9    in there.  See item -- right here.  You can't see

10   my -- go down --

11           Q.    All right.  I see.  I see what you're...

12   All right.  We've looked at 9C.  We've looked at 9B.

13   We've looked at 14B.  We have not looked at 6D.  We

14   looked at 5A, and we've documented 9A.  Then what --

15   are these new numbers?  Are these numbers we've

16   already talked about?

17           A.    Where are you at?  Page what?

18           Q.    2.

19           A.    Page 2?  I'm looking at the same notes on

20   my iPad because I'm having a hard time seeing it on

21   my computer screen so.  So there are Tower A, Tower

22   B, Tower C, D, and E.  That's -- that's how they're

23   marked.

24           Q.    Why is there no -- there's always been a

25   number associated.  What is Tower A?

Jeffrey Lindsey

123

1          A.   These were out of -- these are out of one

2     of our boxes, and I'm not sure which one.  I don't --

3     I don't recall which box.  There's a whole box of new

4     Tower cords and so I grabbed them out of that box.

5     And so there's one, two, three, four, five.

6          Q.   A through E?

7          A.   Yes.

8          Q.   So if I go through the rest of these

9     pages and I see an item, then it's going to tell me

10    that you did what?

11         A.   Well, all the things on these pages,

12    everything in these sets of notes, I have gone and

13    measured the contact resistance.

14         Q.   Okay.

15         A.   And, in addition, if -- if you see red

16    lettering there which says see pictures on 8 -- what

17    is that, 8-12-21, there is additional photographs

18    that show those particular things that I took on

19    8-21 -- or 8-12-21.  So there's additional

20    photographs and they are linked back to these notes

21    then.

22         Q.   When you say they are linked back to

23    these notes, you meaning you need to go find the

24    photos, right?

25         A.   Yeah.  The photos are in that -- in the

Jeffrey Lindsey

124

1   photo group.  Then in that folder there should be

2   folders from August 12, 2021.  And they were taken --

3   I took additional photographs then as I was doing

4   these resistance measurements.

5           Q.   Okay.  So I will not take our time up

6   now, but if I go through and write down all the

7   different item numbers, then I'm going to have a --

8   that are in these notes, the notes that we've gone

9   over and including this 7-2-21 contact resistance

10  measurement note, then I'm going to have a list of

11  all of the cords that you examined; is that correct?

12          MR. KUCHARZ:  Object to the form.

13       A.   Again, I have examined all the cords, but

14  the ones that you're going to have a list of are ones

15  that I disassembled and examined because they had

16  damage on them.

17          Q.   So once I get -- go through this and

18  write down all the item numbers, those are all of the

19  cords that you found that had damage on them; is that

20  correct?

21          MR. KUCHARZ:  Object to the form.

22       A.   Those are all the ones that I

23  disassembled.

24          Q.   Did you make a list of how many cords of

25  the approximately 150 had damage on them?

Jeffrey Lindsey

125

1          A.    No, I did not.

2          Q.    So as you -- as you sit here today -- let

3     me just make sure I'm getting this correct.  As you

4     sit here today, you don't know how many cords you

5     have; is that true?

6          A.    That's correct.

7          Q.    You don't know how many of those cords

8     have damage on them; is that true?

9          A.    That's correct too.

10         Q.    You do know that if -- if we go in and

11    finish our list of the item numbers that are in your

12    notes, that will give us a list of the cords that you

13    disassembled; is that correct?

14              MR. KUCHARZ:  Object to the form.

15         A.    Yes.

16         Q.    The remaining number of cords you did not

17    disassemble; is that correct?

18              MR. KUCHARZ:  Object to the form.

19         A.    I think that's correct, yes.

20         Q.    Do you have photos of every cord that you

21    received?

22         A.    No.

23         Q.    Do you have information about the

24    location where every cord you received was used?

25         A.    If it's marked on the boxes I received,

Jeffrey Lindsey

126

1    then the answer is yes.  But there are two -- I know

2    at least two, maybe three boxes where there's just a

3    lot of cords in there.  And I have no idea where they

4    came from, you know, what their story is, what their

5    history is.  My recollection, because I did take them

6    out and I looked at them, was they did not appear on

7    the outside at least to be damaged.

8            Q.    Did -- did Carrier give you all of the

9    TRC LCDI cords that they had?

10           A.    That they know they have.

11           Q.    Explain that.

12           A.    Just what I was told was that, you know,

13   as the company has -- it's moved on and the

14   engineering had moved out of Syracuse and had moved

15   into Indianapolis and personnel had changed and

16   Mr. Jamieson had what he believed to be all the cords

17   that were there.

18           Q.    So Carrier said "We're going to give you

19   all the cords that we have been able to find"; is

20   that correct?

21           A.    Well, I think Mr. Jamieson believed he

22   had all the cords.

23           Q.    Okay.  With respect to the cords that you

24   decided to disassemble, what was your criteria for

25   whether you would disassemble a cord set or not?

Jeffrey Lindsey

127

1          A.    Well, I started out taking a closer look

2     at ones where there was obvious damage either to

3     the -- to the plug or the receptacle or both.  That

4     was the first criteria.

5               And then the second part of that was once

6     I started seeing damage on some of the cords, then I

7     actually -- they had recovered a lot of cords that

8     didn't really exhibit a lot of damage, but they were

9     from the same collection.  So I did disassemble some

10    of the ones that really didn't show any obvious

11    damage on the outside.  And on a couple of them I

12    actually found damage inside.

13         Q.    So did you disassemble every cord that

14    had obvious damage on the outside?

15         A.    To a certain extent.  I didn't

16    necessarily take them all down to the same level of

17    disassembly.

18         Q.    Did you disassemble or partially

19    disassemble every cord that had obvious external

20    damage?

21         A.    My answer is going to be yes.

22         Q.    In addition to that, you disassembled

23    certain other cords that were from the same location

24    to see what the inside looked like, correct?

25         A.    Yes.

Jeffrey Lindsey

128

1        Q.   Of the cords that you disassembled, how
2   many of them showed thermal damage on the contacts?
3        A.   You know, that's reflected in the notes
4   so, I mean, we would have to go back through and
5   count them on the notes.  I mean, you've got the
6   notes so if there's -- if there's damage, I'm noting
7   it, or I took pictures of it.  I would say -- going
8   back you're asking about the contacts.  Every TRC
9   LCDI that I disassembled has wear, excessive wear,
10  I'm going to say excessive wear on the contacts.
11       Q.   Even the Tower cords had wear on the
12  contacts; isn't that correct?
13       A.   I would say that they had a lot less
14  wear.  There was a different -- there was just a
15  difference in the wear patterns.  The Tower wear
16  would be a single point divot, if you will, where
17  it's just -- it's kind of what I would expect to see
18  with a contact.  The TRC was -- there wasn't just a
19  single point divot.  There was looked like multiple
20  divots or just the surface -- or the surface was just
21  extremely rough.
22       Q.   Let's -- let's start with this question,
23  the Tower contacts that you looked at also had some
24  thermal evidence on them, correct?
25            MR. KUCHARZ:  Object to the form.

Jeffrey Lindsey

129

1    A.   I don't know what you mean by thermal

2    evidence.

3        Q.   Well, would you prefer to use the word

4    divot?

5        A.   Yeah.  I mean, I think what I prefer to

6    do is just go right to the pictures.  If you want to

7    look at the pictures, we can talk about the specific

8    pictures but.

9        Q.   We're going to look at the pictures, but

10   I need to understand what -- what do you -- you've

11   been calling -- you have stated that the TRC contacts

12   show excessive wear, right?

13       A.   No.  What I said was they had wear

14   greater than what I would expect on something that's

15   never supposed to be used.  They were never supposed

16   to have been used.

17       Q.   So the TRC contacts have wear on them,

18   correct?

19       A.   Yes.

20       Q.   How do you define wear?

21       A.   Well, let's look at the pictures.

22       Q.   What would you like to look at?

23       A.   Well, we could go to the report, if you

24   wish.  I mean, I have got the pictures in there and

25   it's...

130

1          Q.   We're looking at your report Figure 23.

2     That's what you call --

3          A.   All right.  This is -- this is a good

4     example.  So if -- if in the life of a contact, you

5     know, I would say -- all right.  I'm assuming that

6     TRC at the factory does some kind of operational

7     test.  As part of their assembly program or their

8     quality assurance program, they have some way to test

9     each LCDI and make sure it works.  And they probably

10    are doing that under load so there's some kind of

11    under load test.  So every time a contact operates,

12    there -- it draws an arc.  And every time it draws an

13    arc, it melts a very small part of the surface of the

14    contact, both contacts, both surfaces, and stuff.

15          If you look at this, if you look at this

16    contact right here is -- there isn't just one or

17    two -- and I'm saying divots, just little craters,

18    you know, so I would expect to see one or two melt

19    spots and that would signify two operations of the

20    contact.

21          But really if you're looking at this,

22    this is a large area of melting that's taken place

23    on -- this is the stationary contact.  So this in my

24    mind is exceptional damage.  This is damage greater

25    than what I would expect to see on a device that

Jeffrey Lindsey

131

1    spends its life with the contacts closed and not

2    operating.  This would be more -- this would be more

3    the damage I would expect to see on a relay that

4    switches on and off periodically during the day.  And

5    that's not the way the LCDI is supposed to operate.

6        Q.   How do you draw the line between normal

7    wear and excessive wear?

8        A.   Well, I'm pointing to this, and I'm

9    saying for a device that isn't supposed to operate

10   this is excessive wear.

11       Q.   Can you define that by width, color?  How

12   do you define it?

13       A.   Well, I -- my definition was it appears

14   to me that there has been more than one or two or

15   even three operations of this relay contact because

16   if we zoomed in on that, we would see a number of

17   craters and each one of those craters probably

18   signifies one operation.  And there's clearly more

19   than one or two or three -- one, two, or three

20   craters in that picture.

21       Q.   You can have a number of different

22   craters as you've described them on a contact that

23   would never cause thermal damage to any other

24   component; isn't that true?

25       A.   I think a properly designed contact can

Jeffrey Lindsey

132

1  cycle many thousands of times, be designed such that

2  it cycles many thousand times without there being an

3  elevated temperature on the contact surface.

4       Q.   So if we just look at this photo and you

5  see this wear pattern, you can't say whether based on

6  this this would cause any thermal damage or a fire.

7  You would have to know more, correct?

8            MR. KUCHARZ:  Object to the form.

9       A.   Well, this is a flag to me that tells me

10  I need to do additional studies which is what we did.

11       Q.   All right.  You -- you did -- you did

12  electric -- electrical resistance measurements, it

13  says, were performed on each TRC cord sets internal

14  circuitry.  How many did you do electrical resistance

15  measurements on?

16       A.   Those are reflected in that last group of

17  notes that we looked at, the 7-2-21 notes.

18       Q.   All right.  So if we count up all the

19  ones you did in the 7-2-21 notes, those are the ones

20  you did electrical resistance measurements on, right?

21       A.   That's correct.

22       Q.   How did you decide which ones to do these

23  measurements on and which ones not to do these

24  measurements on?

25       A.   Well, it wasn't -- that wasn't the kind

Jeffrey Lindsey

133

1   of decision it was.  It was -- I did as many as I

2   could before I had to write the report.  I had just

3   gotten a device literally a day or two before I had

4   to have the report completed, so I did as many as I

5   could with the time I had remaining.

6          Q.   And did you take any photos of how you

7   did these resistance measurements?

8          A.   No.  No, I did not.

9          Q.   How did you do these resistance

10  measurements?

11         A.   It's a -- it's a -- a milliohm meter is

12  a -- it has four probes, and so two of the probes are

13  connected on one side of the contact, and the other

14  two probes are connected on the other side of the

15  contact.  And there's a very specific order that you

16  have to attach the probes and then basically it's a 1

17  minute test.  So you hit the start button, it counts

18  down for a minute, and then it takes that value.

19  That's -- that's your resistance meeting -- measuring

20  so it's a fairly automated process.

21         Q.   And if you hook the probes up

22  incorrectly, you'll get incorrect results, right?

23         A.   No.  No.  You don't get any result.  You

24  get an error.  So it tests itself each time.  It's

25  either -- it either is properly set up or won't give

Jeffrey Lindsey

134

1    you any measurement at all.

2          Q.   And you have no photos or videos of how

3    you perform that test; is that true?

4          A.   That's correct.

5          Q.   All of the TRC LCDIs that you measured

6    were -- those measurements were on damaged cords,

7    right?

8          A.   Well, the notes reflect how much damage

9    there is with each one.

10         Q.   Can you answer the question?  Did --

11         A.   I did.  No, you're asking me to summarize

12   everything I did, and I -- I'm giving you the real

13   answer which is I measured each one and there's an

14   observation of whether I physically saw damage or

15   not.

16         Q.   Did you measure any TRC LCDI cord that

17   was not damaged?

18         A.   Well, let's look at the notes.

19              Okay.  So in my notes on page 3 of my

20   7-2-21 notes for item 6E, room 522, I have written

21   down here "No heat damage to plug."

22         Q.   Any other TRC LCDIs that you tested that

23   were not damaged?

24         A.   Items 5C and 5E I have as -- as they are

25   TRC devices, that I have them written down as "no

Jeffrey Lindsey

135

1   external damage" on both of those.

2        Q.   Where are the numbers for those

3   measurements for 5E?

4        A.   5E would be -- oh.  5E is bad.  5E the

5   vertical blade was 2.34 ohms or 2,340 milliohms.  And

6   the horizontal is 202 milliohms.

7            5C is much better.  It's 44.4 milliohms

8   for the vertical, and the horizontal is 64.9

9   milliohms.

10       Q.   And what about -- what was the other one,

11  6E?

12       A.   No.  That was -- I said 5 -- I wasn't

13  able to do -- what was that?  No heat damage to plug,

14  6E.  So that one was -- actually 6E had apparently

15  been done with some other testing, so I wasn't able

16  to do that resistance measurement.  That may have

17  been one of the ones that Tom had disassembled to do

18  his metallurgical testing so I wasn't able to do that

19  resistance measurement.

20       Q.   Okay.  So according to your notes, you

21  tested 2 LCD -- TRC LCDI cords that were undamaged,

22  right?

23       A.   Well, it says that, but then the one has

24  terrible contact resistance, so I'm not -- I guess I

25  don't understand why there wasn't heating on it so.

Jeffrey Lindsey

136

1          Q.    For your Tower measurements, all of them

2     were on undamaged cords, right?

3          A.    Yes, sir.

4          Q.    How do you differentiate between

5     damage -- or the measurements that were caused

6     because there's been some heat damage versus the --

7     what it would be as designed?

8               MR. KUCHARZ:   Object to the form.

9          A.    Well, going back to the premise that

10    there -- if you use -- if a cord has been in service

11    for 10 years and its contacts have never operated,

12    then frankly it's resistance should be the same as it

13    was the day it came out of the box.  So whatever its

14    resistance was, the first day should be the same as

15    it is the last day if you've never had to use the

16    relay contacts, if they've never been used for

17    anything.

18               I mean, they can carry current all the

19    time.  We do that all the time with electrical

20    connections.  We splice two wires together, you know.

21    And if I'm measuring on the first day I do the splice

22    and it's a good splice and then I measure it 10 years

23    later, the measurement will be the same because it's

24    a good electrical connection.

25               The problem we're having is there is a

Jeffrey Lindsey

137

1   failure mechanism that's taking place in these

2   contacts.  They overheat, and they become damaged.

3   And as that occurs, their resistance between the two

4   surfaces increases.

5         Q.   I'm looking on page 43 of your report for

6   the -- for the TRC LCDIs.  Do you have a concern with

7   this standard deviation you have listed?

8         A.   Yeah.  It shouldn't be that great.

9         Q.   So does that create a problem in drawing

10  any conclusions from your numbers?

11        A.   No.  I think frankly that supports the

12  conclusion because if you weren't having problems, if

13  you weren't having failures, the standard deviation

14  would be very low.  They would all be consistently

15  the same.

16             So I'm taking into account, okay, so

17  Tower -- the electrical resistance on Tower -- if you

18  look at the standard deviation on the Tower parts,

19  it's small.  That means that they are all pretty much

20  the same.  Well, that -- that's the way any

21  manufactured device should be.  Your standard

22  deviation, as it comes out of the factory, it should

23  always be small.  There shouldn't be much change

24  between individual units.  But when you have units

25  that are failing, then the standard deviation

Jeffrey Lindsey

138

1    increases and that's exactly what we're seeing with

2    the TRC units.  First of all, all the ones I looked

3    at had evidence of thermal damage.  They all have

4    much higher resistance readings than the standard

5    deviations.  That means they are all over the place

6    which is another indication that -- that they're

7    failing.

8          Q.   Did you attempt to find any Tower LCDI

9    cords that had thermal damage to them?

10         A.   Every Tower cord I looked at was

11   undamaged.

12         Q.   Did you ask for any Tower cords that --

13   that exhibited thermal damage?

14         A.   It's my understanding I had all the LCDI

15   cords that Carrier engineering had, whether they be

16   TRC or Tower.

17         Q.   If you had -- if you received a damaged

18   Tower LCDI cord, wouldn't it have higher resistance

19   measurements?

20              MR. KUCHARZ:  Object to the form.

21         A.   If, in fact, the failure was taking place

22   at the contacts, yes.

23         Q.   Do you know whether there were any Tower

24   cords that were connected to Carrier units that had

25   thermal damage?

Jeffrey Lindsey

139

1       A.   I'm not aware of any.

2       Q.   Okay.  For your thermal testing, does

3   this table on page 44 show the thermal testing that

4   you've done, these four samples?

5       A.   Yes.

6            MR. KUCHARZ:  Object to form.

7       Q.   Okay.  How did you choose the samples?

8       A.   Honestly I don't -- they were all -- they

9   all had some evidence of damage, but yet they -- I

10  was able -- well, one criteria was I had to be able

11  to close the contacts on the device.  Several of the

12  TRC LCDIs, the damage was to the point that the

13  contacts, you couldn't close them back up.  They were

14  distorted and bent, and they were no longer

15  connected.  And so that was one criteria.

16           The other -- so these, the TRC units,

17  were all devices that I could put -- they were in the

18  closed position, or I could put them in the closed

19  position.  And that's really -- I think at the time

20  that was the most important criteria was I knew that

21  they could -- they would be closed, and they could

22  stay closed.

23      Q.   Okay.  Do you know the heat -- what the

24  plastic housing in the 37190, what heat rating that

25  plastic housing has?

Jeffrey Lindsey

140

1          A.    You mean what temperature it melts at or
2     what?
3          Q.    It doesn't have a rating?  Doesn't the
4     material have a rating, temperature rating?
5          A.    Are you talking about a fire rating?
6          Q.    Do you know whether the plastic housing
7     has any temperature rating at all to it?
8          A.    I don't know what the rating is.  I don't
9     know how to answer your question so.
10         Q.    Do -- when they're designing these LCDIs,
11    they look at the materials and determine the
12    temperature rating for the materials that they
13    incorporate, right?
14              MR. KUCHARZ:  Object to the form.
15         A.    There are temperature ratings that would
16    be involved in there.  You certainly wouldn't want
17    this thing to be operating normally at a temperature
18    that's higher than say the melting point of the
19    plastic that was enclosing it.
20         Q.    Right.  But do you know -- do you know
21    the melting point for the plastic housing of 37190?
22         A.    No.  You know, plastics melt in a range
23    of 350 to 450, so somewhere that range.
24         Q.    What's the highest temperature rating you
25    got in your thermal testing?

Jeffrey Lindsey

141

1          A.    Looks like the horizontal contact was 306

2     of B.

3          Q.    Okay.  And then the three TRC cords, were

4     these all dam -- TRC cords that experienced heat

5     damage prior to --

6          A.    Yes.

7          Q.    Okay.  And for the Tower cord, the Tower

8     exemplar, that was an undamaged Tower cord, right?

9          A.    Yes, sir.

10         Q.    Your calculations of heat energy, those

11    are calculations but those are essentially

12    duplicative of the resistance value data, right?

13              MR. KUCHARZ:  Object to the form.

14         A.    Well, it's not duplicative.  It's you use

15    the resistance values based on -- they calculate how

16    much heat energy would be generated.

17         Q.    Well, if -- if you have a higher

18    resistance value, you have a higher heat energy,

19    right?

20         A.    Absolutely, yep.

21         Q.    So -- so why -- why are you calculating

22    heat energy if you already have the resistance

23    measurements?

24         A.    Because the actual mechanism that creates

25    heat is the interaction of current and resistance.

Jeffrey Lindsey

142

1    So if you -- resistance alone won't create heat

2    energy.  You actually have to have a current flowing

3    through the resistance to generate heat.

4         Q.   For the electrical -- an electrical

5    connection, isn't 5 watts a large energy value?

6              MR. KUCHARZ:  Object to the form.

7         A.   That would be -- yes, that's -- that's a

8    lot of heat.  That's a lot of energy.

9         Q.   Your report on page 9 talks about

10   additional metallurgical testing and materials

11   analysis.  Are you an expert in materials?

12        A.   I am not, no.

13        Q.   What metallurgical or materials analysis

14   was done?

15        A.   Well, that would have been Mr. Easley's

16   contribution to this.

17        Q.   Yeah.  What was done?

18        A.   Well, I -- we've gone over -- earlier we

19   talked about I was concerned about the possibility

20   that the dissimilar metals.  I know Tom did work on

21   that.

22              The other thing I asked him to do was

23   take a look at the damage and if it was consist -- if

24   we had a current density issue, if there was -- I

25   asked him to take a look at the cracks that I

143

1    observed in several of the samples.  I think,

2    frankly, you know, Tom would need to respond to your

3    question.  I can't.

4         Q.   Did the -- it sounds to me like you had

5    Tom help you out and help with disassembly and some

6    photos and that, and then he looked at various things

7    as we've seen in the e-mails.  Does any of the

8    metallurgical testing or materials analysis, do you

9    rely upon any of that for your opinions or is that

10   all -- are you relying upon for your opinions the

11   work that we've been discussing that you did?

12              MR. KUCHARZ:  Object to the form.

13        A.   Well, I guess you -- I relied upon Tom's

14   work to exclude the dissimilar metals.  I relied

15   upon's Tom work to exclude the geometry and the large

16   hole and the cracks.

17        Q.   I gotcha.

18        A.   I -- I relied upon his photographs; I

19   used his photographs to generate my own opinions.  I

20   relied upon his SEM data collection in -- you know,

21   in generating my opinions.

22        Q.   What do you rely upon the SEM data for?

23        A.   Well, one question we had was, you know,

24   is the contact material a suitable material.  And,

25   you know, Tom identified that it's an alloy.  It's a

Jeffrey Lindsey

144

1    silver cadmium alloy, and I know from past experience

2    that that type of material is used to good -- to good

3    effect in electrical contacts.  So that was very

4    helpful to identify -- you know, because one of the

5    issues we had was, well, maybe the contacts, there's

6    a material issue here.  And it doesn't appear that

7    the choice of alloys is the problem.

8        Q.   Okay.  How did you disassemble the cord

9    sets that you disassembled?

10       A.   Oh, gosh.  There's some screws.  Took the

11   screws out.  They have -- if I remember right, they

12   have one of those security heads on them, so I had to

13   use our security head set to take the screws out.

14   And then usually I used a hammer then to split the

15   seam.

16       Q.   Do you agree that in using the hammer to

17   split the seam, you could have caused some damage to

18   the contacts?

19       A.   You broke up there.  I didn't hear the

20   end of the question.

21       Q.   Do you agree that by using the hammer to

22   split the seam, you could have caused damage to the

23   contacts?

24       A.   No.  No.  The hammer didn't do any damage

25   to the contacts.  The hammer -- basically the weld

145

1    on -- I didn't hit it that --

2              MR. KUCHARZ:  I'm sorry.

3         A.    -- plastic together.

4              MR. KUCHARZ:  That -- I'm getting some

5    internet feedback.  I don't know if anyone else is.

6    So maybe we can have the court reporter read back

7    that question and have your answer start from the

8    beginning.

9         Q.   I'll ask it again.  Do you agree that by

10   using the hammer, you could have caused some damage

11   to the contacts?

12        A.   No.

13        Q.   And why is that?

14        A.   The hammer -- well, I didn't hit it that

15   hard, but the hammer was just used to get -- the

16   enclosure was like glued together.  I mean, in

17   addition to the screws they used some kind of thermal

18   tacking to it.  So the hammer basically just breaks

19   that seam of those two pieces that create the outer

20   cover.  It just gets that started, and then I use a

21   screwdriver to pop the thing off.

22        Q.   And you didn't video your disassembly to

23   show how you used the hammer; isn't that true?

24        A.   That's true -- that's correct, did not.

25        Q.   With respect to the -- the Tower cord

Jeffrey Lindsey

146

1    sets that you received, the only way to determine how

2    many of those Tower cord sets that you examined is to

3    go through your notes, right?

4              MR. KUCHARZ:  Objection to form.

5         A.   Yes.

6         Q.   All right.  You understand that you were

7    required to issue a report with all your opinions and

8    bases for your opinions; is that true?

9         A.   Yes.

10        Q.   Is your report complete?

11        A.   Yes.

12        Q.   Are there any opinions or bases that you

13   intend to offer that are not in your report?

14        A.   No.

15        Q.   Do you agree that in your report you did

16   not give an opinion about the origin or cause of the

17   fire in room 203 of the Toccoa Inn?

18        A.   That's correct.

19        Q.   After your evaluation of the 37190, it's

20   your belief that there were three possible defects

21   that you list on page 6 of your report, right?

22        A.   Yes, sir.

23        Q.   You did not find the MOV or the lack of a

24   thermal fuse related to an MOV in the 37190 to be a

25   defect in design or manufacture; isn't that true?

Jeffrey Lindsey

147

1        A.   That wasn't an issue in any of the LCDIs
2    I looked at.
3        Q.   My first question is you didn't give
4    that -- you're not alleging that that is a defect;
5    isn't that true?
6        A.   No, I'm not.
7        Q.   All right.  The second -- what you
8    answered is -- was my second question is that in all
9    of the L -- 37190 units you looked at, you didn't see
10   any thermal failure that you believed was due to an
11   MOV; isn't that true?
12           MR. KUCHARZ:  Object to the form.
13       A.   Yes, sir.
14       Q.   Do you consider yourself an expert in the
15   area of LCDI design?
16           MR. KUCHARZ:  Object to the form.
17       A.    I wouldn't hold myself out to be an
18   expert in -- in the design of LCDIs.  I think my area
19   of expertise is a good understanding of how devices
20   fail regardless of what they are, whether it's a
21   range or refrigerator, I mean, for an electrical
22   issue.  And it's certainly -- I certainly have the
23   capabilities to -- to evaluate this design.
24       Q.   So I think what you're telling me you are
25   an expert in failure analysis, right?

Jeffrey Lindsey

148

1          A.    Yes, sir.

2          Q.    But do you consider yourself an expert in

3     LCDI manufacturing?

4          A.    No.

5               MR. KUCHARZ:  Object to the form.

6          Q.    Do you consider yourself an expert in

7     LCDI design?

8               MR. KUCHARZ:  Object to the form.

9          A.    I don't know how to answer that.  I -- I

10    mean, the design principles, whether it's an LCDI or

11    anything, is, yes, I do have areas of expertise where

12    I can comment to that.  And clearly the design of the

13    LCDI, that's one of the possible failure modes for

14    this is the contacts were inadequate.  I mean,

15    there's -- it's very easy.  Basically the design of

16    this device said it has to withstand continuously

17    20 amps.

18               Well, I did testing that shows that the

19    contacts can't withstand 20 amps continuously.  They

20    get too hot, you know?  Look -- I looked at a number

21    of products from TRC, this LCDI.  They all appear to

22    have the same failure which, again, one of the

23    possible failure modes is a design issue.  So I'm

24    critical of that, and I believe I'm offering

25    expertise to that portion of the LCDI design.

Jeffrey Lindsey

149

1    Q.   You are an expert in origin and cause of

2    fires though, correct?

3    A.   I am.

4    Q.   But in this case you're not offering an

5    opinion in the area in origin or cause of any

6    particular fire; is that true?

7    A.   That's correct.

8    Q.   And you're not -- you are not offering

9    any opinions in the areas of warnings or human

10   factors; is that true?

11   A.   I am not.

12   Q.   On page 5 of your report, you make the

13   statement that "many of the relay contacts inspected

14   exhibit -- exhibited pitted and melting contact

15   surfaces."  The only way to identify which is to go

16   through your notes; is that correct?

17   A.   Yes.

18   Q.   You don't have a number of how many, do

19   you?

20   A.   I do not.

21   Q.   You also state in that same bullet point

22   on page 5 that "There is greater than the wear

23   normally that would be found," correct?

24   A.   That's my opinion.

25   Q.   Do you have any support, whether it be

Jeffrey Lindsey

150

1  testing or peer reviewed articles, as to what is

2  greater than the normal wear that should be found?

3       A.   Well, I could go back, and we could have

4  the discussion.  Every time the contact opens, a pit

5  is created.  And clearly looking at these contacts

6  they're demonstrating more pits than you would expect

7  to see with this type of device.  This device doesn't

8  open and close.  So at the most there may have been

9  one or two or three operations in the factory when

10  they -- when they tested it operational.  You know,

11  so at the most you should see two or three pits on

12  each surface.

13            And just looking at that photograph,

14  there's multiple -- there are many more pits than two

15  or three.  So, you know, that's my observation.  It's

16  my experience.

17       Q.   Are you -- can you cite any publication

18  or peer reviewed article that supports that the

19  number of pits that you are seeing is unusual or too

20  many?

21       A.   No.  I'm not going to cite anything.

22            MR. KUCHARZ:  We've been going for over

23  two hours now.  I think it would be appropriate to

24  have a short comfort break.

25            MR. BOORMAN:  Sure.  How long do you

151

1   need?

2          MR. KUCHARZ:  Me, just 5 minutes.  I

3   don't know if anyone else needs more time.

4          Q.   Mr. Lindsey, how long do you need?

5          A.   I'm good.  Whatever you guys need to take

6   is fine with me.

7          MR. BOORMAN:  All right.  We'll see

8   everybody is 5 minutes.

9          THE VIDEOGRAPHER:  3:01 and we are going

10  off the record.

11         (Recess taken.)

12         Q.   Okay.  On page 6 of your report, you

13  state that what -- part of your findings were that

14  the "heat energy is generated and flows away from the

15  contacts."  Do you see where I'm talking about of

16  this first bullet point on page 6?

17         A.   Yes.

18         Q.   How do you determine which direction the

19  heat flowed?

20         A.   Well, heat -- I mean, that's -- that's

21  the nature of heat transfer.  You have a point where

22  the heat is -- heat -- the temperature -- the high

23  temperature occurs, and then naturally then the heat

24  flows by a conductive away from that point.  So, I

25  mean, that's just kind of heat transfer -- heat

Jeffrey Lindsey

152

1    transfer 101.

2         Q.   So the -- in your opinion, the damage

3    that you see, the contacts are the epicenter of the

4    heat source; is that right?

5         A.   Yes.

6         Q.   And do you have any evidence of an

7    overheated contact?

8         A.   Yes.

9         Q.   Can you show me a picture of that?  Is

10   that in your report?

11        A.   Well, go back to the temperature

12   readings.  Those temperatures are measured at the

13   contact.

14        Q.   Is there any physical evidence that you

15   see on these that -- that show overheating?

16             MR. KUCHARZ:  Object to the form.

17        A.   If you go to the side view which shows

18   the -- the side view that shows the damage to the

19   circuit board.

20        Q.   Which --

21        A.   Right there.  Stop right there.  Back up.

22   Go back.  Right there.  Yeah, that's basically --

23   that's your heat flow path right there.

24        Q.   Okay.  You are --

25        A.   The contact -- the contact, you can see

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Jeffrey Lindsey

153

1    it on the bottom image, Figure 20.

2         Q.    Right.

3         A.    You can see the contact is right there,

4    all right?

5         Q.    Right.

6         A.    And heat generated there basically is

7    flowing in both directions.  You can see the charring

8    that's taking place in the circuit board above that

9    where the one arrow is pointing, and you also see the

10   fact that that's where the -- the stationary arm is

11   soldered, is fastened to the circuit board.  It's

12   actually heat it flowed there.  It's unsoldered, that

13   connection, and then, of course, then heat moves the

14   other direction and is flowing out the blade, and

15   we've seen the damage that it caused to the plastic

16   enclosure where the blade is in contact as well as

17   the outlet and its cover.

18        Q.    Okay.

19        A.    So the contact is right in the middle

20   of -- I mean, heat is going in both directions from

21   that contact.

22        Q.    I understand what you're saying.  Okay.

23   Going back -- back to page 6 of your report, you

24   identify three possible causes for the alleged

25   defect; is that right?

Jeffrey Lindsey

154

1        A.    Yes, sir.

2        Q.    How many expert reports have you written?

3        A.    I -- I have no number for you.  I don't

4   know.  Many.

5        Q.    I think you said you gave testimony in

6   over a thousand origin and cause cases.  Would it be

7   over a thousand reports?

8        A.    Yes, yes, I'm sure it is.

9        Q.    Have you -- other than this case have you

10  ever given the opinion that there were possible

11  causes of a defect as opposed to listing your opinion

12  about a specific defect?

13            MR. KUCHARZ:  Object to the form.

14       A.    Well, the -- yes.  I've done this -- to

15  me it's absolutely fair.  There is a problem in the

16  LCDI.  You know, the LCDI, the contacts are --

17       Q.    Mr. Lindsey, I'm going to interrupt you

18  just so I save time.  My -- my question is not for

19  you to explain your opinion in the case.  My question

20  is in any other case other than this case have you

21  ever given the opinion that there were possible

22  causes of a defect versus just giving an opinion as

23  to a single cause of defect?

24       A.    Yes.

25       Q.    All right.  How many times have you done

Jeffrey Lindsey

155

1    that?

2         A.    Many.

3         Q.    When's the last time you did that?

4         A.    Probably within a month.  I don't --

5         Q.    Okay.

6         A.    I don't know.  I mean, it's -- it's --

7    that's the way I do it.  I outline the possible

8    causes.

9         Q.    All right.  What -- what have you -- what

10   report have you done in the last month that basically

11   does the same thing?

12               MR. KUCHARZ:  Object and we'll state

13   again to the extent you've not been disclosed as an

14   expert in any of these cases, that is likely subject

15   to work product protection.

16        Q.    Were you disclosed in that other case?

17        A.    I could be.  I mean, they're ongoing

18   cases.  I don't -- what's your question?  Because I

19   don't know how to answer you.  I've told you, yes,

20   I've done this.  That's what I did in this case.

21        Q.    This might be your thing.  So have you

22   been disclosed in any cases in which you've given

23   possible defect causes?  And if so, what are those

24   cases?

25               MR. KUCHARZ:  Object to the form.

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Jeffrey Lindsey

156

1        A.    And the answer is, yes, I have, and I

2   can't really give you any specific case, but I -- I

3   have done that.

4        Q.    So you state that there are three

5   possible causes of the defect but then you -- these

6   are essentially three different defects that you

7   list, correct?

8             MR. KUCHARZ:  Object to the form.

9        A.    Yeah, but I also say that there is a

10  defect -- I have an opinion that there is a defect in

11  the LCDI.  The cause of that defect at this time I

12  don't know what it is, but they all are the

13  responsibility of TRC so.

14       Q.    All right.  What is the defect?

15       A.    The defect is the contacts of the relay

16  contacts are overheating in the LCDI causing damage

17  to the LCDI and the outlet its connected to.

18       Q.    Is it a design defect or a manufacturing

19  defect?

20       A.    I think it could be either.

21       Q.    But you can't say which.

22       A.    No.  But they are all the responsibility

23  of TRC.  That's TRC's job to figure out why their

24  product was shoddy.

25       Q.    You cannot state if any of these three

Jeffrey Lindsey

157

1    alleged defects more likely than not caused the

2    thermal damage in any of the TRC cords you inspected;

3    is that correct?

4              MR. KUCHARZ:  Object to form.

5         A.   That's correct.

6         Q.   You cannot state that any of these three

7    alleged defects more likely than not caused thermal

8    damage or a fire in any 37190 cord; is that correct?

9         A.   That's correct.

10        Q.   You cannot state that any of these three

11   alleged defects more likely than not caused the fire

12   in room 203; is that correct?

13        A.   That is correct.

14        Q.   You cannot state that any of these three

15   alleged defects more likely than not existed in any

16   37190 cord; is that correct?

17             MR. KUCHARZ:  Object to the form.

18        A.   Can you say that one again?

19        Q.   Yeah.  You cannot state that any of these

20   three alleged defects more likely than not existed in

21   any 37190 cord; isn't that correct?

22        A.   Well, I don't know that I agree with that

23   because one of the three is -- is the cause, and if

24   it's a design issue, yes, it does exist.  Whether

25   it's manifested itself or not is -- that's a

Jeffrey Lindsey

158

1    different story.  But in the ones that are damaged

2    that I looked at, I cannot determine which of the

3    three possible TRC problems is the cause of this --

4    of this issue.

5            Q.   Well, for -- for any of the cords that

6    you examined, you can't state within a reasonable

7    degree -- I'm sorry.  Let me start over.  For any of

8    the cords that you examined, you cannot state that

9    more likely than not it was one of these three

10   alleged defects; is that true?

11           MR. KUCHARZ:  Object to the form.

12           A.   Yes, that is correct.

13           Q.   All right.  Let's start with this

14   insufficient -- the first potential defect theory is

15   that the contacts are insufficiently rated.  What --

16   what is the electrical current that this LCDI is

17   rated?

18           A.   It's rated for 20 amps continuous.

19           Q.   All right.  And -- and what is the rating

20   for the contacts?

21           A.   They would have to be at least 20 amps.

22   Hopefully they are greater than 20 amps.

23           Q.   Has UL approved this 37190?

24           MR. KUCHARZ:  Object to the form.

25           A.   I believe it is an approved device, yes.

Jeffrey Lindsey

159

1    Q.   So it -- if it's been approved and you've

2    testified that these contacts must be rated for at

3    least 20 amps, wouldn't that mean that they are

4    sufficiently rated for this current?

5              MR. KUCHARZ:  Object to the form.

6    A.   Well, at least the samples that were

7    submitted to UL passed the UL testing.

8    Q.   So whether something is sufficiently

9    rated or not sufficiently rated, it is a -- it's a

10   knowable fact, right?

11   A.   I -- I don't know.  I don't know that I

12   can answer that because I -- the fact that it passed

13   the UL test does not necessarily show that the design

14   is effective.

15   Q.   So how do you determine what the ratings

16   are for these contacts?

17   A.   Well, the -- I -- well, no, not ideally,

18   but practically the contacts cannot heat as current

19   flows through them.  The problem I have is every one

20   of these contacts, every one of these TRC contacts

21   that I measured, their resistance was a factor of

22   four or five times greater than the Tower relay

23   contacts and that shouldn't be.  This is not -- this

24   isn't new science.  This is not new technology.  And

25   the -- my finding was that these relay contacts are

Jeffrey Lindsey

160

1    much higher than I believe they should be.

2              And the fact that -- and that was the

3    point of doing that calculation was to show that with

4    those kind of values, you know, when 20 amps flowed

5    through it, there was a lot of heat that is being

6    generated at the relay contact and that should not

7    be.  So in my mind -- in my mind that this design is

8    suspect because there is no safety factor built into

9    obviously.

10        Q.   Mr. Lindsey, I do understand that you did

11   testing and you saw temperatures that you believe are

12   in excess of what they should be and a concern.  I do

13   understand that.  What I want to understand is what

14   do you mean by the contacts are insufficiently rated?

15   I thought I understood that -- what you were talking

16   about, but I -- but I don't.  So what do you mean --

17   what rating is insufficient?

18        A.   There is only one rating that matters

19   here.  It's the whole point of this device is

20   overheating.  The only rating that matters is that

21   those contacts cannot add heat to the circuit.

22   They're supposed to be -- they're supposed to be

23   transparent to the -- to the electrical current

24   flowing through to the device.

25        Q.   What is --

Jeffrey Lindsey

161

1          A.    And they're not.  They're not so.

2          Q.    What is the rating?  I don't think

3     you're -- you're not understanding my question, or

4     I'm not understanding your answer.  I mean, you

5     understand that -- you can -- various things can be

6     rated like we talked about earlier.  A plastic can

7     have a heat rating.  A materials expert goes and

8     looks at it and says here's the melting point.

9     Here's these various other points.  Is that what

10    you're talking about in this first bullet point, that

11    the material used was not properly rated for this

12    amount of electrical current?

13               MR. KUCHARZ:  Object to the form.

14         A.    One of the possibilities I've identified

15    is that something about the electrical contact, its

16    shape, its surface, its size, is insufficient to

17    uniformly and continually carry 20 amps of current.

18    The damage I'm seeing to these contacts, the -- the

19    evidence of wear that I'm seeing on contacts that

20    really aren't supposed to open suggests that the

21    design of the contact is insufficient for the job

22    it's been assigned to do.

23               A UL test -- a UL test will not

24    necessarily show that kind of deficiency because we

25    know that all these cords were in service for more

162

1    than the day or the hour or however long UL ran their

2    tests.  So part of the design of the relay contact is

3    something that has to behave the same way in 5 years

4    as it does in 5 minutes after you put power to it.

5         Q.   I want to focus this next question on the

6    word rate.  When you use the word rate in the first

7    bullet point, what rate are you referring to?

8         A.   There's only one rating.  The rating is

9    that now and 5 years from now the contacts have to be

10   able to safely carry amps -- or 20 amps of current.

11   That's the only rating that matters.

12        Q.   Okay.

13        A.   It doesn't matter -- there is no

14   qualification.

15        Q.   You answered the question.  When you are

16   referring to rate, you're saying that you have a

17   concern that the contacts are not rated for 20 amps,

18   right?

19             MR. KUCHARZ:  Object to the form.

20        A.   No.  What I said was they are always

21   rated for 20 amps of current.

22        Q.   But you have concerns that these

23   particular contacts are not sufficiently rated to

24   carry 20 amps; is that right?

25        A.   I think that's a possibility, yes.

163

1          Q.   How do you prove one way or the other

2     whether they are sufficiently rated?

3          A.   If they were sufficiently rated and I ran

4     them for 5 years, if I ran electrical current through

5     this for 5 years and I never ever operated the relay,

6     I just ran current through it for 20 years

7     continuous, okay?  If they were sufficiently rated,

8     they would look exactly the same at year 5 as they

9     would look at year 0.  That would be one point of

10    analysis is the contacts are not supposed to degrade

11    just because they have 20 amps of current.  If they

12    are designed for 20 amps of current after a finite

13    amount of time, they're not supposed to degrade.

14              These -- one of the explanations for this

15    is they are degrading, and one of the possibilities

16    of that is there isn't enough contact surface area or

17    the surface area is not sufficiently smooth or

18    there's some other issue which I don't know what it

19    is but what I believe is that over time one of the

20    possibilities is that the contact resistance

21    degrades, and these relays derate themselves.

22         Q.   So what you're describing is in -- what

23    you just described is that you think the design of

24    these contacts in terms of the shape, surface, or

25    size can degrade over time and that can cause a

Jeffrey Lindsey

164

1  problem; is that right?

2          MR. KUCHARZ:  Object to the form.

3      A.   Yes.

4      Q.   What -- have you made any measurements of

5  the shape, surface, or size of these contacts?

6      A.   Well, I measured the size of the

7  contacts.  I measured the diameter of the contacts.

8  They are smaller than the Tower contacts.

9      Q.   All right.  What --

10      A.   They're shaped -- they're shaped

11  different -- they have an entirely different shape.

12  One of them is round.  On the TRC -- on the Tower

13  contacts they are both round spheroid contacts which

14  is typically what I see, okay?  And on the TRC

15  contacts, one is a round smaller diameter spheroid

16  and then the other, the stationary contact, is a

17  rectangular shape.  So they're shaped differently.

18          It's just an observation.  I don't know

19  if it means anything or not, but it simply tells me

20  that there are differences and possibly those

21  differences have something to do with what's going on

22  with these contacts.  I just don't know.  That's why

23  it's a possibility rather than what happened.

24      Q.   All right.  Can you think of any test

25  that could be done to determine if the shape,

Jeffrey Lindsey

165

1    surface, or size of the TRC contacts was the problem

2    that you believe exists?

3         A.   I'm certain that a test can be devised to

4    do that.  I just -- right at the moment I don't know

5    what that test is, but I'm not saying that it can't

6    be done.  I just -- I don't -- I didn't do that test,

7    and I can't offer an opinion on what that test is

8    going to show.

9         Q.   As you sit here today, you can't -- you

10   can't testify as to what would need to be changed

11   with respect to these contacts to be sufficiently

12   rated; is that fair?

13        A.   If that's the problem, that is correct.

14   It just...

15        Q.   If there is a problem with the shape,

16   surface, or size of the contacts, that would exist

17   from the very first moment that these contacts are

18   manufactured, right?

19             MR. KUCHARZ:  Object to the form.

20        A.   No.  I can't answer that because I don't

21   have a history for -- for the unit.  I don't know --

22   I mean, that's assuming that there were no changes.

23   You know, that this -- this -- that there was no

24   supplier changes, and I don't know that.  I don't

25   have access to any of that.  That -- that's a great

1    analysis point, you know, that would be easy for TRC

2    to look and see did we change suppliers?  Did any of

3    this happen?  But I can't answer that.

4         Q.   I'm talking about the -- the contacts

5    that you physically examined and laid eyes on, the

6    shape, surface, and size of what you saw was the same

7    from the moment that it came off the assembly line,

8    right?

9              MR. KUCHARZ:  Object to the form.

10        A.   That's my understanding, yes.

11        Q.   Okay.  You have seen no evidence that

12   they changed in those dimensions, right?

13             MR. KUCHARZ:  Object to the form.

14        A.   I have not.

15        Q.   Okay.  If that is -- if they are

16   essentially the same shape from the very beginning,

17   wouldn't they overheat and fail immediately if that

18   were the problem?

19        A.   No.

20        Q.   Why not?

21        A.   Well, you know, it's because this may

22   be -- the failure mechanism very well could be a

23   matter of degradation of the -- you know, that this

24   is -- it's close to being what needs to be, but it's

25   not quite enough.  And it degrades over time.  That's

Jeffrey Lindsey

167

1    what it suggests based on -- that's what is suggested

2    based on what we understand about this is these

3    aren't failing early in the life.  They are failing

4    at some later point in life of the product.

5         Q.   And what evidence do you have that these

6    contacts degraded over time?

7         A.   Well, going back to the whole observation

8    about the damage that's on the surface of the

9    contacts, on a -- on a contact that's not supposed to

10   be opening and closing, it's exhibiting damage that's

11   consistent with a relay contact that periodically

12   opens and closes under load.

13            So in my mind what I'm seeing is a

14   degradation for some reason.  Now, either it is a

15   design issue that the design is teetering on the edge

16   of being sufficient or there's some kind of damage

17   that's -- these contacts are experiencing as they are

18   being assembled or manufactured.  I don't know.

19   Those are the other two possibilities we haven't

20   talked about.  But I think any of those or a

21   combination of those is probably what's going on

22   here.

23        Q.   Let's go down to the second which is

24   defective manufacture.  What is the manufacturing

25   defect specifically?

Jeffrey Lindsey

168

1        A.   Well, in at least one or two of them

2   there's physical damage on the contact surface that's

3   not related to their use and it's not related to

4   electrical activity.  There's mechanical gouges.

5   Now, either they came from the supplier that way or

6   they were damaged when they were being assembled at

7   the TRC facility.

8        Q.   When -- in the second bullet point when

9   you're talking about defective manufacture, are you

10  talking about the physical damage that you've noted?

11       A.   That could be part of it or there could

12  be physical damage to the contact surface when the

13  contacts are being created.

14       Q.   What -- what do you mean by that?

15       A.   Well, it's however -- it's whatever

16  process the relay manufacturer has to make their

17  electrical contacts.

18       Q.   We're going to look at photos in a little

19  bit that show scrape marks that you can see in the

20  metal.  That's -- that's the physical damage that you

21  mentioned first, right?

22       A.   Yes.

23       Q.   Is there something else that you're --

24  that you're referring to in this second bullet point

25  about defective manufacture other than the scrape

Jeffrey Lindsey

169

1    marks?

2        A.   Well, the -- another thing that would be

3    important is the physical -- is the physical shape of

4    the contact consistent and uniform and as it was

5    originally designed to be.  If you look at electrical

6    contacts, they -- there is a specific design that the

7    manufacturer, the designer of the contact, makes.

8    You know, is it a point?  Do -- is there a single

9    point of contact or is it a circle of contact surface

10   area?

11           And so manufacturing defects would be is

12   if the contact is improperly -- the surface of the

13   contact is improperly formed or there's foreign

14   objects or there's -- there's some kind of -- what's

15   the word I'm thinking of here?  It would be a

16   manufacturing issue if they got something in there.

17   It's just --

18       Q.   Other than the scrape marks that we'll

19   look at, did you see any evidence of defective

20   manufacturing?

21       A.   No, I did not.  And I didn't look either.

22   That was -- that was -- that's not something I really

23   spent time doing.  That's why this is a possibility.

24       Q.   What -- what is the manufacturing process

25   for these contacts?

170

1          A.   I can't answer that either, so I'm not

2     going to -- I'm just suggesting that if they are

3     improperly manufactured, that could explain why they

4     are failing.

5          Q.   What is it about the manufacturing

6     process that generates an alleged defect?

7          A.   Well, I just went over some things.  I

8     can go over it again.  If the surface is not what it

9     was designed to be which would be a defect in the way

10    it's manufactured, that could cause a failure of the

11    contacts.

12         Q.   But you did not -- hold on a second.  But

13    you did not observe that, did you?

14         A.   No.  I am not offering an opinion to

15    that, no.

16         Q.   Okay.  And if this was a manufacturing

17    defect that existed, then it would be a manufacturing

18    defect that would be true for all of the 37190s,

19    right?

20              MR. KUCHARZ:  Object to the form.

21         A.   Not necessarily.  No, because they're

22    random defects.  If you have a project -- if you have

23    a process that is inconsistent, then it wouldn't

24    necessarily be the same problem each time.  If

25    you're -- if you're introducing some kind of

Jeffrey Lindsey

171

1    contaminant into your contact material, then it
2    wouldn't necessarily be a consistent finding in all
3    contacts.
4            Q.   But you didn't see any evidence of a
5    contaminant in the contacts; isn't that true?
6            A.   I did not, no.
7            Q.   And you can't say that it occurred in
8    contacts that were manufactured from X date to X
9    date; isn't that true?
10           A.   I can't do that either.
11           Q.   But if there were a manufacturing defect,
12   that manufacturing defect would have existed from the
13   moment that those contacts were manufactured, right?
14               MR. KUCHARZ:  Object to the form.
15           A.   Yes.
16           Q.   Then let's go down to the third bullet
17   point which is the possibility that the relay
18   contacts were damaged during the assembly.  By
19   damaged during the assembly, are you referring to the
20   scrape marks that we talked about?
21           A.   That's one possibility or the way that
22   they are installed.
23           Q.   Please explain that.
24           A.   If there's some issue in the way that
25   they align themselves, if there's -- if there's an

Jeffrey Lindsey

172

1    ability when the relay is actually inserted on the

2    board, it can create a mechanical tension that causes

3    a misalignment.

4         Q.   Did you document any misalignment in any

5    of the TRC cords that you inspected?

6         A.   No.

7         Q.   With respect to the scrape marks, how

8    were those -- how was that damage caused?

9         A.   It's -- it's mechanical damage to the

10   contact surface.  I don't know how.  Something that

11   was clearly harder than the contact material gouged

12   out some of the contact material.

13        Q.   How many of the contacts that you

14   inspected were -- showed those damaged and showed

15   scrape marks?

16        A.   I really -- to be honest right now, I

17   only have the recollection of the one that we show in

18   the report but there may have been others.  I just

19   don't recall.

20        Q.   Okay.  And if that were -- again, if they

21   were manufactured during assembly, then -- then

22   it would have -- that scrape mark would have existed

23   before it was sold to the consumer; is that true?

24        A.   Yes, sir.

25        Q.   How would that scrape mark -- what would

173

1    the failure mode be for that scrape mark?  I mean,

2    how would that cause overheating?

3         A.   Well, it -- the geometry of the contacts

4    is critical.  And if one of the contacts is missing

5    material, that's -- that could cause an elevated

6    current density in the parts of the contact that are

7    touching which is never good for the life of a

8    contact.  You want to distribute the current density

9    over the entire contacting surface.

10              The other concern you would have with

11   that scrape is did it damage something else?  Did it

12   cause some other issue in the contact?  But maybe now

13   the force -- the contact is -- the moveable contact

14   is exerting on the stationary contact is now

15   inadequate because of the mechanical damage that

16   occurred when that scrape occurred.

17        Q.   When you did your temperature

18   measurements and you were getting elevated

19   temperatures, were you looking at the contacts to

20   determine what was different about the TRC contacts

21   that were giving you these temperature measurements

22   versus the Tower contacts?

23        A.   Yeah.  I indicated -- I indicated earlier

24   that the Tower contacts there's more -- they're

25   larger.  They're a larger -- it's a larger contact.

Jeffrey Lindsey

174

1    There's more mass there.  They are both the same

2    shape.  They're more of what I typically see where

3    they're both, you know, spheroid contacts.  The TRC,

4    you know, you have a spheroid on the moveable, but

5    the stationary is rectangular.

6         Q.   Did you --

7         A.   So --

8         Q.   I'm sorry.  Go ahead.

9         A.   No.  I'm done.

10        Q.   Did you measure the surface area -- the

11   contact surface area from the Tower contact -- from

12   the Tower contacts?

13        A.   Well, I may -- I created a diameter.  I

14   didn't calculate the surface area, but I did measure

15   the diameter of it.  That's that one note that shows

16   that.

17        Q.   I'm not talking about the physical

18   dimensions of the contact.  I'm saying did you

19   measure the amount of surface area between the two

20   contacts and the Tower cord that were in contact with

21   each other?

22        A.   Well, it would be a point contact.  These

23   are all point contacts.  There's a point on each

24   surface that's touching the other.  And, no, I did

25   not measure that area.

Jeffrey Lindsey

175

1        Q.    All right.  Can you -- is it possible to

2   measure that area?

3        A.    I'm sure someone can do that.  I don't

4   know that I can do that, but I'm sure someone could

5   do that.

6        Q.    And I take it you didn't attempt to

7   measure the contact surface area on the TRC contacts

8   either; is that correct?

9        A.    That's correct.

10        Q.    All right.  Regardless of these, you

11   know, you go on to say, well, regardless, whatever

12   one of these three it is, in your view TRC is

13   responsible.  And you point out that TRC should have

14   had a testing and a control program.  What -- what

15   was TRC's testing and quality control program for the

16   37190?

17        A.    I have no idea.

18        Q.    What testing and quality control programs

19   should have been used?

20        A.    I would think that they would be on the

21   intake of parts that there would be some sampling of

22   the parts to make sure that your suppliers are

23   sending you what you intended them to.

24        Q.    So what -- I mean, the specifics, one in

25   one hundred?  One in one thousand?  What are you

Jeffrey Lindsey

176

1    proposing should have been the testing and quality

2    control program?

3            A.   That's up -- that's -- I'm not proposing

4    the sample size.  I'm not doing that.  I'm simply

5    saying is, you know, it would always be the

6    manufacturer's responsibility to have some program in

7    place to make certain that they are getting good

8    parts.

9            Now, either you do it beforehand or you

10   do it after when you start getting returns and then

11   you have to do a surveillancing.  You have to figure

12   out when did we start getting bad parts.

13           Q.   Have you ever developed a testing or

14   quality control program for a manufacturer?

15           A.   No, I have not.

16           Q.   Does anybody follow a testing and quality

17   control program that you think is the one that TRC

18   should have followed?

19           MR. KUCHARZ:  Object to the form.

20           A.    I can't answer that.  I have -- I have

21   been involved with companies that are trying to track

22   down when defective parts started showing up.  And

23   I've certainly seen good recordkeeping that allowed

24   them to figure out when -- when they went astray, and

25   I've also seen companies that didn't have the

1    recordkeeping that they needed.  So I've seen it both

2    ways.  I've been involved in both kinds of issues.

3           Q.   You would agree that not all overheating

4    causes a fire, right?

5           A.   I think that's -- yes, that -- that is

6    correct, but it can.

7           Q.   Well, what conditions must occur for a

8    fire to occur?

9           A.   Well --

10           MR. KUCHARZ:  Object to the form.

11           A.   In this instance it just has to -- if

12   it's not detected, if the overheating connection --

13   condition is not detected, it's only going to get

14   worse.  And that's the problem you have with bad

15   connections or loose connections is they never heal

16   themselves; they only get worse.  And if allowed to

17   continue, they can cause a fire because I've seen it

18   happen.

19           Q.   Well, you don't have any evidence that

20   the connections in these TRC cords were loose, do

21   you?

22           A.   Well, that's what we're talking about

23   when we're talking about a high resistance

24   connection.  You know, another word for that is a

25   loose connection.  It's a higher -- if you would

Jeffrey Lindsey

178

1   rather, I'll call it a high resistance connection.

2   That's what we have at the contact surface.  That's

3   why the contacts are overheating.  That's why the

4   heat was radiating away from the contact.  It was a

5   high resistance or a loose connection between the two

6   contacting surfaces.

7          Q.   Isn't it possible that you could have

8   heating to the blades that would transmit down to the

9   contacts as a result of a problem with the outlet?

10  Isn't that possible?

11              MR. KUCHARZ:  Object to the form.

12         A.   You could have -- you could have a

13  problem at your electrical connection where -- at the

14  terminal screw where the wire is connected in the

15  outlet, and heat can be generated from that point

16  that would travel into the blade of the plug.

17         Q.   And if that happened, wouldn't it be

18  possible that that overheating could cause high

19  resistance in the contacts?

20         A.   No.

21         Q.   Why not?

22         A.   It's too removed from the -- it's too

23  removed from the point of heating.  I mean, a heat

24  source attacking a contact -- and contacts are

25  designed to melt.  Every time the contacts --

Jeffrey Lindsey

179

1    there -- that's why they choose the silver cadmium

2    material is it's designed to melt and heal itself

3    every time it -- it fires.

4             And so if you had that kind of heating,

5    probably what would happen is you would melt the two

6    contacts together so they would be one.  Now, which

7    is terrible for the cord because now the cord can't

8    operate, but it wouldn't cause a bad connection at

9    the contacts.  I don't see that happening.

10            Q.   All right.  I'm -- I'm on page 11 of your

11   report, and we're looking at item -- evidentiary item

12   No. 15 from the Brent Bohan facility.  And if we look

13   at -- if we look at Figure 2, do you see that there

14   in Figure 2 the gray plastic housing that there is

15   thermal damage in between the two blades?  There's

16   discoloration?

17            A.   Yes.

18            Q.   And do you see in Figure 3 for the

19   vertical blade, do you see this black on the vertical

20   blade?

21            A.   Yes.

22            Q.   Do you agree that that's pitting?

23            A.   No.  That's plastic.

24            Q.   How do you know that's plastic?

25            A.   It's plastic.  It's melted plastic from

Jeffrey Lindsey

180

1    the outlet, from that cover.

2         Q.   The -- on -- on page 14 of your report,

3    it says there was -- your inspection revealed "No

4    evidence of heat damage to these components or the

5    connected electrical wiring."

6         A.   Yes.

7         Q.   What connected electrical wiring are you

8    talking about?

9         A.   Well, roll down and show the rest of the

10   strip there.  Too much.  Sorry.  Yeah, just go down

11   that -- that picture right there.  You know, there

12   was -- there was no evidence that -- of a bad -- the

13   bad connection you're going to have at the receptacle

14   is that the terminal screw -- between the terminal

15   screw and the wire and there was no evidence of

16   anything like that taking place.

17        Q.   But you don't have the -- the electrical

18   wiring, do you?

19        A.   No, I don't.  Nor did I have any evidence

20   that it overheated there.

21        Q.   In Figure 4 the -- these are jaws that

22   come from -- from an outlet, right?

23        A.   Yes.

24        Q.   Do you agree that the jaws on the left

25   are loose?

Jeffrey Lindsey

181

1           MR. KUCHARZ:  Object to the form.

2           A.   No.  I'm not going to agree to that.  I

3   think there's more -- there's more spacing that

4   appears in this photograph the left to the right, but

5   I'm not going to agree that they're loose, no.

6           Q.   Do you agree that the jaws on the left

7   are discolored?

8           A.   They are.

9           Q.   The jaws on the left were connected to

10  which blade?

11          A.   I believe it's the -- you will have to

12  roll up.  I think it's the vertical one, isn't it?

13  Yep.

14              And so just so you understand, for the

15  vertical blade, the vertical blade doesn't slide

16  between those jaws.  The vertical blade actually

17  slides between the back jaw and these two in the

18  front.

19          Q.   Did you take a picture of the spacing of

20  that?

21          A.   No.

22          Q.   All right.  Figure 5, it says -- let

23  me -- I've got this blown up too much.  Figure 5 says

24  because of the heat damage to the interior side of

25  the LCDI, that's how you conclude that the heat

Jeffrey Lindsey

182

1    source came from within that device, right?

2         A.    That's the receptacle cover.

3         Q.    Figure 5 is labeled "Heat damage to the

4    interior side of the Bohan LCDI plastic enclosure,"

5    right?

6         A.    That's wrong.  That's actually the

7    receptacle enclosure.  That picture is wrong.

8         Q.    Okay.  Do you agree that there is heat

9    damage to the interior side of this outlet cover?

10        A.    Yes.  Yeah.  Actually, see that black

11   material that's there?  That was what was stuck to

12   the blade.

13        Q.    Okay.  Because there's heat damage coming

14   from the interior of the outlet doesn't mean that

15   there's a heat source in -- inside the outlet?

16        A.    No.

17        Q.    Why not?

18        A.    No.  That's just heat transfer through

19   the vertical blade into the outlet.  I mean, you see

20   that a lot on these.  When they're plugged in, you

21   see that -- that the heat is able to transfer from

22   the LCDI into the receptacle.

23        Q.    All right.  Your notes from August 2019,

24   "Carrier PTAC LCDI Inspection."  Do you see the

25   markings that are on the vertical blade here?

Jeffrey Lindsey

183

1          A.    Yes.

2          Q.    What -- what do you believe that is?

3          A.    That's -- that would be where it's

4    actually going through the cover of the -- the LCDI,

5    the back cover of the LCDI.  That's the line where

6    that plastic matches up.

7          Q.    Okay.  What do you think this is towards

8    the hole of the vertical blade?

9          A.    That's -- that would be that black

10   material of the receptacle, plastic.  That's plastic,

11   melted plastic.

12         Q.    So in Figure 6 -- maybe I can do this

13   easier.

14               All right.  I'm going to -- in your

15   Figure 6, I'm going to -- I took a screenshot, and

16   I'm making it a -- I'm going to make this screenshot

17   Exhibit 4.  Have I correctly circled the contact, one

18   of the contacts?

19         A.    Yeah.  Can you make that picture bigger?

20         Q.    Sure.  Let me just label it before I

21   forget.  Is that the contact?

22         A.    It is, yes.

23         Q.    Okay.  And this is where you claim -- is

24   that the center of the heat source?

25         A.    Yes.

Jeffrey Lindsey

184

1          Q.   The heat is -- is more pronounced in this

2     photo to the left of the contact, isn't it, in this

3     photo?

4          A.   Yes.

5          Q.   There is very little damage to the

6     plastic to the right of this contact; isn't that

7     true?

8          A.   Yeah.  That plastic isn't in -- that

9     plastic isn't part of the thermal path.  The area of

10    char -- the area of damage is the thermal path.

11    That's the actual -- that's the metal piece.  It's --

12    it's the best conductor of the heat away from the

13    stationary contact because you're looking at the

14    moveable contact there.  And below the moveable

15    contact is the stationary contact and that whole

16    metal band that you see there is -- is -- that's part

17    of the thermal path.  That's why the damage is so

18    bad.

19         Q.   All right.  Let me go down to -- all

20    right.  Evidentiary item -- now we're on page 17 of

21    your report, evidentiary item 6A which is room 617B

22    of Tuscany Village.  I want to talk to you about

23    Figure 10.  This -- there is heat damage on the

24    inside of this cover, right?

25         A.   Yes, where the horizontal blade passed

Jeffrey Lindsey

185

1    through the slot, yes.

2         Q.   Okay.  And -- and this is evidence that

3    the heat is coming from inside this component, right?

4         A.   No.  It's evidence that heat's coming

5    from the horizontal blade that's going through that

6    slot.

7         Q.   So because it's interior, that doesn't

8    mean that the heat is coming from the inside?

9         A.   No.  It means the blade is hot.

10        Q.   Is this a photo of the inside of the

11   out -- of the cover of the outlet or the cover of the

12   LCDI?

13        A.   No, the cover of the outlet.

14        Q.   All right.  Again, this Figure 10 is

15   in -- incorrectly labeled, right?  It says it's the

16   LCDI and that's wrong?

17        A.   Yeah.  Boy, I didn't do a very good job,

18   did I?  No.  That's -- that picture is incorrect.

19   That's supposed to be for the outlet too.

20        Q.   All right.  The Figure 9, the jaws on the

21   bottom of this photo are for the horizontal blade,

22   correct?

23        A.   Yes.

24        Q.   And it shows that there is some spreading

25   of the jaws of the horizontal blade, correct?

Jeffrey Lindsey

186

1          A.   Yes.

2          Q.   The -- you make the statement on -- on

3    page 17 that there is "No evidence of overheating on

4    the receptacle's internal components," right?

5          A.   Yes.

6          Q.   Doesn't Figure 10 show that there was

7    overheating on the internal components?

8          A.   No.  That's -- that's caused by the

9    horizontal blade of the LCDI.  Well, we're looking at

10   9 now.

11         Q.   Yeah.  I'm looking at 9 now.  Wouldn't

12   the separation in the jaws of the horizontal blade be

13   evidence that there is heating?

14         A.   Yeah.  Heat has caused that.  It's heat

15   from the horizontal blade.  It started in the spring

16   tension of the jaws.

17         Q.   Wouldn't that be evidence of overheating

18   on the receptacle's internal components?

19         A.   No.  That's not a -- that's not any

20   evidence of a cause of overheating.  That's just an

21   evidence that it's been exposed to heat.

22         Q.   All right.  In -- in Figure 11 it says

23   "Aside from the overheating of the horizontal blade,

24   no other visible damage was noted"; is that correct?

25         A.   Yes.

Jeffrey Lindsey

187

1          Q.   And that would include no visible

2     evidence of heat damage to the contacts, correct?

3               MR. KUCHARZ:   Object to the form.

4          A.   What do the pictures above it show?

5               Okay.   What do the pictures below it

6     show?   I'm sorry.   I'm going the wrong direction.

7     This is still the same device, yeah.   I think all I'm

8     talking about there is I'm just talking about from

9     the outside the only evidence of damage was to the

10    horizontal blade.

11         Q.   So if the contacts would have overheated,

12    wouldn't you see heat damage to them?

13         A.   Well, I don't know that we've gotten to

14    that yet in the report, have we?   I mean, I'm still

15    showing pictures after that so.   Let's scroll down

16    and see what I say, if I say anything about the

17    contacts.   Because there's with the cover removed.

18         Q.   Yeah.   That's -- that's the end of that

19    sample.

20         A.   Okay.   Then that's -- that's what I said

21    and then I -- don't I also say -- and then I measured

22    those contacts.   And I have a disparity.   So on the

23    vertical contacts it was 38.9 milliohms.   On the

24    horizontal, which is the one that has evidence of

25    heating, the horizontal blade it's 509 milliohms.   So

Jeffrey Lindsey

188

1    it's a factor of 10 greater.  So that's the evidence

2    of heating right there.  It's just they should be the

3    same.

4         Q.   Shouldn't you see physical evidence of

5    overheating?

6         A.   In this case you didn't.  I mean, it's

7    whatever.  I mean, it's just there is evidence of

8    heat on the horizontal blade.  The blade is

9    discolored and does show that it had heat and there

10   is discoloration and damage to the plastic surfaces

11   that it was in contact with.  And we have a disparity

12   in the -- in the resistance between the vertical and

13   horizontal contacts are supposed to be the same.

14        Q.   Where did you make the electrical

15   connections when you were doing these resistance

16   testing?

17        A.   On either side of the contact.  You just

18   click on the metal on either side.  In this case I

19   believe what I did was I clamped on where the blade

20   goes into -- where the blade is.  I make two

21   connections, and then the other two connections I

22   connect back.  I cut out the connector, and I

23   connected back at the end of the power cord.

24        Q.   For this Tuscany Village room 617B, did

25   anybody else investigate this particular LCDI and

Jeffrey Lindsey

189

1    draw any conclusions?

2           A.   I have no idea.  I didn't see any

3    evidence anyone had.

4           Q.   For any of the samples that you call out

5    in your report, do you know if anybody investigated

6    those particular cord sets, and did anybody make any

7    conclusions?

8           A.   I'm not aware that anyone did.

9           Q.   All right.  On page 21 you start

10   discussing item 9C from Miller's Manor.  Do you have

11   the associated receptacles for that cord settings?

12          A.   I don't believe so, no.

13          Q.   Do you -- do you have -- so Figure 12

14   shows kind of a looking down on the blades and prong.

15   Where are the photos that would show a -- the length

16   of the horizontal blade?

17          A.   The length.

18          Q.   So we're looking at the plug like this.

19   If I want to look at this plug like this so that I

20   can see --

21          A.   Oh.  We would have to go back into the

22   pictures and figure it out.

23          Q.   How would we find that?  How do you find

24   that if I say "Show me a picture of that"?

25          A.   Well, we'll -- I'll have to go to the day

1    that I looked at -- what item was that?  9A?

2          Q.   Yes.

3          A.   We would have to go to the first instance

4    of 9A, and I would have to look at those pictures

5    that I took on that day.

6          Q.   I'm sorry.  It was 9C.

7          A.   9C, yeah.  So, you know, since this is a

8    multi -- multi-day exams, we'll just have to go

9    through all the pictures and find the ones for 9C.

10          Q.   You didn't break down photos by, you know

11    the box number, the item number, anything?

12               MR. KUCHARZ:  Object to form.

13          A.   No.

14          Q.   In Figure 13, you believe the heat source

15    is the contact, correct?

16          A.   Yes.

17          Q.   And your opinion is the contacts got so

18    hot that a flame ignited and blew a hole through the

19    plastic housing shown in 13 -- Figure 13?

20               MR. KUCHARZ:  Object to the form.

21          A.   I don't recall saying anything at all

22    about a flame.

23          Q.   If you look at page 21 of your report,

24    the last paragraph, specifically what I highlighted.

25          A.   I think that -- in that case it was

Jeffrey Lindsey

191

1    possible if you look at the blackening of the plastic

2    there.

3         Q.   Okay.  So my question is your opinion is

4    the contacts got so hot a flame ignited and vented

5    through the hole that is shown -- what you circled in

6    red in Figure 13, right?

7         A.   Yes.

8         Q.   All right.  If there is a flame, then you

9    would have soot and char, correct?

10        A.   You would certainly have char.

11        Q.   Would you have soot as well?

12        A.   Could have.

13        Q.   Would you if there was a flame?

14        A.   You could have.

15        Q.   But it's not -- you may not; is that what

16   you're saying?

17        A.   Well, I don't see any evidence of soot.

18        Q.   If we go down to Figure 13, you don't see

19   any charring or soot around the contact, do you?

20             MR. KUCHARZ:  Just for clarification it

21   looks like we're looking at Figure 15, and you

22   referred to Figure 13 there.

23             MR. BOORMAN:  My apologies.

24             MR. KUCHARZ:  No worries.

25        Q.   Looking at Figure 15, you don't see any

Jeffrey Lindsey

192

1      evidence of soot or char near the contact, do you?

2          A.   Well, no, but that isn't -- that -- that

3      board typically will not burn with a flame but the

4      plastic housing, it's a different material, it

5      clearly shows evidence of thermal decomposition, and

6      it could burn where -- as long as the heat was

7      applied to it, it could ignite.  That's a

8      possibility.

9          Q.   What was the ignition source for the

10     flame?

11         A.   The overheated contact, heat generated by

12     that.

13         Q.   And if we wanted to look at close-up

14     photos of this circuit board that we see in

15     Figure 13, we would just have to go through your

16     photos and figure out when you looked at it?

17         A.   Yes.

18         Q.   Looking at Figure 18, you don't show the

19     moveable contact, correct?

20         A.   No.

21         Q.   Is -- you would agree that the moveable

22     contact is part of the analysis you need to do when

23     you're analyzing the system, right?

24         A.   Yes.

25         Q.   So right here you are only showing half

193

1    of the heat generating system?

2           A.   Yes.

3           Q.   The heat should transfer along the arm

4    for the moveable contact; is that correct?

5           A.   Yes.

6           Q.   So the moveable contact should show heat

7    damage?

8                MR. KUCHARZ:  Object to the form.

9           A.   Yes.

10          Q.   All right.  I took a screenshot of your

11   Figure 20 and that's going to be Exhibit 5.  And

12   again, I'm going to circle the -- the stationary

13   contact in red.  Did I -- did I circle that

14   stationary contact correctly?

15          A.   Yes, sir.

16          Q.   And that in your opinion is the heat

17   source, right?

18                MR. KUCHARZ:  Object to the form.

19          A.   Well, it's part of the heat source.

20   It's -- it's the electrical connection and the

21   current flowing through the moveable and stationary

22   contacts is the source of heat.

23          Q.   Okay.  You would agree that there is no

24   heat transfer directly above it; isn't that true?

25                MR. KUCHARZ:  Object to the form.

1          A.   Well, I don't know that I -- there's

2     less -- there's less radiated heat, that's correct.

3     This -- you know, heat can be transferred three

4     different ways.  And in this case it appears that

5     it's conductive heat is what's being -- the majority

6     of the heat is being conducted causing the damage.

7          Q.   All right.  In Figure 22, the -- the

8     moveable contact, where you have the box that has the

9     words "Moveable relay contact"?

10         A.   Yes, sir.

11         Q.   That's written on top of the --

12    what's that -- that's partially covering is a piece

13    of plastic, right?

14         A.   Yes, sir.

15         Q.   And you see on that piece of plastic more

16    heat damage from the left than you see on the right;

17    is that correct?

18         A.   That's -- from this photograph that's

19    what it looks like, yep.

20         Q.   And you see the -- there is a metal bar

21    that's holding the moveable contact, right?

22         A.   Yes.

23         Q.   And there is more heat damage to the left

24    side of that metal bar than there is to the right

25    side of the metal bar; isn't that right?

Jeffrey Lindsey

195

1           A.   I don't know that I can go that far but.

2    I don't know that I agree with that.

3           Q.   Isn't it darker on the left side of the

4    metal bar than it is on the right side of the metal

5    bar?

6           A.   Yes, but I'm not sure that that's -- I

7    don't know that I can go as far as discern a pattern

8    of heat damage on that bar.

9           Q.   On page 30 you make the statement that

10   "All four of the contact surfaces showed pitting and

11   melting of the contact surfaces," right?

12          A.   Yes, sir.

13          Q.   Which figures are related to the

14   horizontal blade which was the heated blade?

15               MR. KUCHARZ:  Object to the form.

16          Q.   It's -- it's 25 and 26?

17          A.   Where did you go?  25 is horizontal.

18          Q.   Yeah.  And 26 -- and 26 is horizontal?

19          A.   Yes.  It looks like those are the two

20   showing the heat.

21          Q.   And how do you draw a difference between

22   the heat shown for the horizontal blade versus the

23   vertical blade?

24          A.   How do I -- a difference?

25          Q.   Yeah.

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Jeffrey Lindsey

196

1        A.    Well, I think in this case it's the
2    coloration of the metal.
3        Q.    What is it that says to you that it was
4    the horizontal blade that got hotter?
5        A.    You would have to go back to the original
6    picture and track it all the way back through.
7    That's -- there.
8        Q.    So the hor -- the horizontal blade shows
9    the heat damage, right?
10       A.    Yes.
11       Q.    But the horizontal blade contacts look
12   very similar to the vertical blade contacts, right?
13       A.    As far as -- you're talking about the
14   damage on the contacts' surface?
15       Q.    Yes.
16       A.    Yes.
17       Q.    Okay.
18       A.    But in all four instances there's a lot
19   more pitting and damage than you would expect to see
20   with a relay contact that's never used.
21       Q.    In all four instances.
22       A.    Yes.
23       Q.    All right.  And is it your opinion that
24   the -- where you see the pitting the heat is coming
25   from the center of the contact and spreading outward?

Jeffrey Lindsey

197

1          A.    Well, the heat is coming from the point

2     of contact between the two contacts.  That is -- that

3     is the high resistance connection, if you will,

4     that's creating the heat.  So wherever the stationary

5     is touching the moveable is -- if you put a meter

6     there and you measured that resistance, it's that

7     resistance that's creating heat any time electrical

8     current flows through it.

9          Q.    And so -- and that would be the darkened

10    spots showing pitting, right?

11         A.    Well, yeah.  You would assume that is,

12    yes.  That's -- that's my assumption that that's --

13    the area of pitting is where the two are touching

14    each other.

15         Q.    And so in your opinion the heat starts

16    there and spreads out from that point, right?

17         A.    Yes.

18         Q.    If you look at Figure 26, it's a close-up

19    of the contact, but would you agree that the heat

20    damage is -- the heat shows a darkened pattern more

21    on the left side of the blade than on the right side

22    of the blade?

23         A.    No, because I'm not certain that the

24    dullness is really more of a heat effect than the

25    color, the darkening.  That is -- that's not really

Jeffrey Lindsey

198

1    what you're looking at is -- on the other one it was

2    all shiny, the plating material is unaffected by

3    heat.  On this one the fact now that it's dull tells

4    you that that whole metal piece has been heated.

5         Q.   To the left of the contact it looks

6    darker and duller, right, than to the right of the

7    contact?

8         A.   Well, it certainly looks dull to me on

9    the right side too, but it is darker on the left.

10        Q.   So wouldn't that show that there was more

11   heat on the left side than there was on the right

12   side?

13        A.   No.  I think the most you can say is the

14   dullness of the metal as a -- that's the observation

15   is that the sheen of the metal has changed and that

16   is always evidence of heating.  Any time a shiny

17   metal goes dull, it always is indicative that that

18   metal has been heated.

19        Q.   All right.  Item 5A is removed from

20   Tuscany Village.  And I'm going to make a screenshot

21   of that and that is going to be Exhibit 6.  Can you

22   tell me where the contact is located in this photo?

23   We can use an arrow or whatever you think is

24   appropriate.

25        A.   Oh.  This -- the melted plastic, that

Jeffrey Lindsey

199

1      blob of melted plastic on the vertical edge?

2            Q.   Right.

3            A.   There would be a contact over in that

4      area.  So as you're looking at this, as you're

5      looking at this, the blade is going down through the

6      bottom -- the bottom of the enclosure.  And so one of

7      the contacts associated with that blade then will be

8      over in the area where you see the melted plastic.

9            Q.   So should I circle here, or should I put

10     an arrow?  What do you think would be the most

11     appropriate to circle where it would be located?

12           A.   I can't tell you physically where in that

13     blob the contact is located, somewhere within that

14     area.

15           Q.   All right.  So to give us --

16           A.   Yeah.  That's fine.

17           Q.   What I've circled in red here, the

18     contact -- when this whole thing is put back

19     together, one of the contacts is going to be

20     essentially in this area; is that right?

21           A.   Right.  It will be -- yeah.  It won't be

22     touching that area.  You know, it's removed from that

23     area, but it's over in that area, yeah.

24           Q.   Okay.  Figure 30, this shows heat damage

25     to the vertical blade that's outside the plastic

Jeffrey Lindsey

200

1    housing, right?

2          A.    Yes.  The entire blade is hot.

3          Q.    Would you agree that these black dots are

4    evidence of pitting?

5          A.    No.

6          Q.    What are the black dots?

7          A.    I don't know.  I mean, you would have to

8    look at a little closer than that.  See, that looks

9    like a stain to me.  That doesn't look like material

10   loss in the blade.

11         Q.    A stain from what?

12         A.    When that thing got hot, whatever it was

13   doing to the plastic outlet, it's just that's residue

14   from the heating.  You know, pitting would mean that

15   there would be missing -- there would be mass loss in

16   that blade.  I don't see any.

17         Q.    Okay.  The -- Figure 30 I've taken a

18   screenshot and that's going to be Exhibit 7.  And

19   again, the -- I'm going to circle.  This is the

20   contact for the vertical blade, right?

21         A.    No.

22         Q.    Where is it?

23         A.    I don't think it's in that picture.

24         Q.    This isn't part of the contact?

25         A.    No.  That's sitting -- there's a plastic

Jeffrey Lindsey

201

1   arm because when this -- when this -- this pin that's
2   sticking up there?  That trips both sides of the
3   relay and that is what's fastening that plastic arm
4   so that when -- no, that's not the contact.
5           Q.   Under -- I think we looked at the side
6   view of this.  This is the top part.  That's the
7   plastic piece and the contact is underneath this,
8   right?
9           A.   Huh-uh.  I don't think so.  Nope.
10          Q.   All right.
11          A.   The contact -- the contact should be to
12  the right of that photograph.
13          Q.   How far to the right of the photograph?
14          A.   Well, it's -- it kind of lines up with
15  it.  You are seeing the edge of that MOV, so
16  typically it's -- it's back a little bit from the MOV
17  too.  This is all that -- no.  That shouldn't be the
18  contact.
19          Q.   So is the contact back here?
20          A.   Yeah.  It's removed from that.
21          Q.   It is next to the MOV?
22          A.   Well, it's further back.
23          Q.   Should I move the arrow, or is that in
24  the right district?
25          A.   That's the correct direction.  It's just

Jeffrey Lindsey

202

1    you're not going to see the contact in this

2    photograph.

3            Q.   And in order to find that contact, we

4    need to go search your photos.  All right.  Okay.

5    Looking at Figure 35, can you tell us what the source

6    of this mechanical damage is?

7            A.   No.  I don't know.

8            Q.   And I'm looking at Figure 37.  Can you

9    tell us what the source of that mechanical damage is?

10           A.   No.

11           Q.   What is the significance of that to your

12   opinions?

13           A.   It shouldn't be there.  I mean, that's --

14   that's just --

15           Q.   Are you contending that's part of what

16   caused the overheating?

17           A.   I think -- I don't know necessarily that

18   it -- I'm just saying that's indicative that there's

19   some kind of issue during the manufacture of this

20   LCDI that that occurred.  That's all -- it's just an

21   observation.  Oh, go back.  Go back to that one where

22   you were at.  You were asking about that -- where we

23   were at on that plastic piece?

24           Q.   Right.

25           A.   I think that plastic is stuck to that

Jeffrey Lindsey

203

1     moveable arm there.

2          Q.   In what figure?

3          A.   No, the picture with the gouge on it.

4     Yeah, that -- this -- the top picture.  I think

5     that's our -- so that is the moveable arm.  That's

6     the armature it's on.  Okay.  You were correct then.

7     That's the top of it.

8          Q.   Should we --

9          A.   You want to go back and correct the

10    picture?  That's fine.  The one where you put the

11    arrow?

12         Q.   I'm going back to Exhibit -- Exhibit 7.

13    Should we put a -- what do we do to fix this?  Where

14    do I put the circle?  That's not what I want.

15         A.   Yeah, you know what --

16         Q.   Do I have the circle in the right place?

17         A.   Well, I think that this is the plastic

18    arm right there.  Yes, that's it right there for the

19    moveable contact.

20         Q.   All right.  So what I've just put in --

21    circled in red touching the arrow in Exhibit 7,

22    that -- that is a -- I have circled part of the

23    contact, the moveable contact, right?

24         A.   Yes.  The top -- that's away from it.

25    It's on the other side.  We don't really see that in

Jeffrey Lindsey

204

1    this picture.

2         Q.   I gotcha.  But that is the top of what's

3    holding it, right?

4         A.   Yes, that's correct.

5         Q.   Looking at Figure 42 which is a photo of

6    the Tower contacts, you do see pitting on the contact

7    to the right; isn't that true?

8         A.   Yes.

9         Q.   Is that acceptable in your view?

10        A.   It's certainly less than the -- you see

11   on the TRCs.  That appears to be a one or two divot

12   hitting is what it looks like to me.

13        Q.   Do you have any -- I mean, just because

14   you see more divots, do you have any evidence that

15   that changes the electrical resistance of the

16   contacts in any way?

17        A.   Sure.  Sure, it would because on relays

18   that are designed to -- a relay contact that is

19   designed to open and close many, many times, many

20   thousands of times, that relay contact, they --

21   actually what happens as it opens, it actually wipes,

22   so it doesn't just pull away.  It actually wipes the

23   surface, the -- resmooth the surface but that's on a

24   relay contact that's designed to last through many

25   thousands of operations.

Jeffrey Lindsey

205

1          Clearly these relays, they're not

2    designed for many thousands of operations.  And they

3    don't appear to have any kind of wiping moment.  But

4    every time that the relay opens, there is an

5    electrical arc that is melting the surface of the

6    moveable and the stationary contact.  And so you will

7    have a divot.  You will have some kind of little

8    crater that is created for each one.  And so actually

9    you can kind of just look at the surface with a

10   microscope.  You can look and see and just see how

11   many craters there are.

12          And if you knew that the relay had been

13   used five times, you should see maybe five.  You will

14   see a small area of reference and stuff, but on the

15   TRCs they're -- they're very rough.  There's a lot of

16   damage to them which is more than what I would expect

17   to see with this type of device the way it's being

18   used.

19        Q.   Looking at page 4 of your document, "Heat

20   effects from relay contacts found on assembly," you

21   would agree that the blue moveable contact shows more

22   divots, right?

23        A.   Yes.

24        Q.   Going to materials summary on page 3,

25   what's labeled as C, that's the contact and that's

Jeffrey Lindsey

206

1   the epicenter of the heat, right?

2          A.   Yes.

3          Q.   How do you rule out that the heat was --

4   in what you've seen was coming from the blade which

5   is labeled I?

6          A.   Because if you look at that previous

7   picture where it's going through the material, you

8   can see that -- where is it?  Where did that go?

9   Maybe that's not in that.

10         Q.   It was in a different...

11         A.   Yeah.  Back in the report, I guess.

12  Yeah.

13         Q.   I don't know where it is.

14         A.   Right there.  I mean, that to me is a

15  real good picture of how the heat moves in this --

16  this device.  You know, it's extremely hot there.

17  It's actually charring the circuit board.  It's

18  unsoldering -- it's unsoldering the tab on the

19  circuit board.  And then it's moving out away from

20  there, and it's going down, you know, the blade and

21  creating less damage as it gets away from that

22  contact point, so I think I have great evidence that

23  the heat is emanating from the contacts and going in

24  both directions and causing the damage.

25         Q.   You -- you believe that the arcing was

Jeffrey Lindsey

207

1    caused by the opening and closing of the contacts

2    under load, right?

3         A.   No, it is.  It does.  It's called a

4    parting arc, but yes.

5         Q.   Are you contending the arcing occurred

6    when the contacts were closed?

7         A.   Well, once they're damaged -- at some

8    point once they become damaged, high resistance

9    connections in some cases can actually become --

10   become microarcs between the two surfaces.

11        Q.   You --

12        A.   It just accelerates the overheating of

13   the contacts.

14        Q.   One of the things you mentioned here as a

15   possible cause is insufficient spring pressure.  You

16   haven't measured any spring pressure, have you?

17        A.   I have not.

18        Q.   And another possibility is a design

19   problem with point contact.  You haven't attempted to

20   measure or put any calculations to that, have you?

21        A.   I have not.

22        Q.   You do say that there is no evidence

23   found of a material quality problem with the silver

24   cadmium, right?

25        A.   That -- it appears to be the right

Jeffrey Lindsey

208

1    material.

2         Q.   Okay.  In your photos "8-12-21 Lab

3    Contact Sheet," item 6H is the first one showed?

4         A.   Yes.

5         Q.   Do you agree that the heat was being

6    caused by the outlet?

7         A.   I agree that there is damage to the

8    outlet, yes.

9         Q.   Well, that's -- my question is do you

10   agree for this particular one that the heat -- the

11   thermal damage was coming from the outlet, not the

12   LCDI?

13             MR. KUCHARZ:  Dr. Lindsey, do you need to

14   take a moment to review this entire document?  It's a

15   17-page document.  If you want the opportunity to

16   review that before answering, I suggest you do that.

17             THE WITNESS:  All right.  Yeah.  Let me

18   go through and look at all the photographs then and

19   the notes.  The notes go with the photographs.

20        Q.   All right.  Let's go off the record while

21   to do that.  How long do you need?  5 minutes?

22        A.   Yeah.  That's fine.

23             (Recess taken.)

24        Q.   So, Mr. Lindsey, I've got questions about

25   this, you know, 8-12-21 lab contact sheet.  Is

Jeffrey Lindsey

209

1    there --

2         A.   Uh-huh.

3         Q.   Are there notes associated with this in

4    which you write your findings down?

5         A.   Well, you have to go back to the 7-2 --

6    go back to the 7-2-21 because it's all associated.  I

7    went back and took pictures from those resistance

8    measurements I had made in July.

9         Q.   So if I want to know what you concluded

10   for -- for what is in this 8-12-21 series of photos,

11   I would look at the 7-2-21 contact resistance

12   measurement notes?

13        A.   Right.  Go to 6 -- 6H.

14        Q.   What page is that on?

15        A.   I don't know.  It's -- it looks like it's

16   on page 3.  It's right there.

17        Q.   So what is -- what is your opinion about

18   the -- what caused the heat damage?

19        A.   Well, the first finding was the

20   contacts -- it's the horizontal blade is the one

21   that's exhibiting heat damage to it, and it's got a

22   much higher contact resistance than the vertical

23   blade, but then if you go and you look at the

24   outlets, the outlet actually has -- its failed at the

25   terminal screw it looks like for the vertical blade.

210

1    Because that's what those pictures are showing.  It's

2    showing a bad connection at the terminal screw.

3              Q.   So for 6H, is it your opinion that the

4    thermal event was caused by the outlet?

5              A.   I honestly don't know what happened here.

6    I think you got more than one thing going on.  It

7    looks to me like you have high contact resistance

8    within the LCDI, and you also have a bad connection

9    at the vertical -- the wire conductor at the -- at

10   the receptacle.  You had two problems.

11             Q.   The thermal damage is to -- near the

12   vertical blade, right?

13             A.   No.  It's the screw.  If you look at the

14   second photograph over after the label, if you zoom

15   in on that -- go back to the pictures and zoom in on

16   that.  I don't know what we are looking at here.

17   Yeah, zoom on the second -- the one right below the

18   label.  125187.  There you go.  Yeah, that's an

19   overheated terminal connection.  That's what's caused

20   that damage.

21             Q.   Okay.  There was no damage caused by the

22   horizontal blade, correct?

23                  MR. KUCHARZ:  Object to the form.

24             A.   That damage is associated with the

25   vertical blade is what you're seeing there.  I don't

Jeffrey Lindsey

211

1    see any evidence on the receptacle on the horizontal

2    blade which was the one that got overheated in the

3    outlet.  So, like I said, there's two things going on

4    with that -- that device.

5         Q.   Well, my question is you don't see any

6    heat damage coming from the horizontal blade in 6H;

7    is that true?

8              MR. KUCHARZ:  Object to the form.

9         A.   Well, no.  The horizontal blade is

10   discolored.  6H's horizontal blade is discolored.

11   Look at 8125190.  Zoom in on that.  Yeah, see, that's

12   showing heat.  And that's also the one with the high

13   resistance.  It's got over 200 milliohms of

14   resistance so there was something going wrong with

15   its contact and they also --

16        Q.   Is it possible that the heat damage --

17   that the problem was with this screw in the outlet

18   and then that heated the horizontal blade?

19        A.   No, because it's -- that's going to the

20   vertical blade so I don't see a direct connection in

21   either direction.  I don't see the horizontal blade

22   causing that damage, nor do I see the problem with

23   the terminal causing the problem with the horizontal

24   blade.

25        Q.   In any of your other investigation other

Jeffrey Lindsey

212

1    than 6H, did you find any other problems with any of

2    the outlets?

3                    MR. KUCHARZ:  Object to the form.

4            A.   I don't recall there being -- that screw

5    is a problem right there.

6            Q.   I'm sorry, Mr. Lindsey.  There was an

7    internet problem and we lost you.  Did you --

8            A.   Yeah.

9            Q.   Other than 6H, did you see problems with

10   any of the other outlets you inspected?

11           A.   I don't recall, no.  I don't believe

12   there was.

13           Q.   Do you agree that engineers who designed

14   LCDIs need standards or testing in order to design

15   the LCDI?

16                    MR. KUCHARZ:  Object to the form.

17           A.   Yes.

18           Q.   Do you -- are you contending that there

19   should have been a -- a standard or a test with

20   respect to these contacts that it would have made

21   them nondefective?

22           A.   Well, I -- I believe that testing --

23   further testing may have discovered what was going on

24   with those relays, or they weren't up to what they

25   were being asked to do.

Jeffrey Lindsey

213

1    Q.   But you can't tell me the specific
2  testing, right?
3    A.   Well, honestly the testing I did shows
4  that they're not working right.  Putting 20 amps
5  through it and measuring the current on them will
6  tell you if there is a problem or there is not a
7  problem.  Using a milliamp meter and measuring the
8  contact resistance will tell you if there's a problem
9  or if there isn't.  You know, doing some load testing
10  where you've allowed the load to remain for several
11  weeks will probably tell you if there's a problem
12  with the relays.  Any of those tests will identify a
13  problem with the relays.
14    Q.   Are you contending that's the testing
15  that should have been done?
16    A.   Well, no.  You asked me what testing
17  could be done and that -- that would be testing that
18  could be done that would identify the problem.
19    Q.   And you don't see any problem with
20  testing cord sets that have already been damaged.
21    A.   Sure.  Why not?  I mean, you got -- I was
22  asked to figure out why they were failing.  Doing
23  testing on them will give me information about why
24  they are failing, as well as disassembly and
25  observation.

Jeffrey Lindsey

214

1           MR. KUCHARZ:  Michael, we're after

2   5 o'clock.  I'm just wondering if you have a sense of

3   how much more time you have in your examination.

4           MR. BOORMAN:  I'm hoping less than an

5   hour.

6       Q.   What -- what is UL?

7       A.   UL stands for Underwriters Laboratory.

8       Q.   Do you agree they care about safety?

9       A.   That's the intent of the UL standards,

10  yes.

11      Q.   And part of UL's stated purpose is to

12  improve safety standards and practices worldwide?

13      A.   I'm not surprised that they would say

14  something like that, yeah.

15      Q.   Do you agree UL has a Fire Safety

16  Research Institute?

17      A.   I -- I'm aware of that, yes.

18      Q.   And UL has various testing protocols in

19  which it certifies certain types of electrical

20  devices, right?

21      A.   Yes.

22      Q.   Have you seen the certification for the

23  37190?

24      A.   No, I have not.

25      Q.   Isn't that something important for you to

Jeffrey Lindsey

215

1    consider?

2          A.   I -- well, are you asking me would I like

3    to see it?  Sure, that's fine.  But that really

4    wasn't my assignment here.  My assignment was to look

5    at a group of cords that have been returned to

6    Carrier and evaluate them and determine if I could

7    figure out why they were damaged.  That's what I did.

8          Q.   Do you know if anybody's challenged the

9    UL certification of the 37190?

10         A.   I don't have any idea about that.

11         Q.   Do you know what specific UL standards

12   apply to the 37190?

13         A.   I can't give you the number.  I was -- I

14   believe -- I thought that there was an LCDI standard,

15   specific for LCDIs, but I really haven't researched

16   that so.  My recollection at one time I thought that

17   there was a standard that spells out performance for

18   LCDIs.

19         Q.   Are you critical of the UL standard that

20   applies to LCDIs?

21         A.   I am not offering any opinions at all

22   about the standard.

23         Q.   Do you know what tests the 37190 had to

24   pass to be UL certified?

25         A.   No.

Jeffrey Lindsey

216

1          Q.    And what is the CPSC?

2          A.    Consumers Product Safety Commission.

3          Q.    Do you agree that the CPSC cares about

4     safety?

5          A.    Yes.

6          Q.    Do you agree that the CPSC never recalled

7     the 37190?

8          A.    I don't know that either.

9          Q.    Did you ever ask anybody if the CPSC took

10     any action with respect to the 37190?

11          A.    I did not.

12          Q.    Do you know whether Carrier tried to get

13     the CPSC to recall the 37190?

14          A.    I don't know that either.

15          Q.    Do you know whether the CPSC investigated

16     the 37190?

17          A.    No, I don't know that.

18          Q.    Did you review any of the CPSC documents

19     produced in this case?

20          A.    No.

21          Q.    Did you make a list of all the times that

22     the 37190 has been tested by anybody?

23          A.    No.

24          Q.    Do you know what tests either during

25     production or postproduction the 37190 has gone

Jeffrey Lindsey

217

1  through?

2          A.   No.

3          Q.   Do you know whether the 37190 has been

4  tested from a product meaning PTAC level, down to a

5  system level, down to a component level, and down to

6  a materials level?

7               MR. KUCHARZ:   Object.

8          A.   I don't know.  I don't know what testing

9  has been done on the device.

10         Q.   Do you know what TRC standards apply to

11 this 37190?

12         A.   No.

13         Q.   Do you know -- do you have any reason to

14 dispute that the 37190 passed TRC's internal

15 standards?

16         A.   I don't know one way or the other.

17         Q.   Do you know whether TRC has investigated

18 thermal damage that involved cords?

19         A.   I hope they have, but I don't know

20 anything specific.

21         Q.   Do you know what internal Carrier

22 standards apply to this 37190?

23         A.   No.

24         Q.   Do you have any reason to dispute that

25 the 37190 passed Carrier's standards?

218

1          I'm sorry.  What was your answer?

2          A.   I haven't answered you yet.  I would

3     assume that Carrier evaluated this cord before they

4     made it available for their product.  So at one

5     point, yes, I believe they probably did test it, but

6     I don't know what that testing was.

7          Q.   Do you know whether Carrier investigated

8     problems or key damage related to 37190 cords?

9          A.   I don't know what testing or evaluation

10    Carrier did.

11         Q.   Did you ask them whether they

12    investigated this -- the source of heat damage in the

13    cords that they sent you?

14         A.   Well, it was my understanding that the

15    engineers involved in that testing were no longer

16    with the company, so they weren't available for me to

17    talk to.  It was my understanding that they had done

18    testing prior to me looking at some of those cords.

19    I just don't know what it was.

20         Q.   Did you ask to see any of the testing

21    that Carrier did?

22         A.   No.

23         Q.   Did you try to reach out to any of the

24    engineers at Carrier that did the testing, whether

25    they be retired or still with the company?

Jeffrey Lindsey

219

1          A.   No.

2          Q.   Do you know if Carrier ever had a

3     hypothesis as to what was causing heat damage in

4     PTACs and in some of the LCDI cords?

5          A.   No.  I don't know any of that.

6          Q.   Did you see Mr. Griswold's photos from --

7     of other rooms including other PTACs and other cords?

8          A.   Is that in his last report -- or in his

9     report?  I saw photographs from his report.

10          Q.   Okay.  Did you -- did you only see the

11    photographs in his report, or did you see the other

12    photographs that were produced as part of his

13    deposition and his file?

14          A.   No, I didn't see his file nor his

15    deposition photographs.

16          Q.   Did you ever read Mr. Griswold's

17    deposition?

18          A.   No, I did not.

19          Q.   Do you agree that some percentage of

20    cords will always be damaged by some external

21    factors?  You'll always have some sort of heat

22    damage.

23               MR. KUCHARZ:  Object to the form.

24          A.   What cords are we talking about here?

25          Q.   Any cords that are -- that are produced

Jeffrey Lindsey

220

1    in -- in a significant volume.

2            A.    For what use?

3            Q.    Let's just take PTACs.

4            A.    For P -- I will agree that the power cord

5    is probably the weakest link on any appliance

6    including the PTAC.  Now, it isn't always heat damage

7    that occurs.  Sometimes it's -- it's -- they're

8    crushed.  They're cut.  They're -- and then there

9    is -- there is a subset where their -- the strain

10   relief fails and the connections inside the cord are

11   damaged.

12           Q.    Do you -- do you know what percentage of

13   37190 cords suffered thermal damage in the field?

14           A.    No.

15           Q.    Did you -- were you aware that

16   Dr. Blanchard did an analysis of the design of the

17   37190 requested by Carrier?

18                 MR. KUCHARZ:  Object to the form.

19           A.    I'm not aware of that, no.

20           Q.    Did you review Dr. Blanchard's report?

21           A.    No, I haven't.

22           Q.    Do you agree that the Toccoa Inn got --

23   destroyed the evidence from room 203 including the

24   PTAC and the LCDI cord?

25                 MR. KUCHARZ:  Object to the form.

Jeffrey Lindsey

221

1      A.   Something happened there.  I didn't get

2  the whole question.  Sorry.

3      Q.   Sure.  Do you agree that the Toccoa Inn

4  spoliated the evidence from room 203 including the

5  PTAC and the LCDI cord?

6           MR. KUCHARZ:  Object to the form.

7      A.   That's my understanding, yes.

8      Q.   Do you fault Mr. Griswold in any way for

9  that?

10     A.   I have -- well --

11          MR. KUCHARZ:  Object to the form.

12     A.   I have no knowledge -- I have no

13  knowledge of what happened, so I'm not going to

14  comment.

15     Q.   Okay.

16          MR. KUCHARZ:  And, Michael, I'm going to

17  have to give a 5-minute warning.  This -- this

18  absolutely has to be suspended in the next 5 minutes

19  on my end.  You've indicated that you still have a

20  substantial amount of your examination to go.  It's

21  currently after -- after 5:00, and I have some

22  questions for the witness as well.  So I can go until

23  maybe 5:20 at the absolute latest, but given that

24  we're not going to finish today apparently, I'm just

25  giving fair warning that I'm going to need to suspend

Jeffrey Lindsey

222

1    by 5:20.

2              MR. BOORMAN:  You have no basis to

3    suspend the deposition.  We are under a Federal Court

4    deadline.  We've already had to suspend the

5    deposition of one of your experts due to problems

6    caused by you and your expert, and I need to finish

7    this today, so I don't know if you want to get

8    another lawyer to sit in or not, but you've got no

9    basis to suspend this deposition.  I get my seven

10   hours, and I haven't used my seven hours.

11             MR. KUCHARZ:  My basis is that, first of

12   all, you are going to exceed seven hours based on

13   your representation.

14             MR. BOORMAN:  Let's go off the record

15   because I'm not burning my time on -- with your

16   nonsense.

17             (Discussion off the record.)

18             MR. BOORMAN:  Let's go back on the

19   record.

20             MR. KUCHARZ:  All right.  The time is now

21   5:17 p.m.  We are suspending the deposition due to

22   the lateness of the hour.  We are agreeable to

23   producing the witness at a mutually agreeable time at

24   the convenience of the parties.

25             You know, Mr. Boorman has indicated that

Jeffrey Lindsey

223

1   he has a substantial amount of questioning left in

2   his examination.  My own knowledge of the case file I

3   anticipate it will take in excess of an hour.  I have

4   my own questioning to occur after his.

5            Given that, I believe it would be

6   burdensome for the witness and, frankly, for counsel

7   as well to continue at this point in time.  So given

8   that, we will be suspending for the day.

9            MR. BOORMAN:  Let me put on the record

10  that we don't agree to that, that there's been no

11  objection filed to me taking my seven hours of

12  testimony today.  I did not represent to anybody that

13  I had a substantial period more of questioning.  And

14  the other problem here is a problem related to

15  Carrier's counsel.

16       Q.   Mr. Lindsey, is there any reason why you

17  wouldn't be able to continue your deposition and

18  finish it tonight if I had less than an hour's worth

19  of questioning?

20       A.   I'm going to stay out of it.

21       Q.   Well, you are under oath.  So is there

22  any reason, any conflict, or any health concern that

23  you would have to not be able to continue your

24  deposition tonight?

25       A.   My expectation was I was going to be done

Jeffrey Lindsey

224

1   at 5 o'clock so we're past 5 o'clock so I move to

2   stop it.

3          Q.   Do you have any scheduling conflict or

4   health --

5          A.   Yes, I do.  I have people I got to pick

6   up tonight.  And I just sent a message telling

7   them --

8          Q.   Who told you --

9          A.   Pardon me?

10          Q.   Who told you that you were going to be

11   done by 5 o'clock?

12          A.   Well, when I agreed to the deposition, it

13   was going to be at 9:00 a.m.  I made my plans at that

14   time.  I learned yesterday that the depo got bumped

15   to 10:30, so I was hoping to be done by 5:00, and I'm

16   planning to get to where I need to go still this

17   evening.  So, you know, I'm not arguing with you.

18   I'll stay as long as I have to stay but I -- right

19   now, as far as I'm concerned, I'm done.

20          MR. BOORMAN:  All right.  Well, then I

21   guess it's your call, Kevin.  If you want to shut off

22   the record, go ahead over objection.

23          MR. KUCHARZ:  Over objection noted.

24          THE VIDEOGRAPHER:  Okay.  The time is

25   approximately 5:20 p.m., and we are going off record.

Jeffrey Lindsey

225

1          (Thereupon, at 5:20 p.m., the deposition

2    was adjourned.)

3                         - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jeffrey Lindsey

226

```
 1   State of Ohio              :
                               :  SS:
 2   County of _____  :

 3        I, Jeffrey E. Lindsey, P.E., IAAI-CFI, do
     hereby certify that I have read the foregoing
 4   transcript of my deposition given on Thursday,
     August 26, 2021; that together with the correction
 5   page attached hereto noting changes in form or
     substance, if any, it is true and correct.

 6

 7                      _____
                        Jeffrey E. Lindsey, P.E.,
 8                      IAAI-CFI

 9

10        I do hereby certify that the foregoing
     transcript of the deposition of Jeffrey E. Lindsey,
11   P.E., IAAI-CFI was submitted to the witness for
     reading and signing; that after he had stated to the
12   undersigned Notary Public that he had read and
     examined his deposition, he signed the same in my
13   presence on the _____ day of
     _____, 2021.
14

15                      _____
                        Notary Public
16

17

18   My commission expires _____, _____.

19                           - - -

20

21

22

23

24

25
```

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Jeffrey Lindsey

227

1                        CERTIFICATE

2   State of Ohio            :
                             :  SS:
3   County of Franklin       :

4        I, Karen Sue Gibson, Notary Public in and for
    the State of Ohio, duly commissioned and qualified,
5   certify that the within named Jeffrey E. Lindsey,
    P.E., IAAI-CFI was by me duly sworn to testify to the
6   whole truth in the cause aforesaid; that the
    testimony was taken down by me in stenotypy in the
7   presence of said witness, afterwards transcribed upon
    a computer; that the foregoing is a true and correct
8   transcript of the testimony given by said witness
    taken at the time and place in the foregoing caption
9   specified and completed without adjournment.

10       I certify that I am not a relative, employee,
    or attorney of any of the parties hereto, or of any
11  attorney or counsel employed by the parties, or
    financially interested in the action.

12

13       IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Columbus, Ohio,
    on this 27th day of August, 2021.

14

15       _____

16       Karen Sue Gibson, Registered
         Merit Reporter and Notary Public
         in and for the State of Ohio.

17

    My commission expires August 14, 2025.

18
    (KSG-7143)

19
                         - - -
20

21

22

23

24

25

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481